**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **AIR METHODS CORPORATION,** | § | **Case No. 23-90886 (MI)** |
| *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**AIR METHODS CORPORATION AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (admitted *pro hac vice*)
Kelly DiBlasi (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Alexander P. Cohen (24109739)

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

November 30, 2023
Houston, Texas

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Air Methods Corporation (5893), ASP AMC Holdings, Inc. (3873), ASP AMC Intermediate Holdings, Inc. (2677), Air Methods Telemedicine, LLC (2091), United Rotorcraft Solutions, LLC (2763), Mercy Air Service, Inc. (0626), LifeNet, Inc. (3381), Rocky Mountain Holdings, L.L.C. (3822), Air Methods Tours, Inc. (4178), Tri-State Care Flight, L.L.C. (5216), Advantage LLC (2762), Enchantment Aviation, Inc. (5198), Native Air Services, Inc. (8798), Native American Air Ambulance, Inc. (8800), AirMD, LLC (1368), Midwest Corporate Air Care, LLC (N/A).  The Debtors' mailing address is 5500 South Quebec Street, Suite 300, Greenwood Village, CO 80111.

# Table of Contents

ARTICLE I.       Definitions and Interpretation. ...................................................................................1

1.1    Definitions. .................................................................................................................1
1.2    Interpretation; Application of Definitions; Rules of Construction. ...........................24
1.3    Reference to Monetary Figures. ................................................................................24
1.4    Consent Rights of Consenting Creditors, the Consenting Sponsor, and DIP Lenders..............25
1.5    Controlling Document. .............................................................................................25

ARTICLE II.     Administrative Expense Claims, Fee Claims, Priority Tax Claims, DIP Claims, and Restructuring Expenses. ..........................................................................................25

2.1    Treatment of Administrative Expense Claims. ..........................................................25
2.2    Treatment of Fee Claims. ..........................................................................................26
2.3    Treatment of Priority Tax Claims. .............................................................................26
2.4    Treatment of DIP Claims. ..........................................................................................27
2.5    Restructuring Expenses. ............................................................................................27
2.6    Treatment of Securitization Program Claims. ...........................................................28

ARTICLE III.    Classification of Claims and Interests. .....................................................................28

3.1    Classification in General. ..........................................................................................28
3.2    Formation of Debtor Groups for Convenience Only. ................................................28
3.3    Summary of Classification of Claims and Interests. .................................................28
3.4    Special Provision Governing Unimpaired Claims. ...................................................29
3.5    Elimination of Vacant Classes. .................................................................................29
3.6    Voting Classes; Presumed Acceptance by Non-Voting Classes. ..............................29
3.7    Voting; Presumptions; Solicitation. ..........................................................................29
3.8    Cramdown. .................................................................................................................30
3.9    No Waiver. .................................................................................................................30

ARTICLE IV.    Treatment of Claims and Interests...........................................................................30

4.1    Class 1:  Other Priority Claims. ...............................................................................30
4.2    Class 2:  Other Secured Claims. ..............................................................................30
4.3    Class 3:  Prepetition Secured Loan Claims. ..............................................................31
4.4    Class 4:  Prepetition Securitization Program Claims. ..................................................31
4.5    Class 5: SICFA Claims. ............................................................................................32
4.6    Class 6:  Prepetition Aircraft Financing Claims. .........................................................32
4.7    Class 7:  Prepetition Unsecured Note Claims. ...........................................................32
4.8    Class 8:  General Unsecured Claims. ........................................................................33
4.9    Class 9:  Intercompany Claims. ...............................................................................33
4.10   Class 10:  Existing Equity Interests. .........................................................................34
4.11   Class 11:  Intercompany Interests. ...........................................................................34

ARTICLE V.     Means for Implementation. ......................................................................................34

5.1    Sources of Consideration for Plan Distribution. .......................................................34
5.2    Compromise and Settlement of Claims, Interests, and Controversies. ......................34
5.3    Debt Rights Offering. ................................................................................................35
5.4    Equity Rights Offering. .............................................................................................36
5.5    Equity Cash-Out Option and Private Placement. ......................................................36
5.6    Exit Facilities.............................................................................................................37
5.7    Authorization and Issuance of New Common Stock, New Warrants, and DOT Warrants. ....................38

5.8      DOT Procedures. ...........................................................................................................39
5.9      Continued Corporate Existence; Effectuating Documents; Further Transactions. ...................39
5.10     Corporate and Limited Liability Company Action. .................................................................41
5.11     Cancellation of Existing Securities and Agreements. ..............................................................41
5.12     Cancellation of Certain Existing Security Interests. ...............................................................44
5.13     Officers and Boards of Directors. ............................................................................................44
5.14     Management Incentive Plan. ....................................................................................................44
5.15     Securities Exemptions. ............................................................................................................45
5.16     Intercompany Interests. ...........................................................................................................46
5.17     Separate Plans. ........................................................................................................................46
5.18     Closing of Chapter 11 Cases. ..................................................................................................46

ARTICLE VI.           Distributions. ............................................................................................................47

6.1      Distributions Generally. ..........................................................................................................47
6.2      No Postpetition Interest on Claims. .........................................................................................47
6.3      Date of Distributions. ..............................................................................................................47
6.4      Distribution Record Date. ........................................................................................................47
6.5      Distributions After Plan Effective Date. ..................................................................................48
6.6      Disbursing Agent. ....................................................................................................................48
6.7      Delivery of Distributions. ........................................................................................................48
6.8      Unclaimed Property. ................................................................................................................48
6.9      Satisfaction of Claims. .............................................................................................................49
6.10     Manner of Payment Under Plan. ..............................................................................................49
6.11     Fractional Shares and Warrants. ..............................................................................................49
6.12     Minimum Distribution. ............................................................................................................49
6.13     No Distribution in Excess of Amount of Allowed Claim. ........................................................50
6.14     Allocation of Distributions Between Principal and Interest. ....................................................50
6.15     Setoffs and Recoupments. ........................................................................................................50
6.16     Rights and Powers of Disbursing Agent. .................................................................................50
6.17     Expenses of Disbursing Agent. ...............................................................................................50
6.18     Withholding and Reporting Requirements. ..............................................................................51

ARTICLE VII.          Procedures for Resolving Claims. ............................................................................51

7.1      Disputed Claims Process. .........................................................................................................51
7.2      Claims and Interests Administration Responsibilities .............................................................52
7.3      Estimation of Claims. ..............................................................................................................52
7.4      Adjustment to Claims Register Without Objection ..................................................................53
7.5      Claim Resolution Procedures Cumulative. ..............................................................................53
7.6      No Distributions Pending Allowance. ......................................................................................53
7.7      Distributions After Allowance ................................................................................................53

ARTICLE VIII.         Executory Contracts and Unexpired Leases. ...........................................................53

8.1      General Treatment. ..................................................................................................................53
8.2      Determination of Assumption and Cure Disputes; Deemed Consent. ......................................54
8.3      Rejection Damages Claims. .....................................................................................................55
8.4      Survival of the Debtors' Indemnification Obligations. ............................................................55
8.5      Compensation and Benefit Plans. ............................................................................................56
8.6      Insurance Policies. ...................................................................................................................56
8.7      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...................57
8.8      Reservation of Rights. .............................................................................................................57

ARTICLE IX.           Conditions Precedent to Confirmation of Plan and Occurrence of Plan Effective Date. ..........57

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Confirmation. | 57 |
| 9.2 | Conditions Precedent to Plan Effective Date. | 58 |
| 9.3 | Waiver of Conditions Precedent. | 59 |
| 9.4 | Effect of Failure of a Condition. | 60 |

ARTICLE X.        Effect of Confirmation. ................................................................... 60

| | | |
|---|---|---|
| 10.1 | Binding Effect. | 60 |
| 10.2 | Vesting of Assets. | 60 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. | 60 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 61 |
| 10.5 | Injunction Against Interference with Plan. | 61 |
| 10.6 | Plan Injunction. | 61 |
| 10.7 | Releases. | 63 |
| 10.8 | Exculpation. | 65 |
| 10.9 | Injunction Related to Releases and Exculpation. | 66 |
| 10.10 | Subordinated Claims. | 66 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 66 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 66 |

ARTICLE XI.        Retention of Jurisdiction. ............................................................... 67

| | | |
|---|---|---|
| 11.1 | Retention of Jurisdiction. | 67 |
| 11.2 | Courts of Competent Jurisdiction. | 69 |

ARTICLE XII.        Miscellaneous Provisions. ............................................................. 69

| | | |
|---|---|---|
| 12.1 | Statutory Fees. | 69 |
| 12.2 | Exemption from Certain Transfer Taxes. | 69 |
| 12.3 | Request for Expedited Determination of Taxes. | 70 |
| 12.4 | Dates of Actions to Implement Plan. | 70 |
| 12.5 | Amendments. | 70 |
| 12.6 | Revocation or Withdrawal of Plan. | 70 |
| 12.7 | Severability. | 71 |
| 12.8 | Governing Law. | 71 |
| 12.9 | Immediate Binding Effect. | 71 |
| 12.10 | Successors and Assigns. | 71 |
| 12.11 | Entire Agreement. | 72 |
| 12.12 | Computing Time. | 72 |
| 12.13 | Exhibits to Plan. | 72 |
| 12.14 | Notices. | 72 |
| 12.15 | Reservation of Rights. | 73 |

Each of Air Methods Corporation ("**Air Methods Corp.**"), ASP AMC Holdings, Inc. ("**Holdings**"), ASP AMC Intermediate Holdings, Inc., Air Methods Telemedicine, LLC, United Rotorcraft Solutions, LLC, Mercy Air Service, Inc., LifeNet, Inc., Rocky Mountain Holdings, L.L.C., Air Methods Tours, Inc., Tri-State Care Flight, LLC, Advantage LLC, Enchantment Aviation, Inc., Native Air Services, Inc., Native American Air Ambulance, Inc., AirMD, LLC, and Midwest Corporate Air Care, LLC (together with Air Methods Corp. and Holdings, each, a "**Debtor**" and collectively, the "**Debtors**") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

## ARTICLE I.          DEFINITIONS AND INTERPRETATION.

### 1.1     *<u>Definitions.</u>*

The following terms shall have the respective meanings specified below:

*1145 DRO* means the portion of the DRO to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the DRO Procedures.

*1145 ERO* means the portion of the ERO to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in accordance with the ERO Procedures.

*1145 Rights Offering Securities* means, collectively, the New Interests distributable pursuant to the 1145 DRO (other than the DRO Backstop Interests) and the 1145 ERO (other than the ERO Backstop Interests).

*4(a)(2) DRO* means the portion of the DRO to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, in accordance with the DRO Procedures.

*4(a)(2) ERO* means the portion of the ERO to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, in accordance with the ERO Procedures.

*4(a)(2) Rights Offering Securities* means, collectively, the New Interests distributable pursuant to the 4(a)(2) DRO (including the DRO Backstop Interests) and the 4(a)(2) ERO (including the ERO Backstop Interests), if any.

*Acquisition Agreement* means, in the event the Purchase Transaction occurs, a purchase and sale agreement with respect to the Purchase Transaction.

*AcquisitionCo* means, in the event the Purchase Transaction occurs, an indirect wholly-owned corporate subsidiary of a newly-formed holding company, which holding company would then be the Reorganized Parent hereunder, that shall acquire all or substantially all of the Debtors' assets and/or membership interests in accordance with the Acquisition Agreement and the Purchase Transaction Documents.

*AcquisitionCo Entities* means, in the event the Purchase Transaction occurs, AcquisitionCo and any entity related to AcquisitionCo intended to be party to the Exit Facility Documents pursuant to and in accordance with the Acquisition Agreement.

*Ad Hoc Group* means that certain ad hoc group of Prepetition Secured Parties and Prepetition Unsecured Noteholders represented by the Ad Hoc Group Advisors.

*Ad Hoc Group Advisors* means Davis Polk & Wardwell LLP, Evercore Group, L.L.C., Vinson & Elkins LLP, and all other special or local counsel, consultants, or advisors providing advice to the Ad Hoc Group in connection with the Restructuring; *provided*, that the Ad Hoc Group shall provide prior written notice (email shall suffice) to the Debtors of its intent to retain other counsel, consultants, or advisors in connection with the Restructuring, to the extent not specifically named above.

*Adjusted DRO Amount* has the meaning set forth in the Purchase Commitment and Backstop Agreement.[2]

*Adjusted ERO Amount* has the meaning set forth in the Purchase Commitment and Backstop Agreement.

*Adjusted Private Placement Amount* has the meaning set forth in the Purchase Commitment and Backstop Agreement.

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Plan Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) Fee Claims, (iii) Commitment Premiums, (iv) Restructuring Expenses, but excluding DIP Claims and Priority Tax Claims; and (v) Independent Director Fee Claims.

*Affiliate* means any "affiliate" as defined in section 101(2) of the Bankruptcy Code.

*Aircraft Financing Arrangements* means the outstanding capital leases and promissory notes pursuant to which the Debtors lease and/or finance, as applicable, certain aircraft.

*Allowed* means, with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Plan Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or (b) as to which an objection has been asserted and such Claim or Interest is subsequently allowed pursuant to a Final Order of the Bankruptcy Court, (ii) any Claim or Interest as to which the liability of the Debtors and the amount

---

[2]   On November 17, 2023, in accordance with the Purchase Commitment and Backstop Agreement, the Debtors calculated the Projected Available Liquidity (as defined in the Purchase Commitment and Backstop Agreement) of the Reorganized Debtors as of the Plan Effective Date.  Based on the results of that calculation, the Debtors determined that (i) the Adjusted DRO Amount would be $185 million, (ii) the Adjusted ERO Amount would be $0, and (iii) up to $135 million would be available to fund the Equity Cash-Out Option.

thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under this Plan or by the DIP Orders; *provided* that notwithstanding the foregoing, the Reorganized Debtors will retain all Claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.

**Allowed Consenting Sponsor Claim** means a General Unsecured Claim of the Consenting Sponsor Allowed in the amount of $1,750,000.

**Applicable Discount Ratio** means a discount or implied purchase price reduction per any New Interest, as applicable, based on: (i) with respect to the New Interests offered and sold pursuant to the ERO, a 35.0% discount to the Plan Equity Value; (ii) with respect to the ERO Backstop Commitment Premium Interests and the Private Placement Premium Interests, a 35.0% discount to the Plan Equity Value; and (iii) with respect to any New Interests offered and sold in connection with the Private Placement (other than the Private Placement Commitment Interests), a 10.0% discount to the Plan Equity Value.

**Asset** means any right, title, and interest of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure promulgated under title 28 of the United States Code, 28 U.S.C. § 2075, applicable to the Chapter 11 Cases, and the general, local, and chamber rules of the Bankruptcy Court, as may be amended from time to time.

**BH Guarantor Release** has the meaning set forth in the RSA.

**Business Day** means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

**Cap Amount** means (i) 24.9% (or such other maximum percentage as applicable legislation hereafter provides) of all outstanding New Common Stock, and (ii) to the extent not prohibited by the DOT Rules Compliance, 49.0% of all outstanding New Common Stock; *provided* that regardless of any conversion of DOT Warrants, in no event shall Non-U.S. Citizens who are not citizens of a country that is party to a "Open Skies" agreement with the United States (which countries are listed at https://www.transportation.gov/policy/aviation-policy/open-skies-agreements-being-applied) be entitled to own in the aggregate more than 24.9% of the New Common Stock.

***Cash*** means legal tender of the United States of America.

***Cash Collateral*** has the meaning set forth in section 363(a) of the Bankruptcy Code.

***Cashed-Out Equity Interests*** means New Interests distributed (i) under this Plan on account of the Prepetition Secured Loan Claims Equity Distribution, (ii) under this Plan on account of the Prepetition Unsecured Note Claims Recovery Pool, and (iii) in exchange for DRO Interests, in each case, that a Prepetition Secured Party or Prepetition Unsecured Noteholder, as applicable, elects to exchange for Cash pursuant to the terms of the Equity Cash-Out Option.

***Cause of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state or foreign law fraudulent transfer claim.

***Chapter 11 Case*** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

***Claims and Noticing Agent*** means Epiq Corporate Restructuring LLC, the claims, noticing, and solicitation agent retained by the Debtors.

***Claims Register*** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

***Class*** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Collateral* means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

*Commitment Parties* means, collectively, the DRO Backstop Commitment Parties, the ERO Backstop Commitment Parties, and the Private Placement Commitment Parties.

*Commitment Premium Interests* means, collectively, the New Interests issued in payment of the Commitment Premiums.

*Commitment Premiums* means, collectively, the DRO Backstop Commitment Premium, the ERO Backstop Commitment Premium, and the Private Placement Commitment Premium.

*Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming this Plan and approving the Disclosure Statement and Solicitation Materials.

*Consenting Claims* has the meaning set forth in the RSA.

*Consenting Creditors* has the meaning set forth in the RSA.

*Consenting Parties* has the meaning set forth in the RSA.

*Consenting Sponsor* has the meaning set forth in the RSA.

*Cure Amount* means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*D&O Insurance Policy* means each directors' and officers' insurance policy (including any "tail policy") in effect or purchased as of the Petition Date.

*Debtor(s)* has the meaning set forth in the introductory paragraph of this Plan.

*Definitive Documents* has the meaning set forth in the RSA.

*DIP Agent* means Wilmington Savings Fund Society, FSB, solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, together with its successors and permitted assigns in such capacity.

**DIP Backstop Parties** means those certain members of the Ad Hoc Group and the Consenting Sponsor set forth on <u>Schedule 2</u> to the DIP Term Sheet that have agreed to backstop the DIP Facility, in accordance with <u>Section 3.08</u> of the RSA and the terms of the DIP Term Sheet.

**DIP Backstop Premium** has the meaning of "Backstop Premium" as set forth in the DIP Term Sheet.

**DIP Claim** means any Claim held by a DIP Lender or the DIP Agent on account of, arising under, or relating to the DIP Loans, the DIP Documents, or the DIP Orders, which includes Claims for all principal amounts outstanding, interest, reasonable and documented fees, indemnification, premiums, discounts, expenses, and costs, and other charges of the DIP Lenders, in each case payable under and in accordance with the DIP Documents or the DIP Orders.

**DIP Commitments** means the commitments in respect of the DIP New Money Loans in accordance with the terms set forth in the DIP Term Sheet and the RSA.

**DIP Credit Agreement** means that certain *DIP Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Agreement* entered into as of October 27, 2023, by and among Air Methods Corp., as borrower, Holdings, the guarantors from time to time party thereto, the DIP Agent, and the DIP Lenders, as approved by the DIP Orders, as amended, supplemented, or otherwise modified from time to time in accordance with its terms.

**DIP Documents** has the meaning set forth in the DIP Orders.

**DIP Facility** means the superpriority, senior secured, priming debtor-in-possession term loan credit facility in an aggregate principal amount of up to $155,000,000, consisting of the DIP New Money Loans and the DIP Rolled-Up Loans.

**DIP Lenders** means any lender (including, as applicable, any DIP Backstop Party and any Joining DIP Commitment Party, as defined in the RSA) having a DIP Commitment and/or holding outstanding DIP Loans.

**DIP Loans** means the loans under the DIP Facility, consisting of the DIP New Money Loans and the DIP Rolled-Up Loans.

**DIP New Money Claims** means an Allowed DIP Claim arising from the DIP New Money Loans.

**DIP New Money Loans** means the new-money DIP Loans under the DIP Facility committed by the DIP Lenders, in an aggregate principal amount equal to $80,000,000.

**DIP Obligations** has the meaning set forth in the DIP Orders.

**DIP Orders** means, collectively, the Interim DIP Order and the Final DIP Order.

**DIP Rolled-Up Loans** means a roll-up of Prepetition Secured Loans held by the DIP Lenders, on a pro rata basis in accordance with the share of DIP New Money Loans made by such DIP Lender, in an aggregate principal amount of up to $75,000,000, which will occur on the

Roll-Up Effective Date (as defined in the DIP Credit Agreement), and which will convert, on a dollar-for-dollar basis, to Exit Term Loans upon the Plan Effective Date; *provided* that the aggregate principal amount of DIP Rolled-Up Loans will be reduced, on a pro rata basis, dollar-for-dollar by an amount equal to (i) the Adjusted DRO Amount *minus* (ii) $175,000,000.

**DIP Rolled-Up Loans Claim** means an Allowed DIP Claim arising from the DIP Rolled-Up Loans.

**DIP Term Sheet** has the meaning set forth in the RSA.

**Disbursing Agent** means any Entity in its capacity as a disbursing agent under Section 6.6 of this Plan, including any Debtor or Reorganized Debtor, as applicable, that acts in such capacity to make distributions pursuant to this Plan.

**Disclosure Statement** means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with the RSA, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

**Disputed Claim** means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE VII of this Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules, if any Schedules are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and disputed as to the balance of such Claim.

**Distribution Record Date** means, except as otherwise provided in this Plan, the Plan Supplement, or the Confirmation Order, three (3) Business Days before the Plan Effective Date. For the avoidance of doubt, no distribution record date shall apply to holders of Prepetition Unsecured Notes.

**DOT** means the United States Department of Transportation and any successor agency thereto.

**DOT Procedures** means the procedures detailed in Section 5.8 of this Plan.

**DOT Rules** means, collectively, the definition of "citizen of the United States" as set forth at Section 40102(a)(15) of Title 49 of the United States Code and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the DOT and the FAA and their practices enforcing, administering, and interpreting such laws, statutes, rules, and

regulations, in each case as amended or supplemented from time to time, relating to the ownership of an air carrier and the operation of aircraft registered in the United States.

*DOT Rules Compliance* means compliance by Air Methods Corp. and the Reorganized Parent with the DOT Rules to be eligible to own a U.S. air carrier and operate aircraft registered in the United States.

*DOT Warrants* means the warrants to be distributed in lieu of New Common Stock pursuant to the DOT Procedures and on the terms set forth in the DOT Warrants Agreement.

*DOT Warrants Agreement* means the warrant agreement or warrant certificate to be entered into by the Reorganized Parent that shall govern the terms of the DOT Warrants.

*DRO* means, collectively, the 1145 DRO and 4(a)(2) DRO, as applicable, whereby Reorganized AMC shall distribute to each holder of an Allowed Prepetition Secured Loan Claim such Entity's Pro Rata share of the DRO Subscription Rights, pursuant to this Plan, the DRO Procedures, and the DRO Documents, and subject in all respects to the DOT Procedures.

*DRO Backstop Commitment* means, with respect to any DRO Backstop Commitment Party, its commitment to fund, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement, the Unsubscribed DRO Term Loans.

*DRO Backstop Commitment Parties* means, collectively, those Entities that hold a DRO Backstop Commitment pursuant to the Purchase Commitment and Backstop Agreement.

*DRO Backstop Commitment Premium* means a premium payable in New Interests on the Plan Effective Date to each DRO Backstop Commitment Party as consideration for the DRO Backstop Commitments in accordance with the DRO Documents, the aggregate number of which is equal to 11.0% of the aggregate number of New Interests, subject to the DOT Procedures and dilution by:  (i) New Common Stock issued on account of the Management Incentive Plan; and (ii) New Common Stock issued upon the exercise of the New Warrants; *provided* that a DRO Backstop Commitment Party may elect to receive such amount in Cash (at a 10.0% discount to Plan Equity Value) out of the Equity Cash-Out Amount pursuant to the Purchase Commitment and Backstop Agreement.

*DRO Backstop Commitment Premium Interests* means the New Interests distributed to each DRO Backstop Commitment Party in payment of the DRO Backstop Commitment Premium, and subject to the DOT Procedures.

*DRO Backstop Interests* means the New Interests distributable to each DRO Backstop Commitment Party upon the purchase of Unsubscribed DRO Term Loans pursuant to the DRO Backstop Commitment, and subject to the DOT Procedures.

*DRO Documents* means, collectively, the Purchase Commitment and Backstop Agreement, the DRO Procedures, the DRO Procedures Approval Order, the Purchase Commitment and Backstop Approval Order, and any and all other agreements, documents, and instruments delivered or entered into or distributed in connection with, or otherwise governing, the DRO.

**DRO Funding Price** means $1.00 per $1.00 principal amount of DRO Term Loans.

**DRO Interests** means the New Interests distributable pursuant to the DRO (including the DRO Backstop Interests) in an aggregate number equal to 40.0% of the aggregate number of New Interests, subject to the DOT Procedures and dilution by: (i) New Common Stock issued on account of the Management Incentive Plan; (ii) New Common Stock issued upon the exercise of the New Warrants; and (iii) ERO Interests.

**DRO Participants** has the meaning set forth in the Purchase Commitment and Backstop Agreement.

**DRO Procedures** means the procedures governing the 1145 DRO and 4(a)(2) DRO, as applicable, including any questionnaires, subscription forms, or spreadsheets attached thereto, as approved by the DRO Procedures Approval Order.

**DRO Procedures Approval Order** means the order of the Bankruptcy Court approving the DRO Procedures, which order, for the avoidance of doubt, may be the same order as the Confirmation Order, the ERO Procedures Approval Order, or the Purchase Commitment and Backstop Approval Order.

**DRO Subscription Rights** means the subscription rights to participate in the DRO that the Debtors will provide to each holder of an Allowed Prepetition Secured Loan Claim, pursuant to which each such holder may (i) fund its Pro Rata share of the DRO Term Loans at the DRO Funding Price and (ii) receive DRO Interests, in each case, in accordance with the DRO Procedures.

**DRO Term Loans** means, collectively, the Exit Term Loans funded pursuant to and in accordance with the DRO Procedures and the Plan (and, in the case of the Unsubscribed DRO Term Loans, the Purchase Commitment and Backstop Agreement).

**DTC** means The Depository Trust Company.

**Election Procedures** means the procedures governing (i) the Equity Cash-Out Option and (ii) the declaration of U.S. citizenship and other documentation in connection with the DOT Procedures, in each case, including any certifications, declarations, affidavits, questionnaires, election forms, subscription forms, or spreadsheets attached thereto, as approved by the Bankruptcy Court.

**Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**Equity Cash-Out Amount** means Cash per Cashed-Out Equity Interest in an amount equal to 90.0% of the value of such Cashed-Out Equity Interest, in an aggregate amount up to the Adjusted Private Placement Amount.

**Equity Cash-Out Option** means the option offered to each DRO Participant (including DRO Backstop Commitment Parties), holder of an Allowed Prepetition Secured Loan Claim, or holder of an Allowed Prepetition Unsecured Note Claim to elect to receive its share of the Equity Cash-Out Amount in exchange for its share of the Cashed-Out Equity Interests;

*provided* that any holder that elects to subscribe for the ERO may not elect the Equity Cash-Out Option.

**ERO** means the equity rights offering whereby Reorganized AMC shall distribute to each holder of an Allowed Prepetition Secured Loan Claim such Entity's Pro Rata share of the ERO Subscription Rights, pursuant to this Plan, the ERO Documents, and the ERO Procedures, and subject in all respects to the DOT Procedures.

**ERO Backstop Commitment** means, with respect to any ERO Backstop Commitment Party, its commitment to purchase, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement, the Unsubscribed ERO Interests.

**ERO Backstop Commitment Parties** means, collectively, those Entities that hold an ERO Backstop Commitment pursuant to the Purchase Commitment and Backstop Agreement.

**ERO Backstop Commitment Premium** means a premium payable in New Interests on the Plan Effective Date to each ERO Backstop Commitment Party as consideration for the ERO Backstop Commitments in accordance with the ERO Documents, the aggregate value of which is equal to 10.0% of the Adjusted ERO Amount, as calculated according to the Applicable Discount Ratio, subject to the DOT Procedures and dilution by: (i) New Common Stock issued on account of the Management Incentive Plan; and (ii) New Common Stock issued upon the exercise of the New Warrants.

**ERO Backstop Commitment Premium Interests** means the New Interests distributed to each ERO Backstop Commitment Party in payment of the ERO Backstop Commitment Premium, and subject to the DOT Procedures.

**ERO Backstop Interests** means the Unsubscribed ERO Interests distributed to each ERO Backstop Commitment Party in connection with the ERO Backstop Commitment, and subject to the DOT Procedures.

**ERO Documents** means, collectively, the Purchase Commitment and Backstop Agreement, the ERO Procedures, the ERO Procedures Approval Order, the Purchase Commitment and Backstop Approval Order and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the ERO, and any other materials distributed in connection with the ERO.

**ERO Interests** means the New Interests distributed pursuant to the ERO (including the ERO Backstop Interests) in accordance with the ERO Documents, subject to the DOT Procedures and dilution by: (i) New Common Stock issued on account of the Management Incentive Plan; and (ii) New Common Stock issued upon the exercise of the New Warrants.

**ERO Participants** has the meaning set forth in the Purchase Commitment and Backstop Agreement.

**ERO Procedures** means the procedures governing the 1145 ERO and 4(a)(2) ERO, as applicable, including any questionnaires, subscription forms, or spreadsheets attached thereto, as approved by the ERO Procedures Approval Order.

**ERO Procedures Approval Order** means the order of the Bankruptcy Court approving the ERO Procedures, which order, for the avoidance of doubt, may be the same order as the Confirmation Order.

**ERO Subscription Rights** means the subscription rights to participate in the ERO that the Debtors will provide to each holder of an Allowed Prepetition Secured Loan Claim, pursuant to which each such holder may purchase its Pro Rata share of ERO Interests in accordance with the ERO Procedures, at the Applicable Discount Ratio, in an aggregate amount equal to the Adjusted ERO Amount.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Exculpated Parties** means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law:  the Debtors.

**Existing Equity Interests** means all Interests in Holdings.

**Exit Facility Documents** means, collectively, the Exit Term Loan Facility Credit Agreement, the Exit Securitization Program Agreement, and any and all other agreements, documents, notes, pledges, collateral agreements, loan and security agreements, mortgages, control agreements, deeds of trust, intercreditor agreements, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection with the Exit Term Loan Facility and the Exit Securitization Program.

**Exit Securitization Program** means the new accounts receivable financing facility or other alternative financing facility to be entered into on the Plan Effective Date, on terms set forth in the Exit Securitization Program Term Sheet.

**Exit Securitization Program Agreement** means that certain credit agreement, dated as of the Plan Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), containing terms consistent with the Exit Securitization Program Term Sheet.

**Exit Securitization Program Term Sheet** means the term sheet describing the material terms of the Exit Securitization Program.

**Exit Term Loan Facility** means the senior secured first lien term loan facility to be entered into on the Plan Effective Date in an aggregate principal amount of up to $250,000,000.

**Exit Term Loan Facility Credit Agreement** means that certain credit agreement, dated as of the Plan Effective Date (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), containing terms consistent with the Exit Term Loan Facility Term Sheet.

**Exit Term Loan Facility Term Sheet** has the meaning set forth in the RSA.

**Exit Term Loans** means the loans under the Exit Term Loan Facility, comprised of (i) the DRO Term Loans and (ii) the Exit Term Loans converted from DIP Rolled-Up Loans on the Plan Effective Date, on the terms set forth in the Exit Term Loan Facility Term Sheet.

**FAA** means the United States Federal Aviation Administration and any successor agency thereto.

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through and including the Confirmation Date under sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code by Professionals retained by an order of the Bankruptcy Court.

**Fee Escrow Account** means an interest-bearing account funded by the Debtors on the Plan Effective Date with Cash in an amount equal to the total estimated amount of Fee Claims.

**Final DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (Docket No. 225).

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired.  However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Final Securitization Program Order** means the *Final Order (I) Authorizing Certain Debtors to Continue Selling, Contributing, and Servicing Receivables and Related Rights Pursuant to the Securitization Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (Docket No. 227).

**General Unsecured Claim** means a Claim other than a DIP Claim, Prepetition Secured Loan Claim, SICFA Claim, Other Secured Claim, Other Priority Claim, Prepetition Securitization Program Claim, Securitization Facility Claim, Prepetition Aircraft Financing Claim, Prepetition Unsecured Note Claim, Intercompany Claim, or any other Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the

Bankruptcy Court, including, for the avoidance of doubt, the Allowed Consenting Sponsor Claim and any damages Claims arising from rejection of any executory contract or unexpired lease.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Holdings* has the meaning set forth in the preamble hereto.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indenture* means, collectively, that certain *Indenture*, dated as of April 21, 2017, by and among ASP AMC Merger Sub Inc., as issuer, the Guarantors (as defined in the Indenture) party thereto, and the Indenture Trustee (each, on behalf of itself and/or certain funds managed by it or its affiliates, together with their respective successors and permitted assigns), as supplemented by (i) that certain *First Supplemental Indenture*, dated as of April 21, 2017, by and among Air Methods Corp. (as successor to ASP AMC Merger Sub Inc.), the Guarantors party thereto, and the Indenture Trustee, (ii) that certain *Second Supplemental Indenture*, dated as of March 18, 2021, by and among Air Methods Corp., the Guarantors party thereto, and the Indenture Trustee, and (iii) that certain *Third Supplemental Indenture*, dated as of December 5, 2022, by and among Air Methods Corp., the Guarantor party thereto, and the Indenture Trustee (each as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

*Indenture Trustee* means Wilmington Trust, National Association and any successors thereto, as permitted by the terms set forth in the Indenture, in its capacity as indenture trustee, registrar, paying agent, or authenticating agent under the Indenture.

*Indenture Trustee Fees* means all reasonable and documented compensation, fees, expenses, and disbursements, including, without limitation, outside attorneys' and agents' fees, expenses, and disbursements incurred by or owed to the Indenture Trustee under the Prepetition Unsecured Note Documents, whether incurred before or after the Petition Date.

*Indenture Trustee Charging Lien* means the Lien and priority of payment rights in favor of the Indenture Trustee under the Indenture and/or the Prepetition Unsecured Note Documents, on or with respect to distributions to be made on account of Prepetition Unsecured Note Claims.

*Independent Director Fee Claims* means Allowed Administrative Expense Claims for any and all unpaid fees and expenses due to the independent directors of the Debtors pursuant to their respective agreements with the applicable Debtors, for the period between the Petition Date and the Plan Effective Date.

*Intercompany Claim* means a Claim against a Debtor held by another Debtor or an Affiliate of a Debtor that is a direct or indirect subsidiary of Holdings.

*Intercompany Interest* means an Interest in a Debtor held by another Debtor or an Affiliate of a Debtor that is a direct or indirect subsidiary of Holdings, other than an Existing Equity Interest.

*Interest* means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Plan Effective Date.

*Interim DIP Order* means the order entered by the Bankruptcy Court approving, among other things, the DIP Loans, the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on an interim basis.

*IRS* means the United States Internal Revenue Service.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means a management incentive plan, which will provide for the issuance of 10.0% of the aggregate number of New Interests on a fully diluted basis to management and other key employees of Reorganized Parent, and which shall be on terms to be adopted by the New Board in accordance with Section 5.14 of this Plan.

*New Board* means the initial board of directors of Reorganized Parent.

*New Common Stock* means the shares of common stock in the Reorganized Parent to be issued on the Plan Effective Date pursuant to this Plan or issuable pursuant to this Plan, and, in the event the Purchase Transaction occurs, as contemplated by the Acquisition Agreement.

*New Corporate Governance Documents* means the documents providing for corporate governance of the Reorganized Debtors, including any forms of certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, Registration Rights Agreement, other forms of corporate governance documents, and term sheets related thereto, as applicable, of or relating to the Reorganized Debtors, as may be amended, supplemented, or otherwise modified from time to time.

*New Interests* means the New Common Stock and DOT Warrants distributed in lieu of New Common Stock.

*New Tranche 1 Warrants* means warrants to purchase New Common Stock representing in the aggregate up to 10.0% of the aggregate number of New Interests (upon the exercise of such New Tranche 1 Warrants, subject to dilution by the New Common Stock issued on account of the Management Incentive Plan), exercisable at any time prior to the date that is 5.5 years from the Plan Effective Date, each of which will have an exercise price for each underlying share of New Common Stock equal to the implied price per share of one share of New Common Stock calculated using a total enterprise value of $1,750,000,000 as of the Plan Effective Date, the terms of which will be set forth in the New Warrants Agreements. The New Tranche 1 Warrants shall not have Black-Scholes protections.

*New Tranche 2 Warrants* means warrants to purchase New Common Stock representing in the aggregate up to 5.0% of the aggregate number of New Interests (upon exercise

of such New Tranche 2 Warrants, subject to dilution by the New Common Stock issued on account of the Management Incentive Plan), exercisable at any time prior to the date that is 5.5 years from the Plan Effective Date, each of which will have an exercise price for each underlying share of New Common Stock equal to the implied price per share of one share of New Common Stock calculated using a total enterprise value of $2,250,000,000 as of the Plan Effective Date, the terms of which will be set forth in the New Warrants Agreements.  The New Tranche 2 Warrants shall not have Black-Scholes protections.

*New Warrants* means collectively, the New Tranche 1 Warrants and the New Tranche 2 Warrants.

*New Warrants Agreements* means the warrant agreements or warrant certificates to be entered into by the Reorganized Parent that shall govern the terms of the New Warrants, which shall be consistent with this Plan and the RSA.

*New Warrants Documents* means collectively, the New Warrants Agreements, and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the New Warrants.

*Non-U.S. Citizen* means any Entity that fails to qualify as a "citizen of the United States," as the term is used in the DOT Rules.

*Other Priority Claim* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim other than a Priority Tax Claim, a DIP Claim, a Prepetition Secured Loan Claim, a SICFA Claim, a Prepetition Securitization Program Claim, a Securitization Program Claim, or a Prepetition Aircraft Financing Claim.

*Paul, Weiss* means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Sponsor.

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint prepackaged chapter 11 plan of reorganization, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the RSA.

*Plan Distribution* means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under this Plan.

*Plan Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of this Plan set forth in Section 9.2 of this Plan have been satisfied or waived in accordance with Section 9.3 of this Plan.

**Plan Equity Value** means a total enterprise value of the Reorganized Debtors of $800,000,000, *minus* the pro forma debt of the Reorganized Debtors on the Plan Effective Date, *plus* the Cash on the Plan Effective Date.

**Plan Supplement** means a supplement or supplements to this Plan containing certain documents and forms of documents, agreements, schedules and exhibits relevant to the implementation of this Plan (in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the RSA, the Bankruptcy Code, and the Bankruptcy Rules), which shall include: (i) the New Corporate Governance Documents; (ii) the size and composition of the New Board, including the identities of the directors to be appointed to the New Board to the extent known and determined; (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (iv) the Exit Term Loan Facility Credit Agreement; (v) the Exit Securitization Program Term Sheet and, to the extent available, the Exit Securitization Program Agreement; (vi) the New Warrants Agreements; (vii) the DOT Warrants Agreement; (viii) the Registration Rights Agreement; (ix) the Restructuring Transactions Exhibit; (x) a schedule of retained Causes of Action; and (xi) the Schedule of Rejected Contracts, if any; *provided* that, through the Plan Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the RSA. The initial Plan Supplement shall be filed with the Bankruptcy Court not later than seven (7) calendar days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court.

**Prepetition Agent** means the Royal Bank of Canada, solely in its capacity as administrative agent under the Prepetition Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the Prepetition Credit Agreement.

**Prepetition Agent Fees and Expenses** means, to the extent required to be paid by the Debtors under the Prepetition Credit Agreement, all accrued and unpaid reasonable and documented out-of-pocket fees and expenses incurred after the commencement of the Chapter 11 Cases, of the Prepetition Agent and Milbank LLP, as counsel to the Prepetition Agent.

**Prepetition Aircraft Financing Claims** means Claims arising from the Aircraft Financing Arrangements.

**Prepetition Credit Agreement** means that certain Credit Agreement, dated as of April 21, 2017 (as may be amended, supplemented, or otherwise modified from time to time, including by the *Incremental Facility Agreement No. 1*, dated April 6, 2021, and the *Amendment No. 2 to Credit Agreement*, dated September 29, 2023), by and among Air Methods Corp., as borrower, ASP AMC Intermediate Holdings, Inc., as parent guarantor, certain subsidiaries of Air Methods Corp., as Subsidiary Guarantors (as defined therein), Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto (each, on behalf of itself and/or certain funds managed by it or its affiliates, together with their respective successors and permitted assigns).

**Prepetition Secured Loan Claims** means the Claims arising under the Prepetition Credit Agreement, consisting of loans and commitments including approximately (i) $1,175,000,000 in aggregate outstanding principal amount of term loans and (ii) $115,817,833

in aggregate outstanding principal amount of revolving loans, plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the Prepetition Credit Agreement, calculated as of the Petition Date.

**Prepetition Secured Loan Claims Equity Distribution** means 100% of the New Interests, subject to the DOT Procedures and dilution by:  (i) DRO Interests; (ii) DRO Backstop Commitment Premium Interests; (iii) ERO Interests; (iv) ERO Backstop Commitment Premium Interests; (v) Private Placement Commitment Interests; (vi) Private Placement Premium Interests; (vii) the Prepetition Unsecured Note Claims Recovery Pool; (viii) New Common Stock issued upon the exercise of the New Warrants; and (ix) New Common Stock issued on account of the Management Incentive Plan.

**Prepetition Secured Loans** means the loans made pursuant to the Prepetition Credit Agreement.

**Prepetition Secured Parties** means the lenders party to the Prepetition Credit Agreement, each in its capacity as such.

**Prepetition Securitization Program** means that certain *Receivables Financing Agreement*, dated as of June 28, 2022, by and among Rocky Receivables, LLC, LifeNet Receivables LLC, and Mercy Receivables LLC, as borrowers, Air Methods Corp., as servicer, PNC Bank, National Association as administrative agent, and each Person (as defined therein) that is or becomes a party to the Prepetition Securitization Program from time to time up until the Petition Date (as may be amended, supplemented, or otherwise modified from time to time, including by that certain *Amendment No. 1 to Receivables Financing Agreement*, dated as of March 31, 2023).

**Prepetition Securitization Program Claims** means the Claims arising under the Prepetition Securitization Program from time to time.  For the avoidance of doubt, Prepetition Securitization Program Claims do not include the principal and accrued and unpaid interest on the Prepetition Securitization Program.

**Prepetition Securitization Program Lenders** means PNC Bank, National Association, and each Entity that is or becomes a party to the Prepetition Securitization Program from time to time in the capacity of a lender.

**Prepetition Unsecured Note Claims** means the Claims based upon, or arising under, in connection with, or on account of the Prepetition Unsecured Notes or the Indenture, excluding the Indenture Trustee Fees.  For purposes of this Plan, the Prepetition Unsecured Note Claims shall be deemed Allowed in the amount of $500,000,000 in aggregate outstanding principal amount of Prepetition Unsecured Notes, plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the Indenture.

**Prepetition Unsecured Note Claims Recovery Pool** means 2.0% of the New Interests, subject to the DOT Procedures and dilution by: (i) the ERO Interests; (ii) New Common Stock issued upon the exercise of the New Warrants; and (iii) New Common Stock issued on account of the Management Incentive Plan.

17

*Prepetition Unsecured Noteholders* means holders of Prepetition Unsecured Notes, each in its capacity as such.

*Prepetition Unsecured Note Documents* means the Indenture and all related agreements and documents, including, without limitation, any agreements executed by any of the Debtors or their Affiliates in connection with the Indenture.

*Prepetition Unsecured Notes* means those certain 8.0% senior unsecured notes due 2025, issued pursuant to the Indenture.

*Priority Tax Claim* means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Private Placement* means the purchase in a private placement by each Private Placement Commitment Party of its Private Placement Commitment of Private Placement Commitment Interests, in accordance with the Purchase Commitment and Backstop Agreement.

*Private Placement Commitment* means the commitment by each of the Private Placement Commitment Parties to purchase, severally and not jointly, the Private Placement Commitment Interests in a private placement at the Applicable Discount Ratio for aggregate consideration equal to the Adjusted Private Placement Amount, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement.

*Private Placement Commitment Interests* means the New Interests distributed to each Private Placement Commitment Party in connection with the Private Placement, and subject to the DOT Procedures.

*Private Placement Commitment Parties* means, collectively, those Entities that are party to the Purchase Commitment and Backstop Agreement that have committed, severally and not jointly, to purchase the Private Placement Commitment Interests in a private placement at the Applicable Discount Ratio for aggregate consideration equal to the Adjusted Private Placement Amount, on the terms and in the amount(s) set forth in such agreement.

*Private Placement Commitment Premium* means a premium payable in New Interests on the Plan Effective Date to each Private Placement Commitment Party as consideration for the Private Placement Commitments in accordance with the Private Placement Documents, the aggregate value of which is equal to 10.0% of the difference of $135,000,000 and the Adjusted ERO Amount, as calculated according to the Applicable Discount Ratio, subject to the DOT Procedures and dilution by: (i) the New Common Stock issued on account of the Management Incentive Plan; and (ii) New Common Stock issued upon the exercise of the New Warrants.

*Private Placement Documents* means, collectively, the Purchase Commitment and Backstop Agreement, the Purchase Commitment and Backstop Approval Order, and any and all other agreements, documents, and instruments delivered, entered into, or distributed in connection with, or otherwise governing, the Private Placement.

*Private Placement Premium Interests* means the New Interests distributed to each Private Placement Commitment Party in payment of the Private Placement Commitment Premium, and subject to the DOT Procedures.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

*Professional* means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Purchase and Backstop Commitments* means, collectively, the DRO Backstop Commitment, the ERO Backstop Commitment and the Private Placement Commitment.

*Purchase Commitment and Backstop Agreement* means that certain *Purchase Commitment and Backstop Agreement* entered into on October 26, 2023, by and among the Debtors, the DRO Backstop Commitment Parties, the ERO Backstop Commitment Parties, and the Private Placement Commitment Parties, providing for the Purchase and Backstop Commitments (including all exhibits, annexes, and schedules thereto, in each case, as such agreement or exhibits, annexes, and schedules may be amended, supplemented, or otherwise modified pursuant to the terms thereof, including by the *Amendment No. 1 to the Purchase Commitment and Backstop Agreement*, dated November 19, 2023), as has been approved by the Purchase Commitment and Backstop Approval Order.

*Purchase Commitment and Backstop Approval Order* means that certain *Order (I) Approving Omnibus Procedures, Noteholder Election Procedures, and Related Forms, (II) Authorizing Debtors to Conduct Rights Offerings and Private Placement in Connection with Debtors' Plan of Reorganization, (III) Authorizing Debtors' Entry into and Performance under the Purchase Commitment and Backstop Agreement, (IV) Approving Obligations Thereunder as Administrative Expense Claims, and (V) Granting Related Relief* (Docket No. 259), as entered on November 21, 2023, which order is the same order as the DRO Procedures Approval Order.

*Purchase Commitment and Backstop Documents* means the Purchase Commitment and Backstop Agreement and any and all other documents, agreements, and instruments delivered or entered into in connection with, or otherwise governing, the Purchase and Backstop Commitments, including the DRO Documents, the ERO Documents and the Private Placement Documents.

*Purchase Transaction* means, if they occur, a series of transactions described in the Restructuring Transactions Exhibit (including any amendments thereto) pursuant to which AcquisitionCo acquires substantially all of the assets of the Debtors (directly or indirectly) in connection with the consummation of this Plan.

*Purchase Transaction Documents* means the Acquisition Agreement and any and all other documents setting forth the definitive terms of the Purchase Transaction.

***Purchase Transaction Election Date*** means the date that is the day prior to the date the Plan Supplement is required to be filed.

***Registration Rights Agreement*** means one or more registration rights agreements that may be entered into as of the Plan Effective Date, to be entered into by and among Reorganized Parent and the Commitment Parties relating to the registration of the resale of the New Common Stock, which shall contain terms substantially consistent with the RSA.

***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under this Plan in accordance with section 1124 of the Bankruptcy Code.

***Related Parties*** means with respect to an Entity, that Entity's current and former Affiliates, and such Entity's and their current and former Affiliates' predecessors, successors, assigns, and current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives.

***Released Parties*** means collectively, and in each case solely in their capacity as such: (i) the Debtors and the Reorganized Debtors; (ii) the Debtors' non-Debtor Affiliates; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the Prepetition Agent; (vi) the Indenture Trustee; (vii) the DIP Agent; (viii) the DIP Lenders; (ix) the DRO Backstop Commitment Parties; (x) the ERO Backstop Commitment Parties; (xi) the Private Placement Commitment Parties; (xii) the Securitization Program Parties; (xiii) holders of Claims and Interests who vote to accept this Plan but do not opt out of granting the releases set forth herein; and (xiv) with respect to each of the foregoing Entities in clauses (i) through (xiii), such Entity's Related Parties. Notwithstanding the foregoing, any Entity that opts out of the releases set forth in this Plan will not be a Released Party.

***Releasing Parties*** means, collectively, and in each case solely in their capacity as such: (i) the Debtors and the Reorganized Debtors; (ii) the Debtors' non-Debtor Affiliates; (iii) the Consenting Creditors; (iv) the Consenting Sponsor; (v) the Prepetition Agent; (vi) the Indenture Trustee; (vii) the DIP Agent; (viii) the DIP Lenders; (ix) the DRO Backstop Commitment Parties; (x) the ERO Backstop Commitment Parties; (xi) the Private Placement Commitment Parties; (xii) the Securitization Program Parties; (xiii) the holders of Claims or Interests that vote to accept this Plan but do not opt out of granting the releases set forth herein; (xiv) the holders of Claims or Interests whose vote to accept or reject this Plan is solicited but that do not vote either to accept or to reject this Plan and do not opt out of granting the releases set forth herein; (xv) the holders of Claims or Interests that vote, or are deemed, to reject this Plan or that are presumed to accept this Plan but do not opt out of granting the releases set forth herein; (xvi) the holders of Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out; and (xvii) any other Released Party.

***Reorganized AMC*** means Air Methods Corp. as reorganized pursuant to and under this Plan, or any successors or assigns thereto by merger, consolidation, conversion, acquisition of assets, or otherwise, on or after the Plan Effective Date.

20

*Reorganized Debtor(s)* means, with respect to each Debtor, such Debtor as reorganized on the Plan Effective Date in accordance with this Plan, or any successor thereto, by merger, consolidation, transfer of all or substantially all assets or otherwise (including, Reorganized Parent, but in the event the Purchase Transaction occurs, only after the closing of the Purchase Transaction and, also after the closing of the Purchase Transaction, if applicable, AcquisitionCo and any direct or indirect parent of AcquisitionCo).

*Reorganized Parent* means, as determined by the Debtors, with the reasonable consent of the Requisite Prepetition Secured Parties, and as set forth in the Restructuring Transactions Exhibit, either: (i) Holdings, as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise; (ii) Air Methods Corp., as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization or otherwise; (iii) any entity directly or indirectly holding the assets and/or equity interests of the Reorganized Debtors on the Plan Effective Date in accordance with this Plan, as determined by the Debtors, or any successor or assign thereto by merger, consolidation, reorganization or otherwise; or (iv) a new Entity that may be formed or caused to be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or equity of the Debtors or Reorganized Debtors and issue the New Interests to be distributed pursuant to the Plan or distributed in connection with the DRO and ERO.

*Representative* means any Entity's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, agents, fund advisors, investment managers, investment advisors, sub-advisors, and sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

*Requisite Prepetition Secured Parties* has the meaning set forth in the RSA.

*Restructuring* means the restructuring of the Debtors' capital structure on the terms and conditions set forth in this Plan and Plan Supplement, and subject to the terms of the RSA.

*Restructuring Expenses* means (i) all reasonable and documented out-of-pocket fees and expenses of (a) the Ad Hoc Group (including the reasonable and documented out-of-pocket fees and expenses of the Ad Hoc Group Advisors in accordance with the terms of their applicable engagement letters and/or fee letters, or as otherwise may be agreed, with the Debtors and not previously paid by, or on behalf of, the Debtors) and (b) Paul, Weiss, in each case, incurred in connection with the RSA, the Definitive Documents, the Chapter 11 Cases, or the Restructuring, (ii) the Prepetition Agent Fees and Expenses, and (iii) the Indenture Trustee Fees (up to an aggregate cap of $100,000).

*Restructuring Transactions* means one or more transactions to occur on or prior to the Plan Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect the Restructuring or any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including:  (i) the consummation of the transactions provided for under, contemplated by, or described in this Plan, the RSA, the Definitive Documents,

and the other documents comprising the Plan Supplement; (ii) the execution and delivery of any agreements or other documents (including the documents comprising the Plan Supplement) containing terms that are consistent with and reasonably necessary to implement the Restructuring and the terms of this Plan and the RSA and that satisfy the requirements of applicable law; (iii) the execution and delivery of instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the RSA, and the documents comprising the Plan Supplement; (iv) the filing of certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (v) such other transactions that are required to effectuate the Restructuring Transactions Exhibit in a tax-efficient manner for the Debtors and Reorganized Debtors and as set forth in the RSA, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (vi) the execution, delivery, and filing, if applicable, of the Definitive Documents; (vii) the issuance of securities; and (viii) all other actions to implement the Restructuring that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with this Plan and the RSA.

*Restructuring Transactions Exhibit* means the exhibit setting forth the material components of the transactions that are required to effectuate the Restructuring Transactions contemplated by this Plan and the RSA.

*RSA* means that certain *Restructuring Support Agreement* attached hereto as Exhibit A, dated as of October 23, 2023, by and among the Debtors and the Consenting Parties, including all exhibits, annexes, and schedules attached thereto, as the same may be amended, supplemented, or otherwise modified from time to time in accordance with its terms.

*RSA Creditors* means those certain Entities constituting the Requisite Prepetition Secured Parties.

*Schedule of Rejected Contracts* means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to this Plan, if any, as the same may be amended, supplemented, or otherwise modified from time to time.

*Schedules* means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time, to the extent the filing of such documents is not waived or extended beyond the Plan Effective Date pursuant, in each case, to an order of the Bankruptcy Court.

*Secured Claim* means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

*Securitization Program* means that certain trade receivables securitization facility pursuant to the Securitization Program Transaction Documents and approved by the Final Securitization Program Order.

*Securitization Program Agent* means, collectively, PNC Bank, National Association, in its capacity as Administrative Agent under the Securitization Program Documents, and PNC Capital Markets LLC, in its capacity as Structuring Agent under the Securitization Program Documents, including, in each case, any successors thereto.

*Securitization Program Claims* means any Claims constituting Securitization Program Obligations (as defined in the Final Securitization Program Order).

*Securitization Program Lenders* means PNC Bank, National Association, and each Entity that is or becomes a party to the Securitization Program from time to time in the capacity of a lender.

*Securitization Program Parties* means, collectively, the Securitization Program Agent and the Securitization Program Lenders.

*Securitization Program Transaction Documents* means collectively, the "Securitization Transaction Documents" as defined in the Final Securitization Program Order, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Shareholders' Agreement* means the shareholders agreement, if any, to be entered into (or deemed entered into) by Reorganized Parent and holders of New Interests and New Warrants, to the extent required thereby, on the Plan Effective Date in accordance with this Plan.

*SICFA* means that certain *Substitute Insurance Collateral Facility Agreement*, dated August 2, 2023, by and between 1970 Group, Inc., as the applicant, Air Methods Corp., as beneficiary, and certain subsidiaries and affiliates of Air Methods Corp., as Guarantors (as defined therein), as may be amended, supplemented, or otherwise modified from time to time.

*SICFA Claims means* the Claims arising under the SICFA, consisting of approximately $12,065,000 in aggregate outstanding letters of credit under the SICFA, plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the SICFA.

*Solicitation Materials* means any and all materials (including ballots and any election and subscription forms) related to the solicitation of votes for this Plan pursuant to sections 1123 and 1126 of the Bankruptcy Code, including the Disclosure Statement and

solicitation procedures, in each case, as may be amended, supplemented, or otherwise modified from time to time.

**Statutory Fees** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**U.S. Trustee** means the United States Trustee for Region 7.

**Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**Unsubscribed DRO Term Loans** has the meaning set forth in the Purchase Commitment and Backstop Agreement.

**Unsubscribed ERO Interests** has the meaning set forth in the Purchase Commitment and Backstop Agreement.

**Voting Deadline** means November 27, 2023 at 5:00 p.m. prevailing Central Time, or such other date and time as may be set by the Bankruptcy Court.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the RSA.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

       **1.4**      *Consent Rights of Consenting Creditors, the Consenting Sponsor, and DIP Lenders.*

       Notwithstanding anything herein to the contrary, any and all notice and consent rights of (a) the Debtors, the Consenting Creditors, and the Consenting Sponsor set forth in the RSA and (b) the Debtors and the DIP Lenders set forth in the DIP Orders and DIP Credit Agreement, in each case, with respect to the form and substance of this Plan, the Disclosure Statement, the motion seeking approval by the Bankruptcy Court of the Disclosure Statement, the Plan Supplement, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

       **1.5**      *Controlling Document.*

       In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each.  If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

**ARTICLE II.**      **ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, AND RESTRUCTURING EXPENSES.**

       **2.1**      *Treatment of Administrative Expense Claims.*

       On, or as soon thereafter as is reasonably practicable, the later of (a) the Plan Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors (with the consent of the Requisite Prepetition Secured Parties) agree to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than Restructuring Expenses or Fee Claims) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) payment in full in Cash, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2 *Treatment of Fee Claims.*

(a)     All Professionals seeking approval by the Bankruptcy Court of Fee Claims shall (i) file, on or before the date that is forty-five (45) calendar days after the Plan Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors or Reorganized Debtors, as applicable, are authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On the Plan Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to each Professional's good faith estimate of its respective Fee Claims, which estimate shall be provided to the Debtors and counsel to the Ad Hoc Group at least five (5) calendar days prior to the Plan Effective Date.  Funds held in the Fee Escrow Account shall not be deemed to be property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Allowed Fee Claims have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professionals and for no other parties until all Allowed Fee Claims have been paid in full.  Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable after the date upon which a Final Order relating to any such Allowed Fee Claim is entered, (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable, or (iii) in accordance with any order of the Bankruptcy Court establishing procedures for interim compensation.  The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of Allowed Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with <u>Section 2.1</u> of this Plan.  When such Allowed Fee Claims have been paid in full, any remaining amount in the Fee Escrow Account shall be promptly returned to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way, other than the customary liens in favor of the depository bank at which the Fee Escrow Account is maintained.

(c)     Any objections to Fee Claims shall be served and filed (i) no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement or (ii) such later date ordered by the Bankruptcy Court.

### 2.3 *Treatment of Priority Tax Claims.*

On, or as soon thereafter as is reasonably practicable, the later of (a) the Plan Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Plan Effective Date, (b) the first Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, except to the extent that a holder of an Allowed Priority

Tax Claim and the Debtors (with the consent of the Requisite Prepetition Secured Parties) agree to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable, either (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### 2.4 *Treatment of DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Plan Effective Date in an amount equal to the aggregate amount of the DIP Obligations, including, without limitation, (a) the principal amount outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all accrued and unpaid fees, discounts, expenses, costs and indemnification obligations payable under the DIP Documents. On or as soon as reasonably practicable after the Plan Effective Date, each holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim: (i) on account of the portion of such holder's Allowed DIP Claim that constitutes an Allowed DIP New Money Claim, Cash in an amount equal to such Allowed DIP New Money Claim and (ii) on account of the portion of such holder's Allowed DIP Claim that constitutes an Allowed DIP Rolled-Up Loans Claim, Exit Term Loans in an aggregate principal amount equal to such Allowed DIP Rolled-Up Loans Claim. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the provisions of the DIP Documents that expressly survive termination or maturity of the DIP Facility (including those provisions relating to the rights of the DIP Agent and the other DIP Lenders to expense reimbursement, indemnification, and other similar amounts) shall continue in full force and effect after the Plan Effective Date in accordance with the terms thereof.

### 2.5 *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Plan Effective Date, shall be paid in full in Cash on the Plan Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, the DIP Orders, the Indenture, and any applicable fee letters, without any requirement to file a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval or the need for time detail. All Restructuring Expenses to be paid on the Plan Effective Date shall be invoiced and/or estimated prior to and as of the Plan Effective Date and such invoices and/or estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Plan Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Plan Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Expenses incurred prior to and as of the Plan Effective Date shall be submitted to the Reorganized Debtors. For the avoidance of doubt, any and all DIP Obligations that are also Restructuring Expenses are entitled to all rights and protections of other DIP Obligations. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay post-Plan Effective Date, when due and payable in the ordinary course, Restructuring Expenses, whether incurred before, on, or after the Plan Effective Date. Any Restructuring Expenses invoiced after the Plan Effective Date shall be paid promptly, but no later

than twenty (20) Business Days from receiving an invoice.  Subject to the terms of the RSA, the DIP Orders, the Indenture, and any applicable fee letters, any invoices and final invoices provided to the Debtors pursuant to this Section 2.5 may be in the form of a summary invoice generally describing the services rendered without the need for time detail.

### 2.6     *Treatment of Securitization Program Claims.*

All Securitization Program Claims shall be Allowed Claims.  On the Plan Effective Date, unless otherwise agreed by the holder of a Securitization Program Claim and the applicable Debtor or Reorganized Debtor with the consent of the Requisite Prepetition Secured Parties, Allowed Securitization Program Claims will be satisfied in full in accordance with the terms of the Securitization Program Transaction Documents.  On the Plan Effective Date, or as soon as reasonably practicable thereafter, all fees and expenses incurred by the advisors to the parties to the Securitization Program shall be paid in full in Cash to the extent required under the Final Securitization Program Order.

## ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1     *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Plan Effective Date.

### 3.2     *Formation of Debtor Groups for Convenience Only.*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Plan Effective Date.

### 3.3     *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired and Unimpaired under this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, Priority Tax Claims, DIP Claims, and Restructuring Expenses have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | Prepetition Secured Loan Claims | Impaired | Yes |
| Class 4 | Prepetition Securitization Program Claims | Unimpaired | No (Presumed to accept) |
| Class 5 | SICFA Claims | Unimpaired | No (Presumed to accept) |
| Class 6 | Prepetition Aircraft Financing Claims | Unimpaired | No (Presumed to accept) |
| Class 7 | Prepetition Unsecured Note Claims | Impaired | Yes |
| Class 8 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| Class 9 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |
| Class 11 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

### 3.4 *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Elimination of Vacant Classes*.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.6 *Voting Classes; Presumed Acceptance by Non-Voting Classes*.

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### 3.7 *Voting; Presumptions; Solicitation*.

(a)     **Acceptance by Certain Impaired Classes**.  Only holders of Claims in Class 3 and Class 7 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  An Impaired Class of Interests shall have accepted this Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept this Plan.

29

(b) **Deemed Acceptance by Unimpaired Classes**. Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, 8, 9, and 11 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c) **Deemed Rejection by Impaired Classes**. Holders of Interests in Class 10 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

### 3.8 *Cramdown.*

If any Class entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (a) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify this Plan in accordance with the terms hereof, the RSA, and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.9 *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim.

## ARTICLE IV.   TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 *Class 1:  Other Priority Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by this Plan. On or as soon as reasonably practicable after the later of the Plan Effective Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes an Allowed Claim, except to the extent that a holder of an Allowed Other Priority Claim and the Debtors agree (with the consent of the Requisite Prepetition Secured Parties) to less favorable treatment, each holder of an Allowed Other Priority Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim, at the option of the Debtors or Reorganized Debtors (as applicable), with the consent of the Requisite Prepetition Secured Parties, either (i) payment in full in Cash, or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b) **Impairment and Voting**: Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.2 *Class 2:  Other Secured Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan. On or as soon as reasonably practicable

after the later of the Plan Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, except to the extent that a holder of an Allowed Other Secured Claim and the Debtors agree (with the consent of the Requisite Prepetition Secured Parties) to less favorable treatment, each holder of an Allowed Other Secured Claim shall receive in full and final satisfaction, settlement, release, and discharge of such Claim, at the option of the Debtors or Reorganized Debtors (as applicable), with the consent of the Requisite Prepetition Secured Parties, either (i) payment in full in Cash, (ii) Reinstatement of such Allowed Other Secured Claim, or (iii) other treatment rendering such Allowed Other Secured Claim Unimpaired.

(b)     **Impairment and Voting**: Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.3     *Class 3:  Prepetition Secured Loan Claims.*

(a)     **Treatment**:  On or as soon as reasonably practicable after the Plan Effective Date, pursuant to the Restructuring Transactions, each holder of an Allowed Prepetition Secured Loan Claim shall receive from Reorganized AMC, in full and final satisfaction, settlement, release, and discharge of such Prepetition Secured Loan Claim, subject to the DOT Procedures, its Pro Rata share, calculated as of the Petition Date, of:  (i) the Prepetition Secured Loan Claims Equity Distribution; (ii) the DRO Subscription Rights; and (iii) the ERO Subscription Rights; *provided* that each holder of an Allowed Prepetition Secured Loan Claim shall have the option to elect to exercise the Equity Cash-Out Option in lieu of (A) receiving its Pro Rata share of the Prepetition Secured Loan Claims Equity Distribution and (B) subscribing for the ERO, in accordance with this Plan.

(b)     **Impairment and Voting**:  Allowed Prepetition Secured Loan Claims are Impaired.  Holders of Allowed Prepetition Secured Loan Claims are entitled to vote on this Plan.

(c)     **Allowance**:  The Prepetition Secured Loan Claims shall be deemed Allowed on the Plan Effective Date in the aggregate principal amount of (i) $1,175,000,000 of term loans and (ii) $115,817,833 of revolving loans, in each case plus accrued and unpaid interest, fees, and other amounts arising and payable under and in accordance with the Prepetition Credit Agreement, calculated as of the Petition Date.

### 4.4     *Class 4:  Prepetition Securitization Program Claims.*

(a)     **Treatment**.  On or as soon as reasonably practicable after the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of the Prepetition Securitization Program Claims, each holder of an Allowed Prepetition Securitization Program Claim shall receive, at the option of the Debtors or Reorganized Debtors (with the consent of the Requisite Prepetition Secured Parties), as applicable, either:  (i) Reinstatement of the obligations of the Debtors pursuant to the applicable Exit Facility Documents; (ii) payment in full in Cash; or

(iii) such other treatment as agreed with the holder of an Allowed Prepetition Securitization Program Claim and the Debtors (with the consent of the Requisite Prepetition Secured Parties).

(b) **Impairment and Voting**: Allowed Prepetition Securitization Program Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, holders of Allowed Prepetition Securitization Program Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Prepetition Securitization Program Claims.

### 4.5 *Class 5: SICFA Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed SICFA Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed SICFA Claim and the Debtors agree (with the consent of the Requisite Prepetition Secured Parties) to less favorable treatment, on and after the Plan Effective Date, the Reorganized Debtors shall continue to pay each Allowed SICFA Claim or dispute each SICFA Claim in the ordinary course of business.

(b) **Impairment and Voting**: Allowed SICFA Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed SICFA Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed SICFA Claims.

### 4.6 *Class 6: Prepetition Aircraft Financing Claims.*

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Prepetition Aircraft Financing Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Prepetition Aircraft Financing Claim and the Debtors (with the consent of the Requisite Prepetition Secured Parties) agree to less favorable treatment, on and after the Plan Effective Date, the Reorganized Debtors shall continue to pay each Allowed Prepetition Aircraft Financing Claim or dispute each Prepetition Aircraft Financing Claim in the ordinary course of business.

(b) **Impairment and Voting**: Allowed Prepetition Aircraft Financing Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Prepetition Aircraft Financing Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Prepetition Aircraft Financing Claims.

### 4.7 *Class 7: Prepetition Unsecured Note Claims.*

(a) **Treatment**: On or as soon as reasonably practicable after the Plan Effective Date, pursuant to the Restructuring Transactions, each holder of an Allowed Prepetition Unsecured Note Claim shall receive from Reorganized AMC, in full and final satisfaction, settlement, release, and discharge of such Allowed Prepetition Unsecured Note Claim, subject to the DOT Procedures, its Pro Rata share of: (i) the Prepetition Unsecured Note Claims Recovery Pool; (ii) the New Tranche 1 Warrants; and (iii) the New Tranche 2 Warrants; *provided* that each holder of an

Allowed Prepetition Unsecured Note Claim shall have the option to elect to exercise the Equity Cash-Out Option, in accordance with this Plan. In addition, for the benefit of the holders of Prepetition Unsecured Note Claims, the Debtors shall pay the Indenture Trustee Fees in accordance with <u>Section 2.5</u> hereof (up to an aggregate cap of $100,000). For the avoidance of doubt, distribution to holders of Allowed Prepetition Unsecured Note Claims shall be allocated, in accordance with <u>Section 6.14</u> of this Plan, first to principal outstanding and then, if principal is paid in full, to interest.

(b)     **Impairment and Voting**: Allowed Prepetition Unsecured Note Claims are Impaired. Holders of Allowed Prepetition Unsecured Note Claims are entitled to vote on this Plan.

(c)     **Allowance**: The Prepetition Unsecured Note Claims shall be deemed Allowed on the Plan Effective Date in the aggregate principal amount of $500,000,000, plus accrued and unpaid interest, fees, and other amounts arising and payable in accordance with the Indenture.

### 4.8     *Class 8:  General Unsecured Claims.*

(a)     **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors (with the consent of the Requisite Prepetition Secured Parties) agree to less favorable treatment, the Debtors or Reorganized Debtors shall pay the Allowed Consenting Sponsor Claim in full in Cash on the Plan Effective Date, and on and after the Plan Effective Date, the Reorganized Debtors shall continue to pay each other Allowed General Unsecured Claim or dispute each General Unsecured Claim in the ordinary course of business.

(b)     **Impairment and Voting**: Allowed General Unsecured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 4.9     *Class 9:  Intercompany Claims.*

(a)     **Treatment**: On or as soon as practicable after the Plan Effective Date, all Intercompany Claims shall be adjusted, Reinstated, or discharged, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, as applicable, subject to the consent of the Requisite Prepetition Secured Parties.

(b)     **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

**4.10**   ***Class 10:  Existing Equity Interests.***

(a)   **Treatment:**  On the Plan Effective Date, pursuant to the Restructuring Transactions, all Existing Equity Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for holders of Existing Equity Interests on account of such Interests.

(b)   **Impairment and Voting**:  Each holder of an Existing Equity Interest is deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Existing Equity Interests are not entitled to vote to accept or reject this Plan.

**4.11**   ***Class 11:  Intercompany Interests.***

(a)   **Treatment**:  On or as soon as reasonably practicable after the Plan Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be adjusted, Reinstated, or discharged as determined by the Debtors or the Reorganized Debtors, as applicable, in their sole discretion, including for the administrative convenience of maintaining the existing corporate structure of the Debtors.

(b)   **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

**ARTICLE V.**      **MEANS FOR IMPLEMENTATION.**

**5.1**   ***Sources of Consideration for Plan Distribution.***

The Debtors and Reorganized Debtors shall fund Cash distributions under this Plan with Cash proceeds available from:  (a) Cash available on or after the Plan Effective Date; (b) the DRO; (c) the ERO; (d) the Private Placement; and (e) the Exit Securitization Program.

**5.2**   ***Compromise and Settlement of Claims, Interests, and Controversies.***

(a)   Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest, including, for the avoidance of doubt, with respect to the Allowed Consenting Sponsor Claim.  This Plan shall be deemed a motion to approve the compromises and settlements contained in this Plan.  Entry of the Confirmation Order, as of the Plan Effective Date, shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.  The compromises,

34

settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

(b)       Pursuant to the compromise and settlement with respect to the Allowed Consenting Sponsor Claim, upon and as of the Debtors' or Reorganized Debtors' payment in full in Cash on the Plan Effective Date of the Allowed Consenting Sponsor Claim, all contracts, agreements, and any and all other formal or informal arrangements, other than the Definitive Documents, by and between the Consenting Sponsor and any of its Affiliates, on the one hand, and any of the Debtors or the Debtors' subsidiaries, on the other hand, shall be terminated in full without any further action by any of the parties, and any and all provisions under such terminated contracts, agreements, and other arrangements that, by their terms or otherwise, would survive such termination shall be deemed to have been consensually terminated; *provided* that notwithstanding the foregoing, (i) any and all directors' and officers' indemnification rights of the Consenting Sponsor, its Affiliates, and their representatives shall survive consistent with the provisions of Section 8.4 of this Plan, (ii) the rights of the Consenting Sponsor, its Affiliates, and their representatives as beneficiaries under any D&O Insurance Policy shall continue and be preserved in accordance with Section 8.6 of this Plan, and (iii) nothing in this Section 5.2(b) shall impact the treatment of, or recovery on account of, any Consenting Claims held by the Consenting Sponsor or any of its Affiliates.  Notwithstanding the foregoing, the Consenting Sponsor, its Affiliates and their representatives may only be indemnified as set forth in this Section 5.2(b) up to twice the amount of available coverage under any D&O Insurance Policy in effect as of the date hereof.

### 5.3       *Debt Rights Offering.*

(a)       On the Plan Effective Date, Reorganized AMC shall cause the DRO to be consummated for the Adjusted DRO Amount, pursuant to the DRO Documents and this Plan.  The DRO shall be conducted prior to the Plan Effective Date, and the DRO Term Loans and DRO Interests shall be distributed pro rata to the DRO Participants, pursuant to the DRO Documents and this Plan and subject to the DOT Procedures.  The consummation of the DRO is conditioned on the consummation of the Plan and satisfaction of the applicable conditions specified in the Purchase Commitment and Backstop Agreement and the DRO Procedures.  The DRO Subscription Rights may not be sold, transferred, or assigned, except in the circumstances described in the DRO Documents.

(b)       In accordance with the Purchase Commitment and Backstop Agreement and subject to the terms and conditions thereof, each of the DRO Backstop Commitment Parties, among other things, has agreed (on a several and not joint basis), to fund the Unsubscribed DRO Term Loans, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement.  On the Plan Effective Date, as consideration for the DRO Backstop Commitment and the other agreements of the DRO Backstop Commitment Parties under the Purchase Commitment and Backstop Agreement, and pursuant to the terms and conditions of the Purchase Commitment and Backstop Agreement and the Purchase Commitment and Backstop Approval Order, each DRO Backstop Commitment Party shall receive its pro rata share of the DRO Backstop Commitment Premium in the amount(s) set forth in the Purchase Commitment and Backstop Agreement.

### 5.4    *Equity Rights Offering.*

(a)      On the Plan Effective Date, Reorganized AMC shall cause the ERO to be consummated for the Adjusted ERO Amount, if any, pursuant to the ERO Documents and this Plan.  The ERO shall be conducted (to the extent the Adjusted ERO Amount is greater than $0, as determined in accordance with the Purchase Commitment and Backstop Agreement) prior to the Plan Effective Date and, if applicable, the ERO Interests shall be distributed pro rata to the ERO Participants, pursuant to the ERO Documents and this Plan and subject to the DOT Procedures. The consummation of the ERO is conditioned on the consummation of the Plan and satisfaction of the applicable conditions specified in the Purchase Commitment and Backstop Agreement and the ERO Procedures.  ERO Subscription Rights may not be sold, transferred, or assigned, except in the circumstances described in the ERO Documents.

(b)      In accordance with the Purchase Commitment and Backstop Agreement and subject to the terms and conditions thereof, each of the ERO Backstop Commitment Parties, among other things, has agreed (on a several and not joint basis) to purchase the Unsubscribed ERO Interests, if applicable, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement and subject to the DOT Procedures.  On the Plan Effective Date, as consideration for the ERO Backstop Commitment and the other agreements of the ERO Backstop Commitment Parties under the Purchase Commitment and Backstop Agreement, and pursuant to the terms and conditions of the Purchase Commitment and Backstop Agreement and the Purchase Commitment and Backstop Approval Order, each ERO Backstop Commitment Party shall receive its pro rata share of the ERO Backstop Commitment Premium in the amount(s) set forth in the Purchase Commitment and Backstop Agreement.

### 5.5    *Equity Cash-Out Option and Private Placement.*

(a)      In lieu of receiving New Interests under the Plan, each holder of an Allowed Prepetition Secured Loan Claim or an Allowed Prepetition Unsecured Note Claim shall be entitled to irrevocably elect to receive all or a portion of (i) its distribution of New Interests on account of the Prepetition Secured Loan Claims Equity Distribution, (ii) its distribution of New Interests on account of the Prepetition Unsecured Note Claims Recovery Pool, and/or (iii) its DRO Interests or DRO Backstop Commitment Premium Interests, as applicable, in Cash, consistent with the terms and conditions of the Equity Cash-Out Option, this Plan, and the Election Procedures.  The total amount of Cash available for the Equity Cash-Out Option shall be capped at the Adjusted Private Placement Amount.  The consummation of the Equity Cash-Out Option is conditioned on the consummation of the Plan and satisfaction of the applicable conditions specified in the Purchase Commitment and Backstop Agreement and the Election Procedures.  For the avoidance of doubt, any party that participates in the ERO may not exercise its Equity Cash-Out Option.

(b)      To receive its share of the Equity Cash-Out Amount, a holder of an Allowed Prepetition Secured Loan Claims or Allowed Prepetition Unsecured Note Claims must validly and timely submit an election to receive Cash in lieu of receiving New Interests under the Plan, in accordance with the instructions set forth in the Election Procedures provided to such holder.  Each Entity entitled to participate in the Equity Cash-Out Option pursuant to this Plan that validly and timely submits such an election shall receive its pro rata share of the Equity Cash-Out Amount based on the proportion of New Interests under the Plan that such holder elects not to receive

relative to the aggregate number of Cashed-Out Equity Interests; *provided* that, if after giving effect to each of the validly and timely received elections, the aggregate value of the Cashed-Out Equity Interests is such that the Cash payable on account thereof would exceed the aggregate Adjusted Private Placement Amount, each electing holder's election shall be deemed to be reduced ratably across all electing holders, and such holders shall receive New Interests in lieu of Cash, in an amount corresponding to such reduction.

(c)     The Equity Cash-Out Amount shall by funded by the proceeds of the Private Placement, pursuant to which each of the Private Placement Commitment Parties, among other things, has agreed (on a several and not joint basis) to purchase in a private placement the Private Placement Commitment Interests, on the terms and in the amount(s) set forth in the Purchase Commitment and Backstop Agreement and subject to the DOT Procedures, at the Applicable Discount Ratio, for aggregate consideration equal to the Adjusted Private Placement Amount.  On the Plan Effective Date, as consideration for the Private Placement Commitments and the other agreements of the Private Placement Commitment Parties under the Purchase Commitment and Backstop Agreement, and pursuant to the terms and conditions of the Purchase Commitment and Backstop Agreement and the Purchase Commitment and Backstop Approval Order, each Private Placement Commitment Party shall receive its pro rata share of the Private Placement Commitment Premium in the amount(s) set forth in the Purchase Commitment and Backstop Agreement.

### 5.6     *Exit Facilities*

(a)     <u>Exit Securitization Program</u>.  On the Plan Effective Date, certain of the Reorganized Debtors and/or their Affiliates, as applicable, and the lenders party to the Exit Securitization Program will enter into the applicable Exit Facility Documents, and the Exit Securitization Program will be made available to the Reorganized Debtors, pursuant to the terms and conditions set forth in the Exit Facility Documents.  The obligations of the applicable Reorganized Debtors under the Exit Securitization Program shall constitute legal, valid, binding, and authorized obligations of such Reorganized Debtors enforceable in accordance with its terms.  Upon execution of the Exit Securitization Program, all Liens and security interests granted pursuant to, or in connection with, the Exit Securitization Program shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted pursuant to the Exit Securitization Program, with the priorities established in respect thereof under applicable non-bankruptcy law.

(b)     <u>Exit Term Loan Facility</u>.  On the Plan Effective Date, the Reorganized Debtors or, pursuant to and in accordance with the Acquisition Agreement, the AcquisitionCo Entities, will enter into the applicable Exit Facility Documents, and the Exit Term Loan Facility will be made available to the Reorganized Debtors or AcquisitionCo Entities, pursuant to the terms and conditions set forth in the Exit Facility Documents.  The AcquisitionCo Entities shall, as of the Plan Effective Date, have obtained the necessary authorization to enter into, execute, and deliver the Exit Facility Documents on the terms consistent with this Plan (including the consent rights hereunder) and incur the obligations under the Exit Term Loan Facility.  Confirmation of the Plan shall be deemed approval of the Exit Term Loan Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors and AcquisitionCo Entities in connection therewith, and authorization of the Reorganized Debtors to enter into, execute, and deliver the Exit

Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Term Loan Facility. The Exit Term Loan Facility shall constitute legal, valid, binding, and authorized obligations of the applicable Reorganized Debtors and AcquisitionCo Entities enforceable in accordance with its terms. Upon execution of the Exit Term Loan Facility, all Liens and security interests granted pursuant to, or in connection with the Exit Term Loan Facility shall be valid, binding, perfected, enforceable Liens and security interests in the property subject to a security interest granted by the applicable Reorganized Debtors pursuant to the Exit Term Loan Facility, with the priorities established in respect thereof under applicable non-bankruptcy law.

**5.7** ___Authorization and Issuance of New Common Stock, New Warrants, and DOT Warrants.___

(a) On the Plan Effective Date, in the event that a Purchase Transaction is not elected, Reorganized Parent is authorized to issue or cause to be issued and shall issue (or reserve for issuance, as applicable) (i) the New Common Stock, (ii) the New Warrants, and (iii) the DOT Warrants, in each case, for distribution in accordance with the terms of this Plan without the need for any further corporate or shareholder action. On the Plan Effective Date (other than in the event of the Purchase Transaction), the New Common Stock, DOT Warrants and New Warrants shall be contributed by Reorganized Parent to Reorganized AMC (if separate Entities) (either as a capital contribution or exchange, in whole or in part, for an intercompany note issued by Reorganized AMC, as determined by the Debtors with the consent of the Requisite Prepetition Secured Parties) and, immediately thereafter, such New Common Stock, New Warrants, and DOT Warrants shall be distributed in accordance with the Plan. All of the New Common Stock, New Warrants, and DOT Warrants issuable under this Plan (or in the event of the Purchase Transaction, received pursuant to the Acquisition Agreement), when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Stock (including, upon payment of the exercise price in accordance with the terms thereof, as applicable, New Common Stock issued upon the exercise of the New Warrants and/or DOT Warrants, if any), fully paid, and non-assessable.

(b) The DOT Warrants shall be issuable pursuant to the terms of the DOT Warrants Agreement (and in the event of the Purchase Transaction, received pursuant to the Acquisition Agreement). Each DOT Warrant shall, subject to the terms of the DOT Warrants Agreement, be exercisable for one share of New Common Stock. The New Warrants shall be issuable pursuant to the terms of the New Warrants Agreements (and in the event of the Purchase Transaction, received pursuant to the Acquisition Agreement), which shall be structured such that the New Warrants do not count towards the Cap Amount to comply with applicable regulatory restrictions. The New Common Stock issuable upon exercise of the DOT Warrants and New Warrants will be subject to limitations as determined by the Debtors in their reasonable discretion to ensure compliance with applicable regulatory requirements, including but not limited to, the DOT Rules Compliance.

(c) Each holder of New Interests that will be required to execute the New Corporate Governance Documents pursuant to the terms thereof shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended from time to time following the Plan Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving

New Interests (and their respective successors and assigns) to the extent such Entities are required to execute the New Corporate Governance Documents pursuant to the terms thereof, whether received pursuant to this Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document.

(d)     On or about the Plan Effective Date, Reorganized Parent and all holders of New Interests and New Warrants then outstanding shall be deemed to be parties to the Shareholders' Agreement, to the extent contemplated thereby, regardless of execution by any such holder, and the Shareholders' Agreement shall be binding on Reorganized Parent and all holders of New Interests and New Warrants, to the extent set forth therein.

### 5.8     *DOT Procedures.*

(a)     In no event shall Non-U.S. Citizens in the aggregate own New Common Stock in excess of the Cap Amount.

(b)     Each Entity entitled to receive New Common Stock pursuant to this Plan, shall furnish the Debtors with a valid and timely written declaration of citizenship and any other documentation as the Debtors, together with the Requisite Commitment Parties (as defined in the Purchase Commitment and Backstop Agreement), deem advisable to maintain DOT Rules Compliance on or before the deadline set forth in the Election Procedures.  If an Entity does not validly and timely furnish a declaration of citizenship (together with any other required documentation) to the Debtors in accordance with the instructions set forth in the Election Procedures provided to such holder, or if the declaration of citizenship has not been accepted or has been rejected by the Debtors, in their reasonable discretion and within a reasonable period of time after submission, such Entity will be considered a Non-U.S. Citizen for purposes of these DOT Procedures; *provided*, *however*, that a failure to deliver a declaration of citizenship shall not in and of itself prevent such party from receiving New Common Stock (to the extent that there is capacity for purposes of DOT Rules Compliance for Non-U.S. Citizens to receive New Common Stock in accordance with the provisions of the Purchase Commitment and Backstop Agreement) or DOT Warrants such party is otherwise entitled to under this Plan.

(c)     To ensure compliance with the Cap Amount, each Entity that is eligible to receive New Interests under this Plan and is a Non-U.S. Citizen shall receive DOT Warrants in lieu of New Common Stock as allocated consistent with the terms of the Purchase Commitment and Backstop Agreement.  For the avoidance of doubt, each Entity that is eligible to receive New Interests under this Plan and is not a Non-U.S. Citizen shall receive New Common Stock in accordance with this Plan.

### 5.9     *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)     Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Plan Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to, as applicable, (i) the New Corporate Governance Documents, (ii) the respective certificate of incorporation and bylaws (or other analogous formation, constituent, or governance documents) in effect before the

Plan Effective Date, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent, or governance documents) is amended by this Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to this Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law), and (iii) other applicable organizational documents.

(b)      On or after the Plan Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion (subject to obtaining any required approvals as set forth in the New Corporate Governance Documents) take such action as permitted by applicable law and the New Corporate Governance Documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor, (ii) a Reorganized Debtor to be dissolved, (iii) the legal name of a Reorganized Debtor to be changed, and/or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Plan Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

(c)      On the Plan Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Definitive Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, (iv) the consummation of the Restructuring Transactions, (v) if applicable, the consummation of the Purchase Transaction, and (vi) all other actions that the applicable Entities determine to be necessary or appropriate to effectuate the Restructuring Transactions, including, making filings or recordings that may be required by applicable law.

(d)      In the event the Debtors, on or before the Purchase Transaction Election Date, elect to pursue the Purchase Transaction, the Debtors shall implement the Purchase Transaction as set forth herein and in the Restructuring Transactions Exhibit, and in accordance with the Restructuring Transactions.

(e)      The terms of the Restructuring, including whether the Restructuring is structured as a taxable transaction (in whole or in part), will be structured in a tax-efficient manner, taking into account the tax and non-tax considerations and the associated costs of the Debtors, as determined by the Debtors in their business judgment and in accordance with the terms of the RSA.

### 5.10 *Corporate and Limited Liability Company Action.*

(a)     Upon the Plan Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects (whether to occur before, on, or after the Plan Effective Date), in each case, in accordance with and subject to the terms hereof.  All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)     On or (as applicable) before the Plan Effective Date, each officer, member of the board of directors or managers, or manager of the Debtors is (and each officer, member of the board of directors or managers, or manager of the Reorganized Debtors shall be) authorized and directed to (i) issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents contemplated by this Plan, the RSA, and the Restructuring Transactions Exhibit (or necessary or desirable to effect the transactions contemplated by this Plan, the RSA, and the Restructuring Transactions Exhibit) in the name of and on behalf of the Debtors or Reorganized Debtors, as applicable, including (A) the New Corporate Governance Documents, (B) the DRO Documents, (C) the ERO Documents, (D) the Private Placement Documents, (E) the Exit Facility Documents, (F) the New Warrants Documents, (G) the DOT Warrants Agreements, and (H) the Management Incentive Plan; and (ii) to take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the term and conditions of this Plan, the transactions contemplated by this Plan, the RSA, or the Restructuring Transactions Exhibit, and the Securities distributed pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to this Plan.

(c)     The authorizations and approvals contemplated by this Section 5.10 shall be effective notwithstanding any requirements under non-bankruptcy law.

(d)     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including the Restructuring Transactions.

### 5.11 *Cancellation of Existing Securities and Agreements.*

(a)     Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, the Plan Supplement, or the Confirmation Order, on the Plan Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, Securities and other documents evidencing any Claim or Interest (other than Intercompany Claims and Intercompany Interests, to the extent they are not modified by this Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the obligations of

the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Disbursing Agent.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.

(b)     On the Plan Effective Date, the Prepetition Unsecured Notes and Existing Equity Interests shall be deemed to have been surrendered without the need for any further action by the holder thereof.

(c)     Notwithstanding such cancellation and discharge, the Prepetition Credit Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Prepetition Secured Loan Claims to receive distributions under this Plan, (ii) allow and preserve the rights of the Debtors, the Reorganized Debtors, and the Prepetition Agent, as applicable, to (A) make post-Plan Effective Date distributions on account of such Claims, (B) seek compensation and reimbursement of any reasonable and documented fees and expenses incurred in connection with implementation of the Plan to the extent not otherwise reimbursed under the DIP Orders, including the Prepetition Agent Fees and Expenses, (C) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement, in each case, that the Prepetition Agent may have under the Plan or the Prepetition Credit Agreement, solely to the extent such right or obligation survives the discharge set forth in Section 10.3 of this Plan, or (D) take such other action, if any, pursuant to this Plan on account of the Allowed Prepetition Secured Loan Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with this Plan, including terminating Royal Bank of Canada's obligations as Prepetition Agent, (iii) permit the Prepetition Agent to appear in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Plan Effective Date on matters relating to the Plan or the Prepetition Credit Agreement, and (iv) effectuate the BH Guarantor Release on the Plan Effective Date; *provided* that nothing in this Section 5.11(c) shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors.

(d)     Notwithstanding such cancellation and discharge, the Prepetition Unsecured Note Documents shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Prepetition Unsecured Note Claims to receive distributions under this Plan on account of such Claims (subject to the Indenture Trustee Charging Lien) and (ii) allow and preserve the rights of the Debtors, the Reorganized Debtors, and the Indenture Trustee to (A) make post-Plan Effective Date distributions on account of Allowed Prepetition Unsecured Note Claims, subject to the Indenture Trustee Charging Lien; (B) assert or maintain any rights the Indenture Trustee may have against any money or property distributable or allocable to holders of Allowed Prepetition Unsecured Note Claims, including the Indenture Trustee Charging Lien; (C) pay the Indenture Trustee Fees, to the extent provided herein; (D) preserve, maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, contribution, subrogation, or any other claim or entitlement that the Indenture Trustee may have under the Plan, the Plan Supplement, or the Confirmation Order; (E) effectuate the BH Guarantor Release on the Plan Effective Date; and (F) preserve the rights of the Indenture Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including,

without limitation, enforcing any obligations owed to holders of Allowed Prepetition Unsecured Note Claims and the Indenture Trustee, as applicable, under the Plan, the Plan Supplement, the Confirmation Order, or other document incorporated therein; *provided* that nothing in this Section 5.11(d) shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors other than with respect to the Indenture Trustee Fees.  Except as provided in the Plan, the Plan Supplement, or the Confirmation Order, or as may be necessary to effectuate the terms of the Plan, on the Plan Effective Date, the Indenture Trustee and its agents, successors, and assigns, shall be automatically and fully discharged and released of all of their rights and obligations associated with the Prepetition Unsecured Note Documents.

(e)     Notwithstanding such cancellation and discharge, the DIP Credit Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed DIP Claims to receive distributions under this Plan, (ii) allow and preserve the rights of the Debtors, the Reorganized Debtors, and the DIP Agent, as applicable, to (A) make post-Plan Effective Date distributions on account of such Claims or (B) seek compensation and reimbursement of any reasonable and documented fees and expenses incurred in connection with implementation of the Plan to the extent not otherwise reimbursed under the DIP Orders, (C) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the DIP Agent may have under the Plan or the DIP Credit Agreement that expressly survives termination thereof, in all cases relating to action occurring prior to the Plan Effective Date, or (D) take such other action, if any, pursuant to this Plan on account of the Allowed DIP Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with this Plan, and (iii) permit the DIP Agent to appear in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Plan Effective Date on matters relating to the Plan or the DIP Credit Agreement; *provided* that nothing in this Section 5.11(e) shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors.

(f)     Notwithstanding the foregoing, any provision in any agreement, instrument, note, certificate, indenture, mortgage, Security or other document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.11(f) shall be deemed null and void and shall be of no force and effect.

(g)     Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

(h)     The Debtors shall use commercially reasonable efforts to keep the Indenture Trustee updated with respect to any Cash, New Common Stock, New Warrants, or DOT Warrants to be distributed to holders of Prepetition Unsecured Note Claims pursuant to the Plan.

(i)     Upon the occurrence of the Plan Effective Date, (i) the Prepetition Unsecured Notes shall thereafter be deemed to be null, void, and worthless, and (ii) DTC shall take down the relevant position relating to the Prepetition Unsecured Notes without any requirement of indemnification or security on the part of the Indenture Trustee.

### 5.12   *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor or its Affiliates held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.13   *Officers and Boards of Directors.*

(a)     On the Plan Effective Date, the New Board shall consist of the number of directors set forth in the New Corporate Governance Documents.  The identity and affiliations of any person proposed to serve on the New Board shall be disclosed in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent known at the time of filing.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Debtors immediately before the Plan Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Plan Effective Date. After the Plan Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective New Corporate Governance Documents.

(c)     Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Plan Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Plan Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Plan Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Plan Effective Date.  Commencing on the Plan Effective Date, each of the directors and managers, as applicable, of each of the Reorganized Debtors shall be deemed elected to serve pursuant to the terms of the applicable New Corporate Governance Documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.14   *Management Incentive Plan.*

After the Plan Effective Date, the New Board shall be authorized to adopt the Management Incentive Plan.  The form, terms, allocation, and vesting of all awards under the Management Incentive Plan shall be on terms to be adopted by the New Board, which shall use commercially   reasonable   efforts   to   approve   the   Management   Incentive   Plan   within

ninety (90) calendar days of the Plan Effective Date; *provided* that the terms of the Management Incentive Plan and all initial awards granted thereunder shall be acceptable to the RSA Creditors.

### 5.15   *Securities Exemptions.*

(a)     The offer, issuance and distribution under this Plan of the DRO Subscription Rights, the ERO Subscription Rights, the New Common Stock (other than the 4(a)(2) Rights Offering Securities and the Private Placement Commitment Interests, but including the 1145 Rights Offering Securities and the Commitment Premium Interests), the New Warrants and DOT Warrants (other than any DOT Warrants distributed in lieu of 4(a)(2) Rights Offering Securities and Private Placement Commitment Interests) (in each case, including the New Common Stock issuable upon the exercise thereof) (collectively, the "**1145 Securities**"), as applicable, (i) to each holder of (A) an Allowed Prepetition Secured Loan Claim and (B) an Allowed Prepetition Unsecured Note Claim, and (ii) to the Commitment Parties as a premium in connection with the Purchase and Backstop Commitments, will, in the case of clauses (i) and (ii), be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  The 1145 Securities distributed under this Plan pursuant to Section 1145 of the Bankruptcy Code may be sold without registration under the Securities Act by the recipients thereof, subject to:  (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the U.S. Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such 1145 Securities provided by law, and restrictions provided in the New Corporate Governance Documents; and (iii) any other applicable regulatory approvals and requirements.

(b)     The offer, sale, issuance and distribution under this Plan of the 4(a)(2) Rights Offering Securities and the Private Placement Commitment Interests (including any DOT Warrants distributed in lieu of 4(a)(2) Rights Offering Securities and Private Placement Commitment Interests (in each case, including the New Common Stock issuable upon the exercise thereof)) (collectively, the "**4(a)(2) Securities**"), as applicable, will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 4(a)(2) of the Securities Act and/or Regulation D thereunder.  The 4(a)(2) Securities, if any, distributed under this Plan pursuant to section 4(a)(2) of the Securities Act and/or Regulation D thereunder may be sold without registration under the Securities Act by the recipients thereof, subject to: (i) the requirements of the applicable provisions of Rule 144 or Rule 144A or any other available registration exemption under the Securities Act; (ii) the restrictions, if any, on the transferability of the 4(a)(2) Securities provided by law, and restrictions provided in the New Corporate Governance Documents; and (iii) any other applicable regulatory approvals and requirements.

(c)     The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of this Plan Effective Date.

(d)     The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including, for the avoidance of doubt, any transfer agent for the New Common Stock, New Warrants, and DOT Warrants, including DTC)

with respect to the treatment of the New Common Stock, New Warrants, or DOT Warrants (including any New Common Stock issuable upon the exercise thereof) to be distributed under this Plan under applicable securities laws.  Any transfer agent or any Entity who may hereafter act as depositary for the New Common Stock, New Warrants, or DOT Warrants, including DTC, shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock, New Warrants, or DOT Warrants (including any New Common Stock issuable upon the exercise thereof), as applicable, is exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

(e)     Notwithstanding anything to the contrary in this Plan, no Entity (including, for the avoidance of doubt, any transfer agent for the New Common Stock, New Warrants, and DOT Warrants, including DTC) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Common Stock, New Warrants, and DOT Warrants (including any New Common Stock issuable upon the exercise thereof), as applicable, is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services or validly issued, fully paid, and nonassessable.

### 5.16   *Intercompany Interests.*

On the Plan Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or Security holders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.17   *Separate Plans.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 5.18   *Closing of Chapter 11 Cases.*

Promptly after the full administration of the Chapter 11 Cases, the Reorganized Debtors shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.  As of the Plan Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly.  Matters concerning Claims may be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.

# ARTICLE VI.        DISTRIBUTIONS.

### 6.1      *Distributions Generally*.

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan.

### 6.2      *No Postpetition Interest on Claims*.

Unless otherwise provided in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.  For the avoidance of doubt, this <u>Section 6.2</u> shall not apply to DIP Claims.

### 6.3      *Date of Distributions*.

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Plan Effective Date or as soon as reasonably practicable thereafter.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in <u>ARTICLE VII</u>.

### 6.4      *Distribution Record Date*.

(a)      As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)      The Distribution Record Date shall not apply to beneficial holders of Allowed Prepetition Unsecured Note Claims, which shall receive Plan Distributions in accordance with the terms of this Plan and subject to the Indenture Trustee Charging Lien.

(c)      Notwithstanding anything in the Plan to the contrary, DTC and all other Entities (including any transfer agent, trustee, registrar, or similar agent) shall be required to accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding the validity of any transaction contemplated by the Plan, including, whether the initial sale and delivery of the New Interests and the New Warrants is exempt from registration under the Securities Act and/or eligible for DTC book entry delivery, settlement, and depositary services,

and no Entity (including DTC and any transfer agent, trustee, registrar, or similar agent) may require a legal opinion with respect thereto.

### 6.5 *Distributions After Plan Effective Date*.

Distributions made after the Plan Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Plan Effective Date but which later become Allowed Claims shall be deemed to have been made on the Plan Effective Date.

### 6.6 *Disbursing Agent*.

All Plan Distributions shall be made by the Disbursing Agent on and after the Plan Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the withholding and reporting requirements outlined in Section 6.18 of this Plan.

### 6.7 *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, the Disbursing Agent shall make all distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents, (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable. Subject to Section 6.8 of this Plan, in the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

The Indenture Trustee shall not incur any liability whatsoever on account of any Plan Distributions. Notwithstanding any other provision of this Plan, the Indenture Trustee shall have no duties, obligations, responsibilities, or liability with respect to any form of distribution to holders of Allowed Prepetition Unsecured Note Claims that is not DTC eligible, and the Disbursing Agent shall make such distributions (subject to the Indenture Trustee Charging Lien).

### 6.8 *Unclaimed Property*.

(a)     One year from the later of: (i) the Plan Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all distributions payable on account of such Claim or Interest that are not claimed or accepted by such date shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Entity (including

the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

(b)     A distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution, (iii) responded to the Debtors' or Reorganized Debtors', as applicable, request for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 6.9     *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10     *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Reorganized Debtors, as applicable.

### 6.11     *Fractional Shares and Warrants.*

No fractional shares of New Common Stock, fractional New Warrants, or fractional DOT Warrants shall be distributed.  When any distribution would otherwise result in the issuance of a number of units or shares, as applicable, of New Common Stock, New Warrants, or DOT Warrants that is not a whole number, the New Common Stock, New Warrants, or DOT Warrants, as applicable, subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number (or as otherwise set forth in the Definitive Documents).  The total number of New Common Stock, New Warrants, and/or DOT Warrants to be distributed on account of Allowed Claims or Interests shall be adjusted as necessary to account for the rounding provided for herein.

### 6.12     *Minimum Distribution.*

No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than $100.00 in Cash.  Fractional amounts of New Common Stock, New Warrants, and/or DOT Warrants that are not distributed in accordance with Section 6.11 shall be returned to, and ownership thereof shall vest in, Reorganized Parent or Reorganized AMC, as the Reorganized Debtors shall determine.

### 6.13    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of this Plan).

### 6.14    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan or as otherwise required by law (as determined by the Debtors or Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest.

### 6.15    *Setoffs and Recoupments.*

Each Debtor or Reorganized Debtor, or such entity's designee as instructed by such Debtor or Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Plan Effective Date.  Notwithstanding the foregoing, neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### 6.16    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all applicable distributions or payments provided for under this Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Plan Effective Date) or pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.17    *Expenses of Disbursing Agent.*

To the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor or as otherwise ordered by the Bankruptcy Court, subject to the written agreement of the Reorganized Debtors, the amount of any reasonable and documented out-of-pocket fees and expenses incurred by the Disbursing Agent on or after the Plan Effective Date (including taxes other than any net income taxes) and any reasonable and documented compensation and out-of-pocket expense reimbursement Claims (including for reasonable and documented outside

attorneys' fees and other professional fees and out-of-pocket expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.18   *Withholding and Reporting Requirements.*

(a)   *Withholding Rights*.  In connection with this Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the applicable withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (ii) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

(b)   *Forms*.  Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon reasonable request, deliver to the withholding agent or such other Entity designated by the Reorganized Debtors, an IRS Form W-8, IRS Form W-9 and/or any other forms or documents, as applicable, requested by any Reorganized Debtor or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a two hundred and ten (210) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

(c)   Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.   PROCEDURES FOR RESOLVING CLAIMS.

### 7.1   *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in this Plan, holders of Claims need not file proofs of Claim.  The Reorganized Debtors and holders of Claims shall determine and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced; *provided* that nothing herein shall prevent the Debtors from filing an objection to any

proof of Claim filed. For the avoidance of doubt, the Reorganized Debtors shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims, in the ordinary course of business after the Plan Effective Date. Notwithstanding any other provision of this Plan, the fact that a Claim, including General Unsecured Claims, remains unaltered by this Plan shall in no way effect whether such Claim is Allowed. Unless otherwise ordered by the Bankruptcy Court, the holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall, after the Plan Effective Date, retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties. Except for (i) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of this Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Plan Effective Date, upon the Plan Effective Date, any filed proofs of Claim, regardless of the time of filing, and including proofs of Claims filed after the Plan Effective Date, shall be deemed withdrawn. To the extent not otherwise provided in this Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under this Section 7.1 of this Plan to assert its Claims after the Plan Effective Date in any forum as though the Debtors' Chapter 11 Cases had not been commenced. From and after the Plan Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2   *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in this Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Plan Effective Date, the Reorganized Debtors shall have the authority to:  (a) file, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Plan Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtor had immediately prior to the Plan Effective Date with respect to any Disputed Claim.

### 7.3   *Estimation of Claims.*

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the

allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 7.4 *Adjustment to Claims Register Without Objection*

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.5 *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

### 7.6 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.7 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Plan Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1 *General Treatment.*

(a) As of and subject to the occurrence of the Plan Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation

Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.

(b)     Subject to (i) satisfaction of the conditions set forth in Section 8.1(a) of this Plan, (ii) resolution of any disputes in accordance with Section 8.2 of this Plan with respect to the contracts or leases subject to such dispute, and (iii) the occurrence of the Plan Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor (or its designated assignee) in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     The Debtors may file, as part of the Plan Supplement, the Schedule of Rejected Contracts.

### 8.2 *Determination of Assumption and Cure Disputes; Deemed Consent.*

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount (i) in Cash on the Plan Effective Date, (ii) in the ordinary course of business, in each case, subject to the limitations described below, or (iii) on such other terms as the counterparties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption (i) shall be deemed to have assented to such assumption, notwithstanding any provision thereof that purports to (A) prohibit, restrict, or condition the transfer or assignment of such contract or lease or (B) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by this Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by this Plan, and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter.

(c)     If there is a dispute regarding (i) any Cure Amount, (ii) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such contract or lease to be assumed, or (iii) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective and shall not prevent or delay consummation of the Plan or the occurrence of the Plan Effective Date. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Amounts, the applicable Debtor may assume the executory contract or unexpired lease prior to the resolution of any such dispute, as long as that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Amount by the contract counterparty. Following entry of a Final Order resolving any such dispute, the Debtors shall have right to reject any executory contract or unexpired lease within thirty (30) calendar days of such resolution. For the avoidance of doubt, nothing provided herein

shall require the Debtors to file a notice of proposed Cure Amounts to be paid in connection with an executory contract or unexpired lease that may be assumed by the Debtors pursuant to this Plan.

(d)     Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, and satisfaction of the applicable Cure Amount pursuant to this Section 8.2(d), shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed and for which any applicable Cure Amount has been fully paid pursuant to this Section 8.2(d) shall be deemed disallowed and expunged as of the Plan Effective Date, without the need for any objection thereto or any further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

## 8.3     *Rejection Damages Claims.*

Any counterparty to an executory contract or unexpired lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) calendar days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such executory contract or unexpired lease. **Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time shall be deemed disallowed pursuant to the Confirmation Order or such other order of the Bankruptcy Court, as applicable, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Reorganized Debtors, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a proof of Claim to the contrary.**

## 8.4     *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in this Plan (including Section 10.3 of this Plan), any and all obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, other organizational documents, or other agreements to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation or consummation of this Plan and shall be Reinstated and remain intact, irrevocable, and shall survive the Plan Effective Date on terms no less favorable to such current and former officers, members, managers, directors, agents, or employees than the indemnification provision in place prior to the Plan Effective Date. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations with respect thereto shall be an Allowed Claim.

### 8.5     *Compensation and Benefit Plans.*

(a)     Unless otherwise modified prior to or on the Plan Effective Date, all employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all restrictive covenant agreements, confidentiality agreements, savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Plan Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

(b)     The Reorganized Debtors shall:  (i) adopt, assume, and/or honor in the ordinary course of business any and all contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, supplemental executive retirement plans, change-in-control agreements, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors; and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Plan Effective Date for accrued vacation time arising prior to the Plan Effective Date and not otherwise paid in the ordinary course of business or pursuant to a Final Order.

(c)     Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Plan Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  For avoidance of doubt, nothing herein shall impact or limit the ability of the Reorganized Debtors to amend, modify, or terminate such arrangements in accordance with their terms following the Plan Effective Date.

### 8.6     *Insurance Policies.*

(a)     Each of the D&O Insurance Policies will be deemed and treated as an executory contract to be assumed by the Debtors under this Plan, and all obligations of the Debtors under such D&O Insurance Policies will continue as obligations of the Reorganized Debtors.

(b)     In addition, after the Plan Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under the D&O Insurance Policies.  Any individuals covered by such D&O Insurance Policies, including all current or former members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date, will be entitled to the full benefits of any such D&O Insurance Policy for the full term of the policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Plan Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement, with the consent of the Requisite Prepetition Secured Parties, such D&O Insurance Policies as the Debtors deem necessary, including by purchasing any additional tail coverage (including a tail policy).

8.7     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

(a)     Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

(b)     Modifications, amendments, and supplements to, or restatements of, prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.8     *Reservation of Rights.*

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective Affiliates has any liability thereunder.

(b)     Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE IX.     CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND OCCURRENCE OF PLAN EFFECTIVE DATE.**

9.1     *Conditions Precedent to Confirmation.*

The Confirmation Date shall not occur unless the following conditions precedent to confirmation of this Plan have been satisfied:

(a) an order finding the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court (which, for the avoidance of doubt, may be the same order as the Confirmation Order);

(b) this Plan, the Plan Supplement, and any and all of the schedules, documents, and exhibits contained therein shall have been filed with the Bankruptcy Court and shall be consistent in all material respects with this Plan and the RSA; and

(c) the RSA shall not have been terminated and shall be in full force and effect.

**9.2** ***Conditions Precedent to Plan Effective Date.***

The Plan Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a) the RSA shall not have been terminated and shall be in full force and effect with no notice of termination, breach, default, event of default, or similar notice having been delivered by or to any signatory thereto (to the extent such breach, default, event of default, or similar notice has not been cured or waived in accordance with the terms of the RSA);

(b) this Plan, as confirmed by the Confirmation Order, shall not have been amended or modified in any manner unless such amendment or modification is effectuated in accordance with the terms set forth in this Plan and the RSA;

(c) the Definitive Documents contain terms and conditions consistent with the RSA, including all consent rights contained therein and in any other Definitive Document;

(d) the Bankruptcy Court shall have entered the Confirmation Order in form and substance (i) acceptable to the Debtors and the Requisite Prepetition Secured Parties and (ii) reasonably acceptable to the Consenting Sponsor, and such Confirmation Order will not have been stayed or materially modified;

(e) the documents related to the Exit Term Loan Facility and the Exit Securitization Program shall have been duly executed and delivered by all of the relevant parties thereto;

(f) the Commitment Premiums and the DIP Backstop Premium shall have been issued or paid, as applicable, in full (or will be issued or paid in full concurrently with the occurrence of the Plan Effective Date) and all other fees, expenses, and other amounts contemplated to be paid by the Debtors pursuant to the Definitive Documents, to the extent due and payable as of such date, shall have been paid in full as set forth therein;

(g) all respective conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of each of the Exit Term Loan Facility and the Exit Securitization Program, shall have been satisfied or waived in accordance with the terms thereof;

(h) the Debtors will have implemented the Restructuring and all transactions contemplated by this Plan in a manner consistent with the RSA (and subject to, and in accordance with, the consent rights set forth therein);

(i) in the event of a Purchase Transaction, all conditions precedent to the closing of such sale under the Acquisition Agreement, other than the effectiveness of this Plan, shall have been satisfied or waived in accordance with the terms thereof;

(j) the BH Guarantor Release shall have occurred;

(k) all Cash proceeds expected to be received pursuant to the ERO, the DRO, and the Private Placement, including with respect to the commitments pursuant to the Purchase Commitment and Backstop Agreement, shall have been received by the Debtors (or will be received substantially concurrently with the occurrence of the Plan Effective Date); and

(l) all authorizations, consents, regulatory or governmental approvals, rulings or documents, including Bankruptcy Court approval, necessary to effectuate and implement this Plan will have been obtained.

### 9.3 *Waiver of Conditions Precedent.*

(a) Each of the conditions precedent to the occurrence of the Plan Effective Date may be waived, in whole or in part, in writing by the Debtors and the Requisite Prepetition Secured Parties without leave of or order of the Bankruptcy Court; *provided* that waiver of the conditions precedent set forth in Sections 9.2(a), 9.2(b), 9.2(c), 9.2(d), 9.2(f), 9.2(h), or 9.2(i) shall additionally require the written consent of the Consenting Sponsor, solely to the extent such waiver would have a material and adverse effect on the rights, obligations, or interests of the Consenting Sponsor. If any such condition precedent is waived pursuant to this Section 9.3 and the Plan Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Plan Effective Date or otherwise challenging the occurrence of the Plan Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Plan Effective Date shall foreclose any ability to challenge this Plan in any court. If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Plan Effective Date to occur.

(b) Except as otherwise provided herein, all actions required to be taken on the Plan Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4     *Effect of Failure of a Condition.*

If the conditions listed in <u>Section 9.2</u> of this Plan are not satisfied or waived in accordance with <u>Section 9.3</u> of this Plan on or before the later of (a) the first Business Day following the date that is seventy-five (75) calendar days after the date on which the Confirmation Order is entered, and (b) such later date reasonably acceptable to the Debtors, the Requisite Prepetition Secured Parties, and the Consenting Sponsor and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Parties, or any other Entity.

## ARTICLE X.        EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

As of the Plan Effective Date, this Plan shall bind (a) the Debtors; (b) the Reorganized Debtors; (c) all holders of Claims against and Interests in the Debtors and their respective successors and assigns, regardless of whether any such holders were (i) Impaired or Unimpaired under this Plan, (ii) deemed to accept or reject this Plan, (iii) failed to vote to accept or reject this Plan, or (iv) voted to reject this Plan; (d) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan; (e) each Entity acquiring property under the Plan and the Confirmation Order; and (f) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

### 10.2     *Vesting of Assets.*

Except as otherwise provided in this Plan, the Plan Supplement, or the Confirmation Order, on and after the Plan Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of this Plan, on and after the Plan Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims), Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3     *Discharge of Claims Against and Interests in Debtors.*

Unless otherwise provided in this Plan or in the Confirmation Order, effective as of the Plan Effective Date and in consideration of the distributions to be made under this Plan:  (a) the

rights afforded in this Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors' Estates, or the Reorganized Debtors; (b) all Claims and Interests shall be deemed to be satisfied, discharged, and released in full, and the liability of the Debtors and the Reorganized Debtors with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; (c) each holder (as well as any trustee or agent on behalf of a holder) of a Claim or Interest and any Affiliate, successor, or assign of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interest, rights, and liabilities that arose prior to the Plan Effective Date; and (d) all Entities shall be forever precluded and enjoined pursuant to sections 105, 524, and 1141 of the Bankruptcy Code from asserting against the Debtors, the Debtors' Estates, or the Reorganized Debtors, any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Plan Effective Date.

### 10.4    *Pre-Confirmation Injunctions and Stays*.

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Plan Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction Against Interference with Plan*.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Plan Effective Date.

### 10.6    *Plan Injunction*.

(a)    Except as otherwise expressly provided in this Plan, or for distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released pursuant to Section 10.7(a) or Section 10.7(b) of this Plan, (ii) discharged pursuant to Section 10.3 of this Plan, or (iii) subject to exculpation pursuant to Section 10.8 of this Plan, and (iv) all other parties in interest, are permanently enjoined, from and after the entry of the Confirmation Order, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, an Estate, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 10.8 of this Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting,

or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Plan Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and Confirmation Order, to the full extent permitted by applicable law; (F) if such Entity is a "50-percent shareholder" as defined under section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended, with respect to any Debtor, treating, or causing any other Entity to treat, any stock (as defined under section 382(k)(6) of the Internal Revenue Code of 1986, as amended,) in any Debtor as "becoming worthless" as defined under section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended, with respect to any taxable year of such Entity ending on or before the Plan Effective Date; and (G) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to this Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor, a Reorganized Debtor, or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of this Plan.

(b)     Subject in all respects to Section 11.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases (including the filing and administration thereof); the Restructuring; any Restructuring Transaction; the RSA; the Disclosure Statement; the Purchase Transaction (if applicable); the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; the Prepetition Secured Loans; the Prepetition Unsecured Notes; the SICFA; the Prepetition Securitization Program; the Securitization Program; the Exit Securitization Program; the Exit Term Loan Facility; the DIP Facility; the DIP Documents; the DRO; the DRO Backstop Commitment; the ERO; the ERO Backstop Commitment; the Equity Cash-Out Option; the Private Placement; the Private Placement Commitment; the New Warrants; the DOT Warrants; the Aircraft Financing Arrangements; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors or Reorganized Debtors; the issuances of New Interests; the New Corporate Governance

Documents; the Management Incentive Plan; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany transactions; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement); the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan; or any other agreement, act or omission, transaction, event, or other occurrence related to the foregoing and taking place on or before the Plan Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 11.1 of this Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

      **10.7**    ***Releases.***

      **(a)**     **Releases by the Debtors.  As of the Plan Effective Date, except (i) for the rights and remedies that remain in effect from and after the Plan Effective Date to enforce this Plan, the Definitive Documents, or the obligations in respect of the Restructuring Transactions or (ii) as otherwise provided in this Plan or in the Confirmation Order, on and after the Plan Effective Date, the Released Parties will be conclusively, absolutely, unconditionally and irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Entities that may purport to assert any Cause of Action derivatively by or through the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases (including the filing and administration thereof); the Restructuring; any Restructuring Transaction; the RSA; the Disclosure Statement; the Purchase Transaction (if applicable); the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; the Prepetition Secured Loans; the Prepetition Unsecured Notes; the SICFA; the Prepetition Securitization Program; the Securitization Program; the**

Exit Securitization Program; the Exit Term Loan Facility; the DIP Facility; the DIP Documents; the DRO; the DRO Backstop Commitment; the ERO; the ERO Backstop Commitment; the Equity Cash-Out Option; the Private Placement; the Private Placement Commitment; the New Warrants; the DOT Warrants; the Aircraft Financing Arrangements; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors or Reorganized Debtors; the issuances of New Interests; the New Corporate Governance Documents; the Management Incentive Plan; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany transactions; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement); the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan; or any other agreement, act or omission, transaction, event, or other occurrence related to the foregoing and taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary herein, the releases contained in this <u>Section 10.7(a)</u> shall not release any Entity from Causes of Action based on willful misconduct, gross negligence, or intentional fraud, in each case as determined by a Final Order.

(b) **Third-Party Releases.** As of the Plan Effective Date, except (i) for the rights and remedies that remain in effect from and after the Plan Effective Date to enforce this Plan, the Definitive Documents, or the obligations in respect of the Restructuring Transactions or (ii) as otherwise provided in this Plan or in the Confirmation Order, on and after the Plan Effective Date, the Released Parties will be conclusively, absolutely, unconditionally, and irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and Representatives and any and all other Entities that may purport to assert any Cause of Action derivatively by or through the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases (including the filing and administration thereof); the Restructuring; any Restructuring Transaction; the RSA; the Disclosure Statement; the Purchase Transaction (if applicable); the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; the Prepetition Secured Loans; the Prepetition Unsecured Notes; the SICFA; the Prepetition Securitization Program; the Securitization Program; the Exit Securitization Program; the Exit Term Loan Facility; the DIP Facility; the DIP Documents; the DRO; the DRO Backstop Commitment; the ERO; the ERO Backstop

**Commitment; the Equity Cash-Out Option; the Private Placement; the Private Placement Commitment; the New Warrants; the DOT Warrants; the Aircraft Financing Arrangements; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors or Reorganized Debtors; the issuances of New Interests; the New Corporate Governance Documents; the Management Incentive Plan; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany transactions; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement); the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan; or any other agreement, act or omission, transaction, event, or other occurrence related to the foregoing and taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary herein, the releases contained in this <u>Section 10.7(b)</u> shall not release any Entity from Causes of Action based on willful misconduct, gross negligence, or intentional fraud, in each case as determined by a Final Order.**

**10.8    _Exculpation._**

To the fullest extent permitted by applicable law, from and after the Petition Date through the Plan Effective Date, no Exculpated Party will have or incur, and each such Entity will be released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part:  the Debtors (including the management, direct or indirect ownership, or operation thereof) or their Estates; the Reorganized Debtors; the Chapter 11 Cases (including the filing and administration thereof); the Restructuring; any Restructuring Transaction; the RSA; the Disclosure Statement; the Purchase Transaction (if applicable); the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; the Securitization Program; the Exit Securitization Program; the Exit Term Loan Facility; the DIP Facility; the DIP Documents; the DRO; the DRO Backstop Commitment; the ERO; the ERO Backstop Commitment; the Equity Cash-Out Option; the Private Placement; the Private Placement Commitment; the New Warrants; the DOT Warrants; the Aircraft Financing Arrangements; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors or Reorganized Debtors; the issuances of New Interests; the New Corporate Governance Documents; the Management Incentive Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Plan Effective Date; any intercompany transactions; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement); the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the issuance or distribution of securities pursuant to this Plan; the distribution of property under this Plan; or any other agreement, act or omission, transaction, event,

or other occurrence related to the foregoing and taking place on or before the Plan Effective Date. Notwithstanding anything herein to the contrary, the exculpation in this Section 10.8 shall not release or exculpate any Entity from Causes of Action based on such Entity's intentional fraud, gross negligence, or willful misconduct, in each case as determined by a Final Order, but in all respects such Entity will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability.

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### 10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right (subject to the consent of the Requisite Prepetition Secured Parties), to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including Sections 10.7(a), 10.7(b), 10.8, and 10.9, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Plan Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Plan Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any

Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring Transactions.

## ARTICLE XI.   RETENTION OF JURISDICTION.

### 11.1   *Retention of Jurisdiction.*

On and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)   to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)   to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)   to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)   to ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)   to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)   to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)   to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)   to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, the Confirmation Order, or any order of the

Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Plan Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, Plan Supplement, and Confirmation Order;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q)     to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(r)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(s)     to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

### 11.2 *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.        MISCELLANEOUS PROVISIONS.

### 12.1 *Statutory Fees.*

All Statutory Fees due and payable prior to the Plan Effective Date shall be paid by the Debtors or the Reorganized Debtors in full on the Plan Effective Date.  On and after the Plan Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  After the Plan Effective Date, each Debtor or Reorganized Debtor, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a proof of Claim or any other request for payment of quarterly fees.

### 12.2 *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities, instruments or documents, including the DRO Subscription Rights, ERO Subscription Rights, New Common Stock, DOT Warrants, New Warrants, and the Exit Term Loans, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Plan Effective Date, including any transfers effectuated under this Plan pursuant to a Restructuring Transaction or the Purchase Transaction, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of Collateral under the Exit Securitization Program, and Exit Term Loan Facility, and (f) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.3   *Request for Expedited Determination of Taxes.*

The Debtors and Reorganized Debtors (including in the event of the Purchase Transaction) shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Plan Effective Date.

### 12.4   *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.5   *Amendments.*

(a)     Plan Modifications.   This Plan may be amended, supplemented, or otherwise modified by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court and, in each case, in accordance with the terms of the RSA.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, supplemented, or otherwise modified.

(b)     Certain Technical Amendments.   Subject to the terms of the RSA, prior to the Plan Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the holders of Claims or Interests under this Plan.

### 12.6   *Revocation or Withdrawal of Plan.*

To the extent permitted under the RSA and any consent rights thereunder, the Debtors reserve the right to revoke or withdraw this Plan prior to the Plan Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Plan Effective Date, or if confirmation or the occurrence of the Plan Effective Date as to such Debtor does not occur on the Plan Effective Date, then, with respect to such Debtor (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of such

Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor or any other Entity.

### 12.7   *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 12.7, is (a) valid and enforceable pursuant to its terms, (b) integral to this Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 12.8   *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that this Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under this Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.9   *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Plan Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected the Plan), the Released Parties, and each of their respective successors and assigns.

### 12.10   *Successors and Assigns*.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

**12.11**   *Entire Agreement*.

On the Plan Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**12.12**   *Computing Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.13**   *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

**12.14**   *Notices*.

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Debtors, to:

Air Methods Corporation
5500 South Quebec Street, Suite 300
Greenwood Village, CO 80111

Attention:   JaeLynn Williams, Chief Executive Officer
(jaelynn.williams@airmethods.com)
Christopher Brady, SVP, General Counsel and Secretary
(christopher.brady@airmethods.com)
Jason Kahn, Interim CFO
(jason.kahn@airmethods.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Attention:   Ray C. Schrock, Esq. (Ray.Schrock@weil.com)
Kelly DiBlasi, Esq. (Kelly.DiBlasi@weil.com)
Kevin Bostel, Esq. (Kevin.Bostel@weil.com)
Alexander P. Cohen, Esq. (Alexander.Cohen@weil.com)

(2) If to the Counsel to the Ad Hoc Group,

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

Attention:   Damian S. Schaible, Esq. (Damian.Schaible@davispolk.com)
              Adam L. Shpeen, Esq. (Adam.Shpeen@davispolk.com)
              Stephen D. Piraino, Esq. (Stephen.Piraino@davispolk.com)
              David Kratzer, Esq. (David.Kratzer@davispolk.com)

(3) If to the Counsel to the Consenting Sponsor,

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Attention:   Paul Basta, Esq. (pbasta@paulweiss.com)
              Jacob Adlerstein, Esq. (jadlerstein@paulweiss.com)
              Kyle R. Satterfield, Esq. (ksatterfield@paulweiss.com)

After the occurrence of the Plan Effective Date, the Reorganized Debtors have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Plan Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

### 12.15   *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Plan Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated:  November 30, 2023
Greenwood Village, Colorado

Respectfully submitted,

**Air Methods Corporation**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**ASP AMC Holdings, Inc.**

By: _____
Name: JaeLynn Williams
Title: Authorized Signatory

**ASP AMC Intermediate Holdings, Inc.**

By: _____
Name: JaeLynn Williams
Title: Authorized Signatory

**Air Methods Telemedicine, LLC**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**United Rotorcraft Solutions, LLC**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

[*Signature Page to Amended Joint Prepackaged Chapter 11 Plan*]

**Mercy Air Service, Inc.**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

**LifeNet, Inc.**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

**Rocky Mountain Holdings, L.L.C.**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

**Air Methods Tours, Inc.**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

**Tri-State Care Flight, L.L.C.**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

**Advantage LLC**

By: _Christopher Brady_
Name: Christopher J. Brady
Title: Authorized Signatory

[*Signature Page to Amended Joint Prepackaged Chapter 11 Plan*]

**Enchantment Aviation, Inc.**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**Native Air Services, Inc.**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**Native American Air Ambulance, Inc.**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**AirMD, LLC**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

**Midwest Corporate Air Care, LLC**

By: _____
Name: Christopher J. Brady
Title: Authorized Signatory

[*Signature Page to Amended Joint Prepackaged Chapter 11 Plan*]

Dated:  November 30, 2023

Greenwood Village, Colorado

Respectfully submitted,

**Air Methods Corporation**

By: _____

Name: Christopher J. Brady
Title: Authorized Signatory

**ASP AMC Holdings, Inc.**

By: _____

Name: JaeLynn Williams
Title: Authorized Signatory

**ASP AMC Intermediate Holdings, Inc.**

By: _____

Name: JaeLynn Williams
Title: Authorized Signatory

**Air Methods Telemedicine, LLC**

By: _____

Name: Christopher J. Brady
Title: Authorized Signatory

**United Rotorcraft Solutions, LLC**

By: _____

Name: Christopher J. Brady
Title: Authorized Signatory

*[Signature Page to Amended Joint Prepackaged Chapter 11 Plan]*

**<u>Exhibit A</u>**

**RSA**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE (AS DEFINED HEREIN).   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   THIS DRAFT RESTRUCTURING SUPPORT AGREEMENT IS SUBJECT IN ALL RESPECTS TO CONTINUED DILIGENCE AND THE NEGOTIATION, APPROVAL, AND EXECUTION THEREOF.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes and schedules attached to this agreement, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of October 23, 2023 is entered into by and among:

(i)     Air Methods Corporation ("**Air Methods Parent**"), ASP AMC Holdings, Inc. ("**Holdings**"), ASP AMC Intermediate Holdings, Inc. ("**Intermediate Holdings**"), Air Methods Telemedicine, LLC, United Rotorcraft Solutions, LLC, Mercy Air Service, Inc., LifeNet, Inc., Rocky Mountain Holdings, L.L.C., Air Methods Tours, Inc., Tri-State Care Flight, LLC, Advantage LLC, Enchantment Aviation, Inc., Native Air Services, Inc., Native American Air Ambulance, Inc., AirMD, LLC, and Midwest Corporate Air Care, LLC (collectively, the "**Company**" and each a "**Company Party**");

(ii)    the undersigned holders, or investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of holders, of (a) loans or commitments (the "**Prepetition Secured Loans**") under that certain Credit Agreement, dated as of April 21, 2017 (as may be amended, supplemented, or otherwise modified from time to time, including by that certain Incremental Facility Agreement No. 1, dated April 6, 2021, and that certain Amendment No. 2 to Credit Agreement, dated as of September 29, 2023, the "**Prepetition Credit Agreement**"), by and among Air Methods Parent, as borrower, Intermediate Holdings, as parent guarantor, certain subsidiaries of Air Methods Parent, as Subsidiary Guarantors (as defined therein), Royal Bank of Canada, as administrative agent, and the lenders from time to time party thereto (together with their respective successors and permitted assigns, and any subsequent Prepetition Secured Party (as defined below) that becomes party hereto by executing a Joinder Agreement (as defined below) in accordance with the terms of this Agreement, the "**Consenting Prepetition Secured Parties**") and (b) senior unsecured notes (the "**Prepetition Unsecured Notes**") under that certain Indenture, dated as of April 21, 2017 (as may be amended, supplemented, or otherwise modified from time to time, the "**Indenture**" and, together with the Prepetition Credit Agreement, the "**Prepetition Credit Documents**"), by and among Air Methods Parent (as successor to ASP AMC Merger Sub Inc.), as issuer, certain subsidiaries of Air

Methods Parent, as Guarantors (as defined in the Indenture), and Wilmington Trust N.A., as trustee thereunder (each, on behalf of itself and/or certain funds managed by it or its affiliates, together with their respective successors and permitted assigns, and any subsequent Prepetition Unsecured Noteholder (as defined below) that becomes party hereto by executing a Joinder Agreement in accordance with the terms of this Agreement, the "**Consenting Prepetition Unsecured Noteholders**" and, together with the Consenting Prepetition Secured Parties, the "**Consenting Creditors**"); and[1]

(iii)     American Securities Associates VII Alternative, LLC, on behalf of ASP VII Alternative Investments I(A), LP, ASP VII Alternative Investments I(C), LP, ASP VII Alternative Investments II(A), LP, and ASP VII Alternative Investments II(C), LP, American Securities Associates VII, LLC, on behalf of American Securities Partners VII (B) LP,  and ASP Manager Corp., on behalf of ASP AMC Co-Invest I, LP, AS/ASP VII Co-Investor LLC, ASP AMC Co-Invest II, LP, AMC Cayman Investors LP, ASP AMC Investco I LP, and ASP AMC Investco II LP (collectively, in their capacity as direct or indirect record or beneficial holders of Interests (defined below) in Holdings, the "**Consenting Sponsor**" and, together with the Consenting Creditors, the "**Consenting Parties**").

The Company and Consenting Parties are collectively referred to herein as the "**Parties**" and each individually as a "**Party**."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below).

**WHEREAS**, as of the date hereof, each Consenting Creditor is the beneficial owner, or the investment advisor, sub-advisor, or manager of discretionary accounts or funds acting on behalf of beneficial owner(s), of Prepetition Secured Loans and/or Prepetition Unsecured Notes, as the case may be, in the principal amounts set forth on its signature page hereto;

---

[1]     For the avoidance of doubt, any affiliates or related parties of any Consenting Creditor that is not or does not become a Consenting Creditor shall not be deemed to be Consenting Creditors themselves.  The Parties acknowledge and agree that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of or advised by an investment manager are being made only with respect to the Prepetition Secured Loans and/or Prepetition Unsecured Notes held by such separately managed or advised account (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Prepetition Secured Loans and/or Prepetition Unsecured Notes that may be beneficially owned by other accounts that are managed or advised by such investment manager.  The Parties further acknowledge and agree that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is an investment advisor, sub-advisor, or manager of managed accounts are being made solely in such Consenting Creditor's capacity as an investment advisor, sub-advisor, or manager to the beneficial owners of the Prepetition Secured Loans and/or Prepetition Unsecured Notes specified on the applicable signature pages hereto (in the amount identified on such signature pages), and shall not apply to (or be deemed to be made in relation to) such investment advisor, sub-advisor, or manager in any other capacity, including in its capacity as an investment advisor, sub-advisor, or manager of other managed accounts.  Notwithstanding the foregoing, and in accordance with Section 17 hereof, each Consenting Creditor (in the capacity in which it signs in accordance with this footnote) shall be bound to this Agreement on account of all Prepetition Secured Loans and/or Prepetition Unsecured Notes set forth on its signature page hereto.

2

**WHEREAS**, as of the date hereof, the Consenting Prepetition Secured Parties, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 71.6% of the aggregate outstanding principal amount of Prepetition Secured Loans;

**WHEREAS**, as of the date hereof, the Consenting Prepetition Unsecured Noteholders, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 66.8% of the aggregate outstanding principal amount of Prepetition Unsecured Notes;

**WHEREAS**, as of the date hereof, the Consenting Sponsor holds approximately 94.7% of the outstanding common stock Interests in Holdings (on a fully diluted basis); and

**WHEREAS**, the Parties have engaged in arm's-length, good-faith negotiations and have agreed to consummate, support, and consent to (as applicable) a restructuring of the Company's capital structure (the "**Restructuring**"), subject to the terms and conditions of this Agreement and as described below:

(a)    the Company will effectuate the Restructuring on the terms set forth in the Plan (as defined below) attached hereto as **Exhibit A** through (i) a prepackaged chapter 11 plan of reorganization (including all exhibits, annexes, supplements and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "**Plan**"), (ii) a solicitation of votes thereon (the "**Solicitation**"), and (iii) commencement by the Company of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

(b)    the Company and the Consenting Prepetition Secured Parties have reached an agreement for the Company's consensual use of Cash Collateral (as defined below) during the Chapter 11 Cases;

(c)    the DIP Lenders (as defined below) have committed, pursuant to the terms hereof, to provide a superpriority, senior-secured, priming debtor-in-possession term-loan facility in the aggregate principal amount of up to $155,000,000 (the "**DIP Facility**"), consisting of (i) $80,000,000 of new-money DIP Loans (the "**DIP New Money Loans**" and the commitments in respect thereof, the "**DIP Commitments**") and (ii) a roll-up of Prepetition Secured Loans held by DIP Lenders, on a pro rata basis in accordance with the share of DIP New Money Loans made by such DIP Lender and subject to the terms and conditions of the DIP Credit Agreement (the "**DIP Rolled-Up Loans**" and, together with the DIP New Money Loans, the "**DIP Loans**"), in the aggregate principal amount of up to $75,000,000, which will convert, on a dollar-for-dollar basis, to Exit Term Loans (as defined in the Plan) upon the Plan Effective Date;

(d)    certain members of the Ad Hoc Group set forth on Schedule I hereto and ASP VII D2 Ltd (in such capacities, the "**DIP Backstop Parties**") have agreed to, severally

3

and not jointly, commit to backstop the DIP Facility, in accordance with Section 3.08 of this Agreement and the terms of the DIP Term Sheet and Plan (each such commitment, a "**DIP Backstop Commitment**"); and

(e)      pursuant to the Plan and the Purchase Commitment and Backstop Agreement (as defined herein), certain creditors will be provided with the opportunity to participate in a debt rights offering and equity rights offering, and certain parties will commit to purchase equity interests in the Company through a private placement of certain equity distributions (in each case pursuant to the terms and conditions set forth in the Plan and the Purchase Commitment and Backstop Agreement), the proceeds of which will be used to fund Plan distributions and liquidity on the Company's go-forward balance sheet, which debt rights offering will be backstopped by the DRO Backstop Commitment Parties, which equity rights offering will be backstopped by the ERO Backstop Commitment Parties, and which private placement of equity interests will be funded by the Private Placement Commitment Parties, in each case in accordance with the terms of the Purchase Commitment and Backstop Agreement.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.      Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)      "**Ad Hoc Group**" means that certain ad hoc group of Prepetition Secured Parties and Prepetition Unsecured Noteholders represented by the Ad Hoc Group Advisors.

(b)      "**Ad Hoc Group Advisors**" has the meaning set forth in the Plan.

(c)      "**Allowed Consenting Sponsor Claim**" has the meaning set forth in the Plan.

(d)      "**Alternative Restructuring**" means any reorganization, liquidation, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, exchange offer, business combination, joint venture, partnership, sale or disposition of a material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring, new-money investment, plan of reorganization, or similar transaction  of the Company, other than the Restructuring expressly contemplated by this Agreement.

(e)      "**A/R Facility**" has the meaning set forth in the Plan.

(f)      "**Bankruptcy Rules**" has the meaning set forth in the Plan.

WEIL:\99393106\1\12309.0021

(g)     "**Business Day**" means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

(h)     "**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

(i)     "**Cause of Action**" has the meaning set forth in the Plan.

(j)     "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(k)     "**Claim**" has the meaning set forth in the Plan.

(l)     "**Commitment and Rights Offering Orders**" means, collectively, the DRO Procedures Approval Order, the ERO Procedures Approval Order, and the Purchase Commitment and Backstop Approval Order, which orders, for the avoidance of doubt, may be the same order, including the Confirmation Order.

(m)     "**Commitment Parties**" has the meaning set forth in the Plan.

(n)     "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan and approving the Disclosure Statement and Solicitation Materials.

(o)     "**Consenting Claims**" means all Claims held by Consenting Parties from time to time.

(p)     "**Consenting Interests**" means all Interests in Holdings held by the Consenting Sponsor.

(q)     "**Davis Polk**" means Davis Polk & Wardwell LLP, as counsel to the Ad Hoc Group.

(r)     "**Definitive Documents**" means, collectively: (i) the Plan; (ii) the Disclosure Statement and the other Solicitation Materials; (iii) the Confirmation Order and any motion or brief filed by the Company Parties in support of entry thereof; (iv) the DIP Documents; (v) the First-Day Pleadings and all orders sought pursuant thereto; (vi) the Exit Facility Documents; (vii) the Purchase Commitment and Backstop Agreement; (viii) the New Corporate Governance Documents; (ix) the New Warrant Documents; (x) the Plan Supplement, and any other compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Company with the Bankruptcy Court, including a restructuring steps memorandum (if any) and the Restructuring Transactions Exhibit; (xi) the DRO Documents; (xii) the ERO Documents; (xiii) the Private Placement Documents; (xiv) the Purchase Commitment and Backstop Approval Order; (xv) any and all other agreements, motions and briefs or material applications, filings, instruments and other documents related to the Restructuring or reasonably desired or necessary to implement the Restructuring, including the Purchase Transaction Documents; and (xiv) any order, or amendment or modification of any order, entered by the Bankruptcy Court, related to the foregoing items (i) through (xv).

5

(s)    "**DIP Closing Date**" means "Closing Date" as defined in the DIP Credit Agreement.

(t)    "**DIP Credit Agreement**" has the meaning set forth in the Plan.

(u)    "**DIP Commitments**" has the meaning set forth in the recitals to this Agreement.

(v)    "**DIP Commitment Outside Date**" means November 1, 2023.

(w)    "**DIP Documents**" means "Credit Documents" as defined in the DIP Credit Agreement.

(x)    "**DIP Facility**" has the meaning set forth in the recitals to this Agreement.

(y)    "**DIP Lender**" means any lender (including, as applicable, any DIP Backstop Party and any Joining DIP Commitment Party) having a DIP Commitment and/or holding outstanding DIP Loans.

(z)    "**DIP Loans**" has the meaning set forth in the recitals to this Agreement.

(aa)    "**DIP New Money Loans**" has the meaning set forth in the recitals to this Agreement.

(bb)    "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

(cc)    "**DIP Rolled-Up Loans**" has the meaning set forth in the recitals to this Agreement.

(dd)    "**DIP Term Sheet**" means the term sheet describing the terms of the DIP Facility attached hereto as **Exhibit D**.

(ee)    "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time in accordance with this Agreement.

(ff)    "**DRO**" has the meaning set forth in the Plan.

(gg)    "**DRO Backstop Commitment**" has the meaning set forth in the Plan.

(hh)    "**DRO Backstop Commitment Parties**" has the meaning set forth in the Plan.

(ii)    "**DRO Documents**" has the meaning set forth in the Plan.

(jj)    "**DRO Procedures**" has the meaning set forth in the Plan.

6

(kk)    "**DRO Procedures Approval Order**" means the order of the Bankruptcy Court approving the DRO Procedures, which order may be the same order as the Confirmation Order.

(ll)    "**Enforcement Action**" means, except to the extent expressly permitted by an order of the Bankruptcy Court:

(i)    any step towards the acceleration or collection of any payment of any Prepetition Secured Loans, Prepetition Unsecured Notes or any other indebtedness of any Company Party or any affiliate thereof (whether on account of a guarantee or primary obligation), including the making of any declaration that any Prepetition Secured Loans, Prepetition Unsecured Notes or any such other indebtedness or any guarantees of any of the foregoing is immediately due and payable or due and payable on demand;

(ii)    any action to exercise or seek to exercise any rights or remedies, including any right of set-off or recoupment, account combination or payment netting against any Company Party or any affiliate thereof, or institute or attempt to institute any action or proceeding with respect to such rights and remedies (including any action of foreclosure);

(iii)    any action of any kind to recover or demand cash in respect of all or any part of indebtedness owed by any Company Party or any affiliate thereof;

(iv)    the taking of any steps to enforce or require the enforcement of any guarantee, mortgage, charge, pledge, lien or other security interest or any other agreement or arrangement having a similar effect granted by any Company Party or any affiliate thereof or granted by any other person as security or credit support for an obligation of any Company Party or any affiliate thereof, including the exercise of any right under any collateral access agreements, landlord waiver or bailee's letter or similar agreement;

(v)    the taking of any steps to block any deposit account or securities account of any Company Party or any affiliate thereof or otherwise restrict access of any Company Party or any affiliate thereof to any deposit account or securities account, including the issuance of any notices of sole control to any deposit account bank or securities intermediary;

(vi)    any action of any kind to sue, claim or institute or continue legal process (including legal proceedings and execution) against any Company Party or any affiliate thereof;

(vii)    any action of any kind to designate an early termination date under any document evidencing a derivative transaction or terminate, or close out any transaction under any document evidencing a derivative transaction, prior to its stated maturity, or demand payment of any amount which would become payable on or following an early termination date or any such termination or close-out; and

7

(viii)    the petitioning, applying for, voting for or taking of any step towards or in connection with the involuntary commencement of any Restructuring Proceeding in respect of any Company Party or any affiliate thereof;

provided that the filing of any claim, proof of claim, or statement of interest in the Chapter 11 Cases shall not be considered an "Enforcement Action."

(mm)    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(nn)    "**ERO**" has the meaning set forth in the Plan.

(oo)    "**ERO Backstop Commitment**" has the meaning set forth in the Plan.

(pp)    "**ERO Backstop Commitment Parties**" has the meaning set forth in the Plan.

(qq)    "**ERO Documents**" has the meaning set forth in the Plan.

(rr)    "**ERO Procedures**" means the procedures governing the ERO, including the questionnaires and subscription forms attached thereto, as approved by the ERO Procedures Approval Order.

(ss)    "**ERO Procedures Approval Order**" means the order of the Bankruptcy Court approving the ERO Procedures, which order may be the same order as the Confirmation Order.

(tt)    "**Exit A/R Facility**" has the meaning set forth in the Plan.

(uu)    "**Exit A/R Facility Term Sheet**" has the meaning set forth in the Plan.

(vv)    "**Exit Facility Documents**" has the meaning set forth in the Plan.

(ww)    "**Exit Term Loan Facility**" has the meaning set forth in the Plan.

(xx)    "**Exit Term Loan Facility Term Sheet**" means the term sheet describing the terms of the Exit Term Loan Facility, attached hereto as **Exhibit B**.

(yy)    "**Final DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the DIP Loans, the Company's use of Cash Collateral, and the parties' rights with respect thereto on a final basis.

(zz)    "**First-Day Pleadings**" means all the motions that the Company files in connection with the commencement of the Chapter 11 Cases and all orders sought thereby.

(aaa)    "**Initial Consenting Prepetition Secured Parties**" means those Consenting Prepetition Secured Parties who execute this Agreement on or prior to the Support Effective Date; *provided* that the Consenting Sponsor shall not be an Initial Consenting Prepetition Secured Party on account of any Prepetition Secured Loans holdings.

8

(bbb) "**Initial Consenting Prepetition Unsecured Noteholders**" means those Consenting Prepetition Unsecured Noteholders who execute this Agreement on or prior to the Support Effective Date; *provided* that the Consenting Sponsor shall not be an Initial Consenting Prepetition Unsecured Noteholder on account of any Prepetition Unsecured Notes holdings.

(ccc) "**Initial Consenting Creditors**" means the Initial Consenting Prepetition Secured Parties and Initial Consenting Prepetition Unsecured Noteholders.

(ddd) "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Company Party, including all shares, units, common stock, preferred stock, membership interests, partnership interests, or other instruments evidencing any fixed or contingent ownership interest in any Company Party, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Company Party, that existed immediately before the Plan Effective Date.

(eee) "**Interim DIP Order**" means the order entered by the Bankruptcy Court approving, among other things, the DIP Loans, the Company's use of Cash Collateral, and the parties' rights with respect thereto on an interim basis.

(fff) "**Milestones**" means the milestones set forth in <u>Section 2.02</u> hereof.

(ggg) "**New Corporate Governance Documents**" has the meaning set forth in the Plan.

(hhh) "**New Equity Interests**" has the meaning set forth in the Plan.

(iii) "**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Sponsor.

(jjj) "**PCBA Documentation Principles**" means the documentation principles for the Purchase Commitment and Backstop Agreement attached hereto as **<u>Exhibit E</u>**.

(kkk) "**Plan Effective Date**" has the meaning set forth in the Plan.

(lll) "**Plan Supplement**" has the meaning set forth in the Plan.

(mmm) "**Prepetition Secured Parties**" means the lenders party to the Prepetition Credit Agreement, each in its capacity as such.

(nnn) "**Prepetition Unsecured Noteholders**" means the holders of Prepetition Unsecured Notes, each in its capacity as such.

(ooo) "**Private Placement**" has the meaning set forth in the Plan.

(ppp) "**Private Placement Commitment**" has the meaning set forth in the Plan.

9

(qqq) "**Private Placement Commitment Parties**" has the meaning set forth in the Plan.

(rrr) "**Private Placement Documents**" means, collectively, the Purchase Commitment and Backstop Agreement, the Purchase Commitment and Backstop Approval Order, and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the Private Placement, and any other materials distributed in connection with the Private Placement.

(sss) "**Purchase and Backstop Commitments**" means, collectively, the DRO Backstop Commitment, the ERO Backstop Commitment, and the Private Placement Commitment.

(ttt) "**Purchase Commitment and Backstop Agreement**" means that certain Purchase Commitment and Backstop Agreement, to be entered into by and among the Company, the DRO Backstop Commitment Parties, the ERO Backstop Commitment Parties, and the Private Placement Commitment Parties, providing for the Purchase and Backstop Commitments (including all exhibits, annexes, and schedules thereto, in each case, as may be amended, supplemented, or otherwise modified pursuant to the terms thereof), which shall include terms consistent with the PCBA Documentation Principles and as described in the Plan and the Disclosure Statement.

(uuu) "**Purchase Commitment and Backstop Approval Order**" has the meaning set forth in the Plan.

(vvv) "**Purchase Commitment and Backstop Documents**" has the meaning set forth in the Plan.

(www) "**Purchase Transaction Documents**" has the meaning set forth in the Plan.

(xxx) "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers some or all Claims (or enter with customers into long and short positions in some or all Claims), in its capacity as a dealer or marketmaker in some or all Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(yyy) "**Related Fund**" has the meaning set forth in <u>Section 3.08(e)</u>.

(zzz) "**Reorganized Debtors**" means, collectively, the Company Parties as reorganized on the Plan Effective Date in accordance with the Plan.

(aaaa) "**Reorganized Parent**" has the meaning set forth in the Plan.

(bbbb) "**Requisite Commitment Parties**" has the meaning set forth in the Purchase Commitment and Backstop Agreement.

(cccc) "**Requisite DIP Backstop Parties**" means, as of the relevant date, (i) at least three (3) unaffiliated DIP Backstop Parties holding DIP Backstop Commitments representing

more than 50% in aggregate principal amount of DIP Backstop Commitments held by the DIP Backstop Parties as of such date or (ii) if there are not at least three (3) unaffiliated DIP Backstop Parties holding DIP Backstop Commitments representing more than 50% in aggregate principal amount of DIP Backstop Commitments held by the DIP Backstop Parties as of such date, then DIP Backstop Parties holding DIP Backstop Commitments representing more than 50% in aggregate principal amount of DIP Backstop Commitments held by the DIP Backstop Parties as of such date.

(dddd) "**Requisite DIP Lenders**" means, as of the relevant time, (i) at least three (3) unaffiliated DIP Lenders having unused DIP Commitments and/or holding outstanding DIP Loans representing more than 50% of the aggregate at such time of all unused DIP Commitments and/or outstanding DIP Loans or (ii) if there are not at least three (3) unaffiliated DIP Lenders having unused DIP Commitments and/or holding outstanding DIP Loans representing more than 50% of the aggregate at such time of all unused DIP Commitments and/or outstanding DIP Loans, then DIP Lenders having unused DIP Commitments and/or holding outstanding DIP Loans representing more than 50% of the aggregate at such time of all unused DIP Commitments and/or outstanding DIP Loans.

(eeee) "**Requisite DRO Backstop Parties**" means, as of the relevant time, (i) at least three (3) unaffiliated DRO Backstop Commitment Parties that together hold more than 50% of the DRO Backstop Commitments or (ii) if there are not at least three (3) unaffiliated DRO Backstop Commitment Parties that together hold more than 50% of the DRO Backstop Commitments, then DRO Backstop Commitment Parties that together hold more than 50% of the DRO Backstop Commitments.

(ffff) "**Requisite ERO Backstop Parties**" means, as of the relevant time, (i) at least three (3) unaffiliated ERO Backstop Commitment Parties that together hold more than 50% of the ERO Backstop Commitments or (ii) if there are not at least three (3) unaffiliated ERO Backstop Commitment Parties that together hold more than 50% of the ERO Backstop Commitments, then ERO Backstop Commitment Parties that together hold more than 50% of the ERO Backstop Commitments.

(gggg) "**Requisite Prepetition Secured Parties**" means, as of the relevant date, (i) at least three (3) unaffiliated Initial Consenting Prepetition Secured Parties holding more than 50% of the aggregate outstanding principal amount of Prepetition Secured Loans that are held by Initial Consenting Prepetition Secured Parties, (ii) if there are not at least three (3) unaffiliated Initial Consenting Prepetition Secured Parties holding more than 50% of the aggregate outstanding principal amount of Prepetition Secured Loans that are held by Initial Consenting Prepetition Secured Parties, then Initial Consenting Prepetition Secured Parties holding more than 50% of the aggregate outstanding principal amount of Prepetition Secured Loans that are held by Initial Consenting Prepetition Secured Parties, or (iii) if there are no Initial Consenting Prepetition Secured Parties party to this Agreement, Consenting Prepetition Secured Parties holding more than 50% of the aggregate outstanding principal amount of Prepetition Secured Loans that are held by Consenting Prepetition Secured Parties.

(hhhh) "**Requisite Prepetition Unsecured Noteholders**" means, as of the relevant date, (i) at least three (3) unaffiliated Initial Consenting Prepetition Unsecured Noteholders holding more than 50% of the aggregate outstanding principal amount of Prepetition Unsecured Notes that

are held by Initial Consenting Prepetition Unsecured Noteholders, (ii) if there are not at least three (3) unaffiliated Initial Consenting Prepetition Unsecured Noteholders holding more than 50% of the aggregate outstanding principal amount of Prepetition Unsecured Notes that are held by Initial Consenting Prepetition Unsecured Noteholders, then Initial Consenting Prepetition Unsecured Noteholders holding more than 50% of the aggregate outstanding principal amount of Prepetition Unsecured Notes that are held by Initial Consenting Prepetition Unsecured Noteholders, or (iii) if there are no Initial Consenting Prepetition Unsecured Noteholders party to this Agreement, Consenting Prepetition Unsecured Noteholders holding more than 50% of the aggregate outstanding principal amount of Prepetition Unsecured Notes that are held by Consenting Prepetition Unsecured Noteholders.

(iiii)   **"Requisite Private Placement Commitment Parties"** means, as of the relevant time, (i) at least three (3) unaffiliated Private Placement Commitment Parties that together hold more than 50% of the Private Placement Commitments or (ii) if there are not at least three (3) unaffiliated Private Placement Commitment Parties that together hold more than 50% of the Private Placement Commitments, then Private Placement Commitment Parties that together hold more than 50% of the Private Placement Commitments.

(jjjj)   **"Restructuring Expenses"** has the meaning set forth in the Plan.

(kkkk)   **"Restructuring Proceedings"** means, other than the Chapter 11 Cases or any other action or proceeding taken in furtherance of or in connection with the Restructuring with the consent of the Company Parties and the Requisite Prepetition Secured Parties, the appointment of an administrator, liquidator, provisional liquidator, bankruptcy or proposal trustee, receiver, administrative receiver, or similar officer in respect of any Company Party or any subsidiary of any Company Party, or the winding up, liquidation, provisional liquidation, dissolution, administration, reorganization, composition, compromise, or arrangement of or with any Company Party or any subsidiary of any Company Party, or any equivalent or analogous appointment or proceedings under the law of any other jurisdiction.

(llll)   **"Restructuring Transactions Exhibit"** has the meaning set forth in the Plan.

(mmmm)   **"Solicitation Materials"** has the meaning set forth in the Plan.

(nnnn)   **"Support Effective Date"** means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting Prepetition Secured Parties (A) holding of record and/or beneficially owning at least 66⅔% of the aggregate outstanding principal amount of Prepetition Secured Loans, and (B) comprising more than one-half in number of Prepetition Secured Parties, (iii) Consenting Prepetition Unsecured Noteholders holding of record and/or beneficially owning at least 66⅔% of the aggregate outstanding principal amount of Prepetition Unsecured Notes, and (iv) the Consenting Sponsor.

(oooo)   **"Support Period"** means, with respect to a Party, the period commencing on the Support Effective Date and ending on the date on which this Agreement is terminated with respect to such Party in accordance with Section 6.01 hereof.

12

(pppp) "**Vinson & Elkins**" means Vinson & Elkins LLP, as local counsel to the Ad Hoc Group.

(qqqq) "**Voting Deadline**" means the deadline to submit votes to accept or reject the Plan.

(rrrr) "**Weil**" means Weil, Gotshal & Manges LLP, as counsel to the Company.

## 2. Restructuring Process; Milestones; Definitive Documents.

Section 2.01    Plan; Other Exhibits.  The Plan is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Plan. In the event of any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan shall govern.  In the event of any inconsistencies between this Agreement and any of the other exhibits hereto, the terms of such exhibit(s) shall govern.

Section 2.02    Milestones.  The Company shall use commercially reasonable efforts to implement the Restructuring in accordance with the following milestones (which, to the extent such date (including any extension thereof), does not consist of a date certain, shall be calculated in accordance with Bankruptcy Rule 9006 of the Bankruptcy Rules) unless waived or extended (i) in writing by the Company and the Requisite Prepetition Secured Parties or (ii) in accordance with sections 2.4(a)(iii), 2.4(b)(iii), and 2.4(c)(iii) of the Purchase Commitment and Backstop Agreement, with email among counsel being sufficient:

(a)    No later than the later to occur of (i) the Support Effective Date and (ii) 11:59 p.m. (prevailing Eastern Time) on October 23, 2023, the Company shall commence the Solicitation.  No later than the later to occur of (i) the Support Effective Date and (ii) 9:00 a.m. (prevailing Eastern Time) on October 24, 2023, the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code for each of the Company Parties and any and all other documents necessary to commence chapter 11 cases (the date on which such filing occurs, the "**Petition Date**");

(b)    as soon as reasonably practicable after the Petition Date, but in no event later than 11:59 p.m. (prevailing Eastern Time) on the date that is two (2) Business Days after the Petition Date, the Company will file or cause to be filed the Plan and the Disclosure Statement with the Bankruptcy Court;

(c)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(d)    no later than 11:59 p.m. (prevailing Eastern Time) on October 26, 2023, the Debtors, the DRO Backstop Commitment Parties, the ERO Backstop Commitment Parties, and the Private Placement Commitment Parties shall have entered into the Purchase Commitment and Backstop Agreement;

(e)    no later than one (1) day after the execution of the Purchase Commitment and Backstop Agreement, the Company shall have filed the motion(s) seeking approval of the Commitment and Rights Offering Orders with the Bankruptcy Court;

13

(f)      no later than forty-three (43) days after the Petition Date, the Company shall have filed the Plan Supplement with the Bankruptcy Court;

(g)      no later than fifty (50) days after the Petition Date, the Voting Deadline shall have occurred;

(h)      no later than fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order, the Final DIP Order, and the Commitment and Rights Offering Orders; and

(i)      no later than 11:59 p.m. (prevailing Eastern Time) on December 29, 2023, the Plan Effective Date shall have occurred (the "**Outside Date**").

In the event any failure to satisfy a Milestone is attributable to lack of availability of the Bankruptcy Court, that Milestone shall be automatically extended to the date that is one (1) Business Day after the first date that the Bankruptcy Court is available.

Section 2.03   <u>Definitive Documents</u>.  The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents, including any modifications, amendments, or supplements thereto, shall (a) contain terms and conditions consistent with this Agreement (including the Plan) and (b) otherwise be in form and substance (including as to whether a Purchase Transaction, as defined in the Plan attached hereto as **Exhibit A**, is pursued) reasonably acceptable to the Company and the Requisite Prepetition Secured Parties; *provided* that in addition (i) the Plan (it being understood the Plan attached hereto as **Exhibit A** is acceptable to the Consenting Parties as of the Support Effective Date), the Plan Supplement, the Confirmation Order, and the New Corporate Governance Documents shall be acceptable to the Requisite Prepetition Secured Parties; (ii) the DIP Documents shall be consistent with the DIP Term Sheet, and otherwise acceptable to the Requisite DIP Lenders; (iii) the Exit Facility Documents shall be consistent with the Exit Term Loan Facility Term Sheet and the Exit A/R Facility Term Sheet and otherwise acceptable to the Requisite DRO Backstop Parties; (iv) the DRO Documents shall be consistent with the Purchase Commitment and Backstop Agreement and otherwise acceptable to the Requisite DRO Backstop Parties; (v) the ERO Documents shall be consistent with the Purchase Commitment and Backstop Agreement and otherwise acceptable to the Requisite ERO Backstop Parties; (vi) the Private Placement Documents shall be consistent with the Purchase Commitment and Backstop Agreement and otherwise acceptable to the Requisite Private Placement Commitment Parties; (vii) the provisions of the Definitive Documents providing for the treatment of the Prepetition Unsecured Notes shall be reasonably acceptable to the Requisite Prepetition Unsecured Noteholders (in their capacity as such); and (viii) unless consistent with this Agreement (including the Plan attached hereto as **Exhibit A**), any provision of any Definitive Document that (x) materially affects the rights, obligations, or treatment of the Consenting Sponsor, including any provisions thereof that relate to the release of claims, indemnification rights, or directors' and officers' liability insurance or the treatment of the Allowed Consenting Sponsor Claim or (y) provides for unequal treatment on account of the Consenting Claims held by the Consenting Sponsor or any of its affiliates shall, in each case, be reasonably acceptable to the Consenting Sponsor, in each case, for the foregoing clauses (i)–(viii), including any modifications, amendments, or supplements thereto.

14

3.      **Agreements of the Consenting Creditors.**

Section 3.01    Support.    Each Consenting Creditor severally, and not jointly, agrees, during the Support Period, subject to the terms and conditions of this Agreement, to:

(a)      (i) timely vote or cause to be voted all of its Consenting Claims that are entitled to vote to accept or reject the Plan to accept the Plan by timely delivering or causing to be delivered its duly executed and completed ballot or ballots, as applicable, following the commencement of the solicitation of the Plan and its receipt of the Solicitation Materials and (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor, effective immediately upon written notice to the Company (with email among counsel being sufficient), may withhold, change, or withdraw (or cause to be withheld, changed, or withdrawn) its vote (and, upon such withdrawal be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to the Consenting Creditors other than on account of a breach by such Consenting Creditor;

(b)      to the extent it is permitted to elect whether to grant or opt-out of the releases set forth in the Plan, grant and not opt-out of (or cause to be granted or not opted-out of) the release of third-party claims contemplated by the Plan and not change or withdraw (or cause to be changed or withdrawn) such election; *provided* that each Consenting Creditor, effective immediately upon written notice to the Company (with email among counsel being sufficient), may withhold or withdraw (or cause to be withheld  or withdrawn) any such election (and, upon such withdrawal, such election shall be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to the Consenting Creditors other than on account of a breach by such Consenting Creditor;

(c)      timely vote (or cause to be voted) its Consenting Claims against any Alternative Restructuring, if solicited;

(d)      not directly or indirectly, through any Entity  (including any administrative agent or collateral agent), (A) seek, solicit, propose, support, assist, participate or engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or (B) object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of and entry of orders regarding the Definitive Documents, or the confirmation and consummation of the Plan and the Restructuring;

(e)      not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement and, if any administrative agent, collateral agent, or indenture trustee (as applicable) in relation to its Consenting Claims takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, use commercially reasonable efforts to direct and cause such administrative agent, collateral agent, or indenture trustee (as applicable) to cease and refrain from taking any such action;

15

(f)     negotiate in good faith with the other Parties the form of the Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date and (as applicable) execute the Definitive Documents to which it is required to be a party;

(g)     not object to the retention of and the payment of fees and expenses to Lazard Frères & Co. LLC ("**Lazard**") in accordance with the terms of the fee letter between Lazard and the Company then in effect (the "**Lazard Fee Letter**") and, in each case, any application seeking approval of or court order approving the same; *provided* the Lazard Fee Letter as attached to any application seeking approval of Lazard's retention will have been amended to (i) reduce the cap on fees set forth in Section 2(e) thereof to $18,500,000, and (ii) modify Section 9(b) thereof to apply only to a UR Sale Transaction Fee (as defined in the Lazard Fee Letter);

(h)     use commercially reasonable efforts and act in good faith to support, not object to, and take all reasonable actions (to the extent practicable and consistent with the terms of this Agreement) reasonably necessary or reasonably requested by the Company to facilitate the Solicitation, approval of and entry of orders regarding the Definitive Documents, and confirmation and consummation of the Plan and the Restructuring contemplated herein, in each case consistent with the terms and conditions, and within the timeframes contemplated by, this Agreement (including the Plan);

(i)     as reasonably requested by the Company Parties to Davis Polk (which, in each case, may be through Weil), inform the Company Parties as to the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body in connection with the Restructuring for which the Consenting Creditors are responsible;

(j)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(k)     if applicable, use commercially reasonable efforts to obtain, or assist the Company in obtaining, any and all required regulatory and/or third-party approvals to effectuate the Restructuring on the terms contemplated by this Agreement and the Plan.

Section 3.02   Transfers of Claims.   Each Consenting Creditor agrees that during the Support Period, it shall not sell, assign, loan, issue, pledge, hypothecate, transfer, participate, or otherwise dispose of ("**Transfer**"), directly or indirectly, in whole or in part, to any affiliated or unaffiliated party, any Claims or any option thereon or any right or interest therein (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act or by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), unless the transferee thereof:

(a)     is another Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Claims transferred) to Weil and Davis Polk within four (4) Business Days following the consummation of such Transfer; or

(b)     agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor and to be bound by all of the

16

terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit C** (a "**Joinder Agreement**") and delivering an executed copy of such Joinder Agreement to Weil and Davis Polk within four (4) Business Days following the consummation of such Transfer, in which event (x) the transferee shall be deemed to be a Consenting Creditor hereunder to the extent of such rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; *provided* that a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a Joinder Agreement, *provided* that (A) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such Transfer and (B) the Qualified Marketmaker complies with Section 3.04 hereof.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in such Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or became a Consenting Creditor.

Any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

Section 3.03    Additional Claims and Interests.   If any Consenting Creditor acquires additional Claims or Interests, including any Prepetition Secured Loans or Prepetition Unsecured Notes, from any Entity that is not a Consenting Creditor, then such Party shall notify Weil and Davis Polk within four (4) Business Days of such acquisition.  For the avoidance of doubt, each Consenting Creditor agrees that any additional Claims or Interests, including any Prepetition Secured Loans or Prepetition Unsecured Notes, acquired by such Consenting Creditor from a Consenting Creditor or any other Entity, whether or not such acquiring Party complies with the immediately preceding sentence, will, automatically upon acquisition (whether or not notice is provided), be subject to this Agreement and be Consenting Claims or Consenting Interests, as applicable.

Section 3.04    Obligations of Qualified Marketmaker.  If at the time of a proposed Transfer of Claims to a Qualified Marketmaker holders of such Claims (i) may vote on the Plan, the proposed transferor Consenting Creditor must first vote on the Plan in accordance with Section 3.01(a) hereof or (ii) have not yet, and may not yet, vote on the Plan and such Qualified Marketmaker does not Transfer such Claims to a subsequent transferee prior to the third Business Day prior to the expiration of the Voting Deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (including the obligation to vote in favor of the Plan) and shall vote in favor of the Plan in accordance with the terms hereof; *provided* that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claims at such time that the transferee of such Claims becomes a Consenting Creditor with respect to such Claims.

17

Section 3.05   Forbearance.   During the Support Period, each Consenting Creditor (severally and not jointly) agrees to forbear from taking any Enforcement Action (or directing any other Entity to take an Enforcement Action) or exercising any other rights or remedies (or directing any other Entity to exercise rights or remedies) in respect of any breach, default, cross-default, potential default, or event of default, (x) existing in respect of the Prepetition Secured Loans and/or the Prepetition Unsecured Notes as of the Support Effective Date and/or (y) arising from or related to:

> (a)   the non-payment of any principal and/or interest and/or fee and/or any other amount in respect of the Prepetition Secured Loans (including any amount payable to an Issuing Lender (as defined in the Prepetition Credit Agreement) in respect of any drawing under any applicable Letter of Credit (under and as defined in the Prepetition Credit Agreement)) and/or the Prepetition Unsecured Notes during the Support Period (subject to any rights granted to the applicable Consenting Creditors pursuant to the DIP Documents or any other order of the Bankruptcy Court);

> (b)   any transaction contemplated by this Agreement (including the Restructuring contemplated by this Agreement);

> (c)   any transaction consented to by the Requisite Prepetition Secured Parties and/or the Requisite Prepetition Unsecured Noteholders, as applicable; and/or

> (d)   the commencement of the Chapter 11 Cases.

Each Consenting Creditor further agrees that if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with any such Consenting Creditor's obligations under this Section 3.05, such Consenting Creditor shall use commercially reasonable efforts to direct and cause such administrative agent, collateral agent, or indenture trustee (as applicable) to cease and refrain from taking such actions.  For the avoidance of doubt, the foregoing forbearance shall not be construed to impair the ability of the Consenting Creditors to take any remedial action, subject to the terms of the Prepetition Credit Agreement or Indenture, as applicable, at any time after the Termination Date (unless the Termination Date occurs solely as a result of the occurrence of the Plan Effective Date).

Section 3.06   Additional Parties.  Any Prepetition Secured Party or Prepetition Unsecured Noteholder may, at any time after the Support Effective Date, become a party to this Agreement as a Consenting Creditor (an "**Additional Consenting Creditor**"), by executing a Joinder Agreement, pursuant to which such Additional Consenting Creditor shall be bound by the terms of this Agreement as a Consenting Creditor hereunder and shall be deemed a Consenting Creditor for all purposes hereunder, and all Claims and Interests (if any) held by such Additional Consenting Creditor shall be Consenting Claims and Consenting Interests, respectively.

Section 3.07   New Corporate Governance Documents. The Consenting Creditors shall use commercially reasonable efforts to provide a draft of the governance term sheet to be filed with the initial Plan Supplement, including, subject to ongoing regulatory analysis, if any, provisions relating to board composition, description of actions requiring board approvals,

18

shareholder consent rights, transfer limitations, and registration rights, (by delivery from Davis Polk) to Weil no later than ten (10) days before the Voting Deadline.

Section 3.08    DIP Commitments.

(a)    *DIP Backstop Parties*.    Subject to the termination rights set forth in Section 6.03 and subject to the conditions described herein and in the DIP Term Sheet, each DIP Backstop Party, severally and not jointly, agrees to provide (or to cause in accordance with Section 3.08(e) any of its Related Funds to provide) DIP New Money Loans in an amount equal to its DIP Backstop Commitment as set forth on Schedule I hereto on the terms and conditions as set forth in the DIP Term Sheet, with such changes prior to the DIP Closing Date approved in accordance with Section 2.03.  The DIP Backstop Commitments of the DIP Backstop Parties shall be reduced on a dollar-for-dollar pro rata basis by the DIP Loans funded on the DIP Closing Date by the Joining DIP Commitment Parties (or the relevant Fronting Lender on their behalf) in accordance with Section 3.08(b) below.

(b)    *Joining DIP Commitment Parties*.

(i)    Each Consenting Prepetition Secured Party that becomes party to this Agreement on or before the DIP Commitment Outside Date and that makes the appropriate election on its signature page hereto (or, in the case of any Consenting Prepetition Secured Party that becomes party to this Agreement after the Support Effective Date, makes the appropriate election pursuant to its Joinder Agreement) shall commit to provide (or to cause in accordance with Section 3.08(e) any of its Related Funds to provide) DIP New Money Loans in an aggregate amount proportional to the Prepetition Secured Loans beneficially held  by such Consenting Prepetition Secured Party as of the DIP Commitment Outside Date (with the amount of its Prepetition Secured Loans being determined by the Ad Hoc Group Advisors, which determination shall be binding absent manifest error and shall give effect to, and assume the settlement of any pending assignments of Prepetition Secured Loan Claims as of the DIP Commitment Outside Date), on the terms and conditions set forth in the DIP Term Sheet, with such changes prior to the DIP Closing Date approved in accordance with Section 2.03 (any such Consenting Prepetition Secured Party, a **"Joining DIP Commitment Party"** and, collectively, the **"Joining DIP Commitment Parties"**).

(ii)    In the event that, after the date any Joining DIP Commitment Party executes a Joinder Agreement and on or before the DIP Commitment Outside Date, (A) such Joining DIP Commitment Party acquires Prepetition Secured Loan Claims from a party that has not executed a Joinder Agreement, such Joining DIP Commitment Party may commit to provide DIP New Money Loans in the same amount that the seller of such Prepetition Secured Loan Claims would have had with respect to such Prepetition Secured Loan Claims by notifying counsel to the Company Parties and the Ad Hoc Group Advisors in accordance with Section 3.02 hereof prior to the DIP Commitment Outside Date (and any such commitment shall give effect to, and assume the settlement of any pending assignments of Prepetition Secured Loans as of the DIP Commitment Outside Date); and/or (B) such Joining DIP Commitment Party sells Prepetition Secured Loan Claims in accordance with this Agreement, such Joining DIP Commitment Party shall no longer be

19

obligated to provide DIP New Money Loans in the amount that it was required to provide with respect to the sold Prepetition Secured Loan Claims (*provided* that the transferee in such sale is a Joining DIP Commitment Party).

(c)        Upon the earlier of (x) the DIP Closing Date and the funding of the DIP Loans and (y) the termination or expiration of this Agreement in accordance with its terms prior to the DIP Closing Date, the commitments of the DIP Backstop Parties and the Joining DIP Commitment Parties to provide their respective portions of the DIP Facility pursuant to this Section 3.08 shall terminate.

(d)        Each DIP Lender may, at its option, arrange for the DIP Credit Agreement to be executed by a financial institution selected by the Requisite DIP Backstop Parties and reasonably acceptable to the Company (the "**Fronting Lender**"), which will act as an initial lender under the DIP Credit Agreement and fund some or all of such DIP Lender's commitments, in which case such DIP Lender will acquire its DIP New Money Loans by assignment from the Fronting Lender promptly after the initial funding of the DIP New Money Loans on the DIP Closing Date in accordance with the assignment provisions of the DIP Credit Agreement.

(e)        Prior to the DIP Closing Date, any DIP Backstop Party may assign all or a portion of its DIP Backstop Commitments hereunder to (i) any other DIP Backstop Party or (ii) any (A) Affiliate (as defined in the DIP Credit Agreement) of such DIP Backstop Party or (B) investment fund, account, vehicle or other entity that is administered, managed, or advised by such DIP Backstop Party, its Affiliates (as defined in the DIP Credit Agreement) or any Entity or Affiliate (as defined in the DIP Credit Agreement) of such Entity that administers, advises, or manages such DIP Backstop Party (as set forth in this clause (ii), collectively, such DIP Backstop Party's "**Related Funds**" and any such assignment permitted by clauses (i) through (ii), a "**Permitted Assignment**"), in each case, pursuant to documentation reasonably acceptable to the Company (such consent not to be unreasonably withheld, conditioned, or delayed); *provided* that the DIP Backstop Parties' rights and obligations under this Section 3.08 and the DIP Backstop Commitments hereunder shall not otherwise be assignable by the DIP Backstop Parties without the prior written consent of the Air Methods Parent (such consent not to be unreasonably withheld, conditioned, or delayed); *provided, further*, that (1) the assigning DIP Backstop Party shall provide written notice of any Permitted Assignment to the Company promptly following such Permitted Assignment (and, in any event, within three (3) Business Days following such Permitted Assignment) and (2) no DIP Backstop Party shall be released, relieved or novated from its obligations under this Section 3.08 (including its DIP Backstop Commitment) in connection with any Permitted Assignment; *provided, further*, that prior to the DIP Closing Date, the Company and the Ad Hoc Group Advisors may amend Schedule I hereto to reflect any such assignments permitted under this Section 3.08(e).

(f)        Each DIP Backstop Party's undertakings and agreements under this Section 3.08 are subject to the conditions precedent expressly set forth under the headings "Conditions Precedent to Effectiveness" and "Conditions Precedent to Extension of Delayed Draw DIP New Money Loans" in the DIP Term Sheet, as applicable (collectively, the "**Limited Conditionality Provisions**").

(g)     The rights and obligations of each of the DIP Backstop Parties under this Section 3.08 shall be several and not joint, and no failure of any DIP Backstop Party to comply with any of its obligations hereunder shall prejudice the rights or obligations of any other DIP Backstop Party; *provided* that in the event that any DIP Backstop Party fails to fund its DIP Backstop Commitment on the DIP Closing Date (each, a "**Defaulting DIP Backstop Party**"), each DIP Backstop Party that is not a Defaulting DIP Backstop Party (each, a "**Non-Defaulting DIP Backstop Party**") shall be offered the option to fund (but shall be under no obligation to fund) the DIP Backstop Commitment of such Defaulting DIP Backstop Party, in whole or in part, and, if any Non-Defaulting DIP Backstop Party agrees to fund the DIP Backstop Commitment of any Defaulting DIP Backstop Party, such Non-Defaulting DIP Backstop Party shall be entitled to all or a proportionate share, as the case may be, of the benefits and rights that would otherwise be owing and payable to, such Defaulting DIP Backstop Party under the DIP Facility, including any related fees and commitment premiums as set forth in the DIP Term Sheet that would otherwise be issued to such Defaulting DIP Backstop Party.

(h)     This Section 3.08 is intended to be solely for the benefit of the Company and the DIP Backstop Parties and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the Company and the DIP Backstop Parties, in each case, to the extent expressly set forth herein.

Section 3.09   BH Guarantor Release.

(a)     The Consenting Prepetition Secured Parties severally, and not jointly, agree that, upon the occurrence of the Plan Effective Date, each of (i) Blue Hawaiian Holdings, LLC, a Delaware limited liability company, (ii) Helicopter Consultants of Maui, LLC, a Hawaii limited liability company, (iii) Nevada Helicopter Leasing LLC, a Nevada limited liability company, (iv) Air Repair Limited Liability Company, a Hawaii limited liability company, (v) Hawaii Helicopters, LLC, a Hawaii limited liability company and (vi) Alii Aviation, LLC, a Hawaii limited liability company (the entities listed in the preceding (i) through (vi), each, a "**BH Guarantor**" and collectively, the "**BH Guarantors**"), is automatically released from each BH Guarantor's Obligations (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement and each BH Guarantor's Guaranty (as defined in the Prepetition Credit Agreement) set forth in the Prepetition Credit Agreement, on the Plan Effective Date (such release, the "**BH Guarantor Release**").

(b)     The Consenting Prepetition Secured Parties severally, and not jointly, agree to use commercially reasonable efforts to direct Royal Bank of Canada, as administrative agent under the Prepetition Credit Agreement, to execute and deliver to any BH Guarantor, at such BH Guarantor's expense, all documents that such BH Guarantor shall reasonably request and are necessary to evidence the BH Guarantor Release. For the avoidance of doubt, the Consenting Prepetition Unsecured Noteholders acknowledge and agree that upon the occurrence of the BH Guarantor Release, each BH Guarantor will, in accordance with the Indenture, be automatically be released from such BH Guarantor's Guarantee (as defined in the Indenture) under the Indenture and shall cease to be a Guarantor (as defined in the Indenture) thereunder, without any further action on the part of the Company or the BH Guarantors.

**4.      Agreements of the Consenting Sponsor**

Section 4.01    The Consenting Sponsor agrees that, for the duration of the Support Period, the Consenting Sponsor shall:

(a)      cause the Consenting Sponsor Affiliates[2] to (i) timely vote or cause to be voted all of its Consenting Interests that are entitled to vote to accept or reject the Plan to accept the Plan by timely delivering or causing to be delivered its duly executed and completed ballot or ballots, as applicable, following the commencement of the solicitation of the Plan and its receipt of the Solicitation Materials and (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that the Consenting Sponsor, effective immediately upon written notice to the Company (with email among counsel being sufficient), may withhold, change, or withdraw (or cause to be withheld, changed, or withdrawn) its vote (and, upon such withdrawal be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to the Consenting Sponsor other than on account of a breach by the Consenting Sponsor;

(b)      cause the Consenting Sponsor Affiliates, to the extent it is permitted, to elect whether to grant or opt-out of the releases set forth in the Plan, grant and not opt-out of the release of third-party claims contemplated by the Plan (or cause the foregoing) and not change or withdraw (or cause to be changed or withdrawn) such election; *provided* that the Consenting Sponsor, effective immediately upon written notice to the Company (with email among counsel being sufficient), may withhold or withdraw (or cause to be withheld  or withdrawn) any such election (and, upon such withdrawal, such election shall be deemed void *ab initio*) at any time following termination of this Agreement in accordance with its terms with respect to the Consenting Sponsor other than on account of a breach by the Consenting Sponsor;

(c)      timely vote (or cause to be voted) its Consenting Interests against any Alternative Restructuring, if solicited;

(d)      not directly or indirectly, through any Entity  (including any administrative agent or collateral agent), (A) seek, solicit, propose, support, assist, participate or engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or (B) object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of and entry of orders regarding the Definitive Documents, or the confirmation and consummation of the Plan and the Restructuring;

(e)      negotiate in good faith with the other Parties the form of the Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date and (as applicable) execute the Definitive Documents to which it is required to be a party;

---

[2]      "**Consenting Sponsor Affiliates**" means ASP AMC Investco I LP and ASP AMC Investco II LP.

(f)     not object to the retention of and the payment of fees and expenses to Lazard in accordance with the terms of the Lazard Fee Letter and, in each case, any application seeking approval of or court order approving the same;

(g)     use commercially reasonable efforts and act in good faith to support, not object to, and take all reasonable actions (to the extent practicable and consistent with the terms of this Agreement) reasonably necessary or reasonably requested by the Company to facilitate the Solicitation, approval of and entry of orders regarding the Definitive Documents, and confirmation and consummation of the Plan and the Restructuring contemplated herein, in each case consistent with the terms and conditions, and within the timeframes contemplated by, this Agreement (including the Plan);

(h)     as reasonably requested by the Company Parties to Paul, Weiss (which, in each case, may be through Weil), inform the Company Parties as to the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body in connection with the Restructuring for which the Consenting Sponsor is responsible, if any;

(i)     upon the payment in full in cash on the Plan Effective Date of the Allowed Consenting Sponsor Claim, (i) terminate that certain Management Consulting Agreement, dated April 21, 2017, by and between Air Methods Corporation and American Securities LLC (as may be amended, supplemented, or otherwise modified from time to time), and any other contractual agreements with the Company Parties and/or their subsidiaries and (ii) waive any and all Claims that may arise in relation thereto against the Company Parties and their subsidiaries; *provided* that, notwithstanding the foregoing, (x) any and all directors' and officers' indemnification rights of the Consenting Sponsor, its affiliates, and their representatives shall survive consistent with the provisions of Section 8.4 of the Plan, (y) the rights of the Consenting Sponsor, its affiliates, and their representatives as beneficiaries under any D&O Insurance Policy shall continue and be preserved in accordance with Section 8.6 of the Plan, and (z) nothing in this Section 4.01(i) shall impact the treatment of, or recovery on account of, any Consenting Claims held by the Consenting Sponsor or any of its affiliates;

(j)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(k)     if applicable, use commercially reasonable efforts to obtain, or assist the Company in obtaining, any and all required regulatory and/or third-party approvals to effectuate the Restructuring on the terms contemplated by this Agreement and the Plan.

Section 4.02    Transfers by Consenting Sponsor.  The Consenting Sponsor agrees that, for the duration of the Support Period (subject, solely with respect to clause (iii) hereof, to the last sentence of this Section 4.02), it will not and will not cause or permit any affiliate or entity it controls to (i) Transfer, offer to Transfer, contract to Transfer, abandon, or otherwise dispose of, in whole or in part, directly or indirectly, any portion of any right, title, or interests in any Interests in the Company or any equity security interests in the Consenting Sponsor Affiliates, (ii) permit (to the extent within its control) direct or indirect transfers of Interests in the Company or any

23

equity security interests in the Consenting Sponsor Affiliates, (iii) claim or cause to be claimed any worthless stock deduction with respect to a direct or indirect equity interest in the Company for any tax year ending on or before the Plan Effective Date, or (iv) take any action that would cause the deconsolidation of any entity within the U.S. federal consolidated tax group that includes any Company entity, in the case of each of (ii), (iii), and (iv) if such action could reasonably be expected to result in an "ownership change" under section 382(g) of the Internal Revenue Code of 1986 (as amended) or otherwise could reasonably be expected to adversely affect the taxes or tax attributes of the Company, including under  section 382 of the Internal Revenue Code of 1986 (as amended).  Notwithstanding anything to the contrary in this Agreement, the Consenting Sponsor's obligations under Section 4.02(iii) hereof shall survive the Support Period solely in the event of this Agreement's (x) automatic termination upon the Plan Effective Date pursuant to Section 6.01 or (y) termination pursuant to a breach by the Consenting Sponsor described in Sections 6.02(b) or 6.04(a).

**5.     Agreements of the Company.**

Section 5.01     The Company agrees that, during the Support Period, the Company shall:

(a)     use commercially reasonable efforts and act in good faith to support, not object to, and take all reasonable actions (to the extent practicable and consistent with the terms of this Agreement) reasonably necessary or reasonably requested by the Requisite Prepetition Secured Parties to facilitate the Solicitation, approval of and entry of orders regarding the Definitive Documents, and confirmation and  consummation of the Plan and the Restructuring contemplated herein, in each case, consistent with the terms and conditions, and within the timeframes contemplated by, this Agreement (including the Plan);

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(c)     to the extent any party commences an Enforcement Action, pursues any Cause of Action, or seeks to terminate any material contract, in each case against any non-debtor subsidiary of any Company Party, to notify promptly Davis Polk and consult with the Requisite Prepetition Secured Parties regarding the foregoing;

(d)     if applicable, use commercially reasonable efforts to obtain, or assist the Consenting Parties in obtaining, any and all required regulatory and/or third-party approvals to effectuate the Restructuring on the terms contemplated by this Agreement and the Plan;

(e)     subject to professional responsibilities, in connection with the Chapter 11 Cases, timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by any Entity seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, (iv) for relief that (y) is inconsistent with this Agreement in any material respect or (z) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing consummation of

24

the Restructuring, or (v) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(f)      as reasonably requested by the Requisite Prepetition Secured Parties (which, in each case, may be through the Ad Hoc Group Advisors), cause management and advisors of the Company Parties to inform and/or confer with the Ad Hoc Group Advisors as to: (i) the status and progress of the Restructuring, including progress in relation to the negotiations of the Definitive Documents; (ii) the status of obtaining any necessary or desirable authorizations (including any consents) with respect to the Restructuring from each Consenting Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body in connection with the Restructuring; (iii) the material business and financial performance of the Company (including liquidity); and (iv) in each of the foregoing cases (i)–(iii), provide timely and reasonable responses to reasonable diligence requests with respect to the foregoing, subject to any applicable restrictions and limitations set forth in any confidentiality agreements then in effect;

(g)      provide draft copies of (x) all motions, orders, and material documents or applications relating to the Restructuring, including the Plan, the Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, all material First-Day Pleadings, and any other Definitive Document to Davis Polk and (y) all Definitive Documents to Paul, Weiss, in each case that the Company intends to file with the Bankruptcy Court, as soon as reasonably practicable before filing such document, and consult in good faith with Davis Polk and Paul, Weiss, respectively, regarding the form and substance of any such proposed filing with the Bankruptcy Court, but in no event less than two (2) Business Days (or such shorter period as may be necessary in light of exigent circumstances) prior to such filing;

(h)      if determined to be necessary, based on the advice of Weil, subject to the reasonable consent of the Requisite Prepetition Secured Parties (which consent shall not be unreasonably withheld, conditioned, or delayed), and subject to professional responsibilities, timely file a formal written reply to any objection filed with the Bankruptcy Court by any person with respect to the Definitive Documents;

(i)      promptly (but in any event within three (3) Business Days) notify Davis Polk in writing of the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Restructuring;

(j)      pay the Restructuring Expenses as and when due; and

(k)      (i) negotiate in good faith upon reasonable request of the Requisite Prepetition Secured Parties and the Consenting Sponsor any modifications to the Restructuring that improve the tax efficiency of the Restructuring, it being understood and agreed that the terms of the Restructuring as finalized by the Company will be structured in a tax-efficient manner, taking into account (a) the tax and non-tax considerations and the associated costs of the Company, the Ad Hoc Group, and the Consenting Sponsor and (b) the fiduciary duties of the Company Parties, their officers, and directors, as well as applicable professional responsibilities with respect thereto and (ii) if this Agreement is terminated prior to the Plan Effective Date, file an emergency motion within two (2) Business Days of such termination seeking approval of procedures with

25

respect to trading in equity securities, or claiming a worthless stock deduction in respect, of the Company Parties and related relief in form and substance reasonably acceptable to the Requisite Prepetition Secured Parties.

Section 5.02   The Company agrees that, during the Support Period, each of the Company Parties shall not directly or indirectly:

(a)   through any Entity (including any administrative agent or collateral agent), (A) seek, solicit, propose, support, assist, participate or engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring or (B) object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the Solicitation, approval of, and entry of orders regarding the Definitive Documents, or the confirmation and consummation of the Plan and the Restructuring (including by filing any motion, pleading, or other document with the Bankruptcy Court or any other court that is materially inconsistent with this Agreement or the Plan);

(b)   seek to amend or modify the Definitive Documents in a manner that is inconsistent with this Agreement or the Plan;

(c)   consummate or enter into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pay any dividend, or incur any indebtedness for borrowed money, in each case outside the ordinary course of business and other than as contemplated by the Plan, this Agreement, and the Restructuring (including incurrence of indebtedness in connection with the DIP Facility and the A/R Facility consistent with this Agreement);

(d)   enter into (i) any new key employee incentive plan or key employee retention plan or any new or amended agreement regarding executive compensation, or, in the case of an Insider (as defined in the Bankruptcy Code), any other new or amended compensation arrangement or payment (which, in each case, for the avoidance of doubt, shall exclude any existing broad-based Company benefit plan providing health or welfare benefits) or (ii) any material executory contract or lease, in each case unless in the ordinary course of business and consistent with past practice; *provided* that if the Company provides written notice to Davis Polk (email being sufficient) of its intent to enter into a new agreement regarding executive compensation for any new employee, in the case of an Insider (as defined in the Bankruptcy Code), any other new or amended compensation arrangement or payment, or a material executory contract or lease outside the ordinary course of business and/or inconsistent with past practice at least five (5) Business Days prior to entry into such agreement and Davis Polk on behalf of the Consenting Creditors does not provide the Company with written notice of its opposition to entry into such agreement (with email from Davis Polk on behalf of the Requisite Prepetition Secured Parties being sufficient) prior to entry into such agreement, entry into such agreement shall not constitute a violation of this Section 5.02(d); or

(e)   except (i) to the extent reasonably necessary to consummate the Restructuring or (ii) otherwise to achieve tax efficiency (taking into account the tax and non-tax considerations and the associated costs of the Company, the Ad Hoc Group, and the Consenting

26

Sponsor), take any action or inaction that would cause a change to the tax classification, for United States federal income tax purposes, of any Company Party; *provided* that any change to the tax classification for United States federal income tax purposes of any Company Party pursuant to clause (ii) hereof shall be subject to the written consent of the Requisite Prepetition Secured Parties and the Consenting Sponsor (such consent not to be unreasonably withheld, conditioned, or delayed).

## 6.    Termination of Agreement.

Section 6.01    Generally.    This Agreement will automatically terminate upon the Plan Effective Date.  This Agreement may be terminated prior to the Plan Effective Date as follows: (i) with respect to all Parties, by the Company at any time after the occurrence of any Company Termination Event (as defined below) other than the occurrence of the Company Termination Event set forth in Section 6.04(a); (ii) solely with respect to the Consenting Sponsor and any of its affiliates that hold Consenting Claims (in their capacities as Consenting Sponsor and Consenting Creditors), by the Company at any time after the occurrence of the Company Termination Event set forth in Section 6.04(a); (iii) with respect to all Parties, by the Requisite Prepetition Secured Parties at any time after the occurrence of any Creditor Termination Event (as defined below) other than the occurrence of the Creditor Termination Event set forth in Section 6.02(b); (iv) solely with respect to the Consenting Sponsor and any of its affiliates that hold Consenting Claims (in their capacities as Consenting Sponsor and Consenting Creditors), by the Requisite Prepetition Secured Parties at any time after the occurrence of the Creditor Termination Event set forth in Section 6.02(b); (v) solely with respect to the Consenting Sponsor and any of its affiliates that hold Consenting Claims (in their capacities as Consenting Sponsor and Consenting Creditors), by the Consenting Sponsor at any time after the occurrence of any Consenting Sponsor Termination Event (as defined below); and (vi) solely with respect to the DIP Backstop Parties, by the Requisite DIP Backstop Parties at any time after the occurrence of any DIP Backstop Party Termination Event (as defined below); in each case, one (1) Business Day following the delivery of written notice to the other Parties, delivered in accordance with Section 21 hereof (for the avoidance of doubt, with respect to the Company, such notice may be delivered by any Company Party on behalf of any or all of the Company Parties).  No Party may terminate this Agreement based on a Creditor Termination Event, Company Termination Event, or Consenting Sponsor Termination Event, as applicable, caused by such Party's breach of this Agreement (unless such breach arises as a result of another Party's prior breach of this Agreement).

Section 6.02    A "**Creditor Termination Event**" will mean any of the following:

(a)    the breach by the Company of any of the undertakings, representations, commitments, warranties, or covenants of the Company set forth herein in any material respect that, to the extent curable, remains uncured for a period of five (5) Business Days after the receipt by the Company Parties of written notice (email among counsel being sufficient) of such breach from the Requisite Prepetition Secured Parties of such breach;

(b)    the breach by the Consenting Sponsor of any of the undertakings, representations, commitments, warranties, or covenants of the Consenting Sponsor set forth herein in any material respect that, to the extent curable, remains uncured for a period of five (5) Business

Days after the receipt by the Consenting Sponsor of written notice (email among counsel being sufficient) of such breach from the Requisite Prepetition Secured Parties of such breach;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining or prohibiting the consummation of or rendering illegal a material portion of the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(d)     the failure to meet a Milestone, which has not been waived or extended pursuant to the terms of this Agreement;

(e)     the Bankruptcy Court enters an order, or any Company Party files a motion or application (without the prior written consent of the Requisite Prepetition Secured Parties) seeking an order, (i) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) authorizing the rejection of this Agreement, which order, in each case, has not been reversed, stayed, or vacated within five (5) Business Days of the entry of such order;

(f)     the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents, or the Restructuring, and such inconsistent relief is not stayed, reversed, vacated, or modified to be consistent with this Agreement within seven (7) Business Days after the date of such issuance; except if such relief is granted pursuant to a motion filed by any Initial Consenting Creditor;

(g)     the occurrence of an "Event of Default" under the DIP Credit Agreement that has not been waived or timely cured in accordance therewith;

(h)     following execution of the Purchase Commitment and Backstop Agreement, the occurrence of any termination event for the benefit of the Commitment Parties under the Purchase Commitment and Backstop Agreement that has not been waived or timely cured in accordance therewith;

(i)     the filing by any Company Party of any Definitive Document, motion, or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement, and such filing is not withdrawn (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Company Parties are provided with such notice, such order is not stayed, reversed, or vacated) within ten (10) Business Days following written notice thereof to the Company Parties by the Requisite Prepetition Secured Parties; *provided* that any such filing shall not trigger a Creditor Termination Event under this clause (g) if the Company provides a draft of such Definitive Document, motion, or pleading to Davis Polk on behalf of the Consenting Creditors at least two (2) Business Days prior to such filing and (i) Davis Polk on behalf of the Consenting Creditors does not provide the Company with written notice of its opposition to such filing (with email from Davis Polk on behalf of the Requisite Prepetition Secured Parties being sufficient) prior to such filing or (ii) if the filing party withdraws such motion, pleading, or document before the earlier of (A) one (1) Business Day after the filing

28

party receives written notice from the Requisite Prepetition Secured Parties (in accordance with Section 21 hereof) that such motion, pleading, or document is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion, pleading, or document;

(j)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company Parties having an aggregate fair market value in excess of $5,000,000 or, in the case of any aircraft assets, $10,000,000, in each case without the written consent of the Requisite Prepetition Secured Parties;

(k)     the Bankruptcy Court enters an order terminating the Company Parties' exclusive right to file and solicit acceptances of a chapter 11 plan; except if such relief is granted pursuant to a motion filed by any Initial Consenting Creditor;

(l)     any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Prepetition Secured Loans claim, or any lien or interest relating to the Prepetition Secured Loans, or the Prepetition Unsecured Notes, or (ii) supports any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(m)     (i) the Bankruptcy Court enters the Confirmation Order in a form not acceptable to the Requisite Prepetition Secured Parties or (ii) the Bankruptcy Court enters an order denying, reversing, or vacating confirmation of the Plan, which order, in each case, is not stayed, reversed, vacated, reinstated, or modified, as applicable, within seven (7) Business Days after the date of such issuance;

(n)     any Company Party provides a Fiduciary Out Notice (as defined below); and

(o)     other than the Chapter 11 Cases, if any Company Party, without the consent of the Requisite Prepetition Secured Parties, (i) voluntarily commences any Restructuring Proceeding with respect to any Company Party or for a substantial part of any Company Party's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors.

Section 6.03    A "**DIP Backstop Party Termination Event**" will mean the occurrence of any Creditor Termination Event.

Section 6.04    A "**Company Termination Event**" will mean any of the following:

(a)     the breach by the Consenting Sponsor of any of the undertakings, representations, warranties, or covenants of the Consenting Sponsor set forth herein in any material respect and the Consenting Sponsor has not cured such breach within five (5) Business Days after the Consenting Sponsor's receipt of written notice from the Company of such breach;

(b)      if, as of 11:59 p.m. (prevailing Eastern Time) on October 30, 2023, the Support Effective Date has not occurred;

(c)      if, as of 11:59 p.m. (prevailing Eastern Time) on the date that is seven (7) Business Days after entry of the Interim DIP Order and the satisfaction of all applicable conditions precedent for such funding under the DIP Documents (or the waiver of such conditions precedent in accordance with the DIP Documents), the DIP Lenders fail to fund the DIP Loans;

(d)      if, as of 11:59 p.m. (prevailing Eastern Time) on the date that is five (5) Business Days after the Petition Date, the Debtors, the DRO Backstop Commitment Parties, the ERO Backstop Commitment Parties, and the Private Placement Commitment Parties have not yet entered into the Purchase Commitment and Backstop Agreement;

(e)      if, as of 11:59 p.m. (prevailing Eastern Time) on the date that is two (2) Business Days after the Outside Date, the Plan Effective Date shall not have occurred;

(f)      if the Consenting Creditors give notice of termination of this Agreement pursuant to Section 6.01 hereof;

(g)      the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties, or covenants of such Consenting Creditors set forth herein in any material respect and (i) the breaching Consenting Creditor(s) have not cured such breach within five (5) Business Days after receipt of written notice from the Company of such breach and (ii) the non-breaching Consenting Creditors do not (A)(1) hold of record and/or beneficially own at least 66⅔% of the aggregate outstanding principal amount of Prepetition Secured Loans and (2) comprise more than one-half in number of the Prepetition Secured Parties and (B) hold of record and/or beneficially own at least 66⅔% of the aggregate outstanding principal amount of Prepetition Unsecured Notes;

(h)      the board of directors, board of managers, managing member, members, partners, or such similar governing body of any Company Party (including any special committee of such governing body, as applicable) reasonably determines in good faith on the advice of counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided that such Company Party provides notice of such determination to the Parties (email to counsel being sufficient) within two (2) Business Days after the date of such determination (a "**Fiduciary Out Notice**");

(i)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining or prohibiting the consummation of or rendering illegal a material portion of the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party to the extent that any Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(j)      the Bankruptcy Court enters an order, or any Initial Consenting Creditor files a motion or application seeking an order (without the prior written consent of the Company Parties), (i) directing the appointment of an examiner with expanded powers or a trustee in the

30

Chapter 11 Cases, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) authorizing the rejection of this Agreement, which order, in each case, has not been reversed, stayed, or vacated within five (5) Business Days of the entry of such order.

Section 6.05    A "**Consenting Sponsor Termination Event**" will mean any of the following:

(a)    the breach by any of the other Parties, of any of the undertakings, representations, commitments, warranties, or covenants of such Party set forth herein in any material respect that adversely affects the rights, obligations, or interests of the Consenting Sponsor (in its capacity as such) and (i) that, to the extent curable, remains uncured for a period of five (5) Business Days after the receipt by such Party of written notice of such breach from the Consenting Sponsor of such breach and (ii), in the case of a breach by any Consenting Creditor, the non-breaching Consenting Creditors do not (A)(1) hold of record and/or beneficially own at least 66⅔% of the aggregate outstanding principal amount of Prepetition Secured Loans and (2) comprise more than one-half in number of the Prepetition Secured Parties and (B) hold of record and/or beneficially own at least 66⅔% of the aggregate outstanding principal amount of Prepetition Unsecured Notes;

(b)    the Bankruptcy Court enters an order, or any Company Party files a motion or application (without the prior written consent of the Consenting Sponsor) seeking an order, (i) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) authorizing the rejection of this Agreement, or (iv) dismissing the Chapter 11 Cases, which order, in each case, has not been reversed, stayed, or vacated within five (5) Business Days of the entry of such order;

(c)    the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents, or the Restructuring, to the extent such inconsistent relief has a material and adverse effect on the rights, obligations, or interests of the Consenting Sponsor set forth herein, and such inconsistent relief is not stayed, reversed, vacated, or modified to be consistent with this Agreement within seven (7) Business Days after the date of such issuance; except if such relief is granted pursuant to a motion filed by the Consenting Sponsor;

(d)    the filing by any Company Party of any Definitive Document, motion, or pleading with the Bankruptcy Court that is not consistent with the rights, obligations, or treatment of the Consenting Sponsor under this Agreement, and such filing is not withdrawn (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Company Parties are provided with such notice, such order is not stayed, reversed, or vacated) within ten (10) Business Days following written notice thereof to the Company Parties by the Consenting Sponsor; *provided* that any such filing shall not trigger a Consenting Sponsor Termination Event under this clause (d) if the Company provides a draft of such Definitive Document, motion, or pleading to Paul, Weiss on behalf of the Consenting Sponsor at least two (2) Business Days prior to such filing and (i) Paul, Weiss on behalf of the Consenting Sponsor does not provide the Company with written notice of its opposition to such filing (with email from Paul, Weiss on behalf of the Consenting Sponsor being sufficient) prior to such filing or (ii) if the

31

filing party withdraws such motion, pleading, or document before the earlier of (A) one (1) Business Day after the filing party receives written notice from the Consenting Sponsor (in accordance with <u>Section 21</u> hereof) that such motion, pleading, or document is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such motion, pleading, or document;

(e)     (i) the Bankruptcy Court enters the Confirmation Order in a form not consistent with the rights, obligations, or treatment of the Consenting Sponsor under this Agreement, or (ii) the Bankruptcy Court enters an order denying, reversing, or vacating confirmation of the Plan, which order, in each case, is not stayed, reversed, vacated, reinstated, or modified, as applicable, within seven (7) Business Days after the date of such issuance;

(f)     any Company Party provides a Fiduciary Out Notice;

(g)     other than the Chapter 11 Cases, if any Company Party, without the consent of the Consenting Sponsor, (i) voluntarily commences any Restructuring Proceeding with respect to any Company Party or for a substantial part of any Company Party's assets, except as contemplated by this Agreement, (ii) consents to the institution of, or (subject to professional responsibilities) fails to contest in a timely manner, any involuntary proceeding or petition described in the preceding clause (i), or (iii) makes a general assignment or arrangement for the benefit of creditors, in each case, for the preceding clauses (i) through (iii), that materially and adversely affects the rights, obligations, or treatment of the Consenting Sponsor under this Agreement; or

(h)     if the Consenting Creditors give notice of termination of this Agreement pursuant to <u>Section 6.01</u> hereof.

Section 6.06   <u>Mutual Termination</u>. This Agreement may be terminated by mutual written agreement of the Company, the Requisite Prepetition Secured Parties, and the Consenting Sponsor. The Company will deliver written notice of any such termination to all Parties in accordance with <u>Section 21</u> hereof.

Section 6.07   <u>Effect of Termination</u>.  Upon any termination of this Agreement that is not limited in its effectiveness to an individual Party or Parties in accordance this <u>Section 6.07</u>, except as provided in <u>Section 14</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party will, except as otherwise provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and will have all the rights and remedies that it would have had it not entered into this Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches, estoppel, or similar doctrine to the extent such claim of laches, estoppel, or similar doctrine is a result of the Parties' entry into and compliance with this Agreement, and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including, without limitation, all rights and remedies available to it under applicable law, the Prepetition Credit Documents, and any ancillary documents or agreements; *provided* that in no event will any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder before the date of such termination

32

and (ii) obligations under this Agreement that expressly survive any such termination pursuant to Section 14 hereunder.

Upon a termination of this Agreement limited in its effectiveness to an individual Party or Parties (the applicable terminating party or parties, the "**Terminated Party**"), except as provided in Section 14 hereof, this Agreement will forthwith become void and of no further force or effect with respect to the Terminated Party, who will, except as otherwise provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and will have all the rights and remedies that it would have had had it not entered into this Agreement, and no such rights or remedies shall be deemed waived pursuant to a claim of laches, estoppel, or similar doctrine to the extent such claim of laches, estoppel, or similar doctrine is a result of the Parties' entry into and compliance with this Agreement, and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including, without limitation, all rights and remedies available to it under applicable law, the Prepetition Credit Documents, and any ancillary documents or agreements; *provided* that (a) in no event will any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder before the date of such termination, and (ii) obligations under this Agreement that expressly survive any such termination pursuant to Section 14 hereof, and (b) this Agreement shall remain in full force and effect with respect to all Parties other than the Terminated Party.

Nothing in this Agreement shall be construed as prohibiting a Company Party, any of the Consenting Creditors, or the Consenting Sponsor from contesting whether any purported termination of this Agreement is in accordance with its terms.

Section 6.08    No Waiver and Inadmissibility.  If the Restructuring is not consummated or if this Agreement is terminated for any reason, except as set forth in Section 6.09 hereof, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce, or with regards to breach of, its terms.

Section 6.09    Automatic Stay.  The Company acknowledges and expressly stipulates that, after the commencement of the Chapter 11 Cases, the giving of notice of default or termination and exercise of termination rights under this Agreement by any other Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code, and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay solely as it relates to any such notice being provided or exercise of such termination; *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

7.      **Good Faith Cooperation.**

Section 7.01   Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, its respective obligations under this Agreement.

8.      **Representations and Warranties.**

Section 8.01   Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)      the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(c)      the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except as (i) expressly provided in this Agreement, the Plan, and the Bankruptcy Code, or (ii) in the case of the Company, as may be necessary in connection with the Chapter 11 Cases and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

(d)      this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 8.02   Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)      (i) is the beneficial and record owner of the Prepetition Secured Loans and/or Prepetition Unsecured Notes set forth below its name on its signature page hereto (or, to

34

the extent applicable, on the signature page of a Joinder Agreement), in each case, taking into account the settlement of any pending (on the date hereof) assignment or trades of Prepetition Secured Loans or Prepetition Unsecured Notes (or such later date that such Party first becomes bound by this Agreement); *provided*, that such Consenting Creditor shall, on the respective date of representation, provide evidence of such pending assignment or trade, which may be an email between the Consenting Creditor's counsel and Weil (a) stating that "[transferor/transferee] confirms the [transfer/purchase] of the following position [to/from] [transferee/transferor]: [Description] [Amount], and (b) attaching the applicable trade confirmation (an "**Evidence of Trade**")) and/or (ii) has, with respect to the beneficial owners of such Prepetition Secured Loans and/or Prepetition Unsecured Notes (A) sole investment or voting discretion with respect to such Prepetition Secured Loans and/or Prepetition Unsecured Notes, (B) full power and authority to vote on and consent to matters concerning such Prepetition Secured Loans and/or Prepetition Unsecured Notes, and (C) full power and authority to bind or act on the behalf of such beneficial owners; and

(b)       except as set forth in this Section 8.02(b), is not the beneficial record owner of any other Prepetition Secured Loans and/or Prepetition Unsecured Notes other than as set forth below its name on the signature page to this Agreement or a Joinder Agreement, as applicable, in each case, taking into account the settlement of any pending (on the date hereof) assignment or trades of Prepetition Secured Loans or Prepetition Unsecured Notes (or such later date that such Party first becomes bound by this Agreement), subject to the requirement above to provide an Evidence of Trade).

Section 8.03   Each Consenting Creditor acknowledges, agrees and represents and warrants to the other Parties that it (i) is either (A) a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or (B) is an institutional "accredited investor" as such term is defined in Rule 501(a)(1), (2), (3), or (7) of Regulation D of the Securities Act, (ii) understands that if it acquires any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities (x) have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement, (y) will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act, and (z) cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

Section 8.04   The Consenting Sponsor represents and warrants to the other Parties that it holds approximately 94.7% of the outstanding common stock Interests in Holdings (on a fully diluted basis) free and clear of any restrictions on transfer, liens or options, warrants, purchase rights, contracts, commitments, claims and demands, except for restrictions or transfers under applicable securities laws and its governing documents.

35

9.      **Disclosure; Publicity.**

The Company shall use commercially reasonable efforts to submit drafts to Davis Polk and Paul, Weiss of any public disclosure of the existence or terms of the Restructuring, this Agreement, or any amendment to the terms of the Restructuring or this Agreement as soon as reasonably practicable before making any such public disclosure, and shall consult in good faith with Davis Polk and Paul, Weiss regarding the form and substance of any such proposed public disclosure, but in no event less than two (2) business days (or such shorter period as may be necessary in light of exigent circumstances) prior to such public disclosure.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Party, no Party or its advisors shall disclose to any Entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the Ad Hoc Group Advisors, and Paul, Weiss the principal amount or percentage of any Prepetition Secured Loans or Prepetition Unsecured Notes, the DIP Backstop Commitment, the DIP Commitment, or any other Claims held by any Consenting Party, in each case, without such Consenting Party's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, or requested by a governmental regulatory or self-regulatory body (solely to the extent that such request is not targeted at the Company) the disclosing Party shall afford the relevant Consenting Party a reasonable opportunity to review in advance of such disclosure and shall take commercially reasonable measures to limit such disclosure (the expense of which shall be borne by the relevant Consenting Party) and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Prepetition Secured Loans or Prepetition Unsecured Notes held by all the Consenting Parties collectively, on a facility by facility basis.  Notwithstanding the provisions in this <u>Section 99</u>, any Party may disclose, if consented to in writing by a Consenting Party, such Consenting Party's individual holdings.

10.     **Amendments and Waivers.**

Except as otherwise expressly set forth herein, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by each of the Company and the Requisite Prepetition Secured Parties (in each case, with consent to any such action not to be unreasonably withheld, conditioned, or delayed); *provided* that: (i) any waiver, modification, amendment, or supplement to this <u>Section 10</u> shall require the prior written consent of each Party; (ii) any waiver, modification, amendment, or supplement to the definition of Requisite Prepetition Secured Parties shall additionally require the prior written consent of each Consenting Prepetition Secured Party; (iii) any waiver, modification, amendment, or supplement to the definition of Requisite Prepetition Unsecured Noteholders shall additionally require the prior written consent of each Consenting Prepetition Unsecured Noteholder; (iv) any waiver, modification, amendment, or supplement to the terms of this Agreement that has a material, disproportionate, and adverse effect on the rights of the holders of the Prepetition Unsecured Notes shall additionally require the prior written consent of the Requisite Prepetition Unsecured Noteholders; (v) any waiver, modification, amendment, or supplement to the terms of this Agreement that has a material, disproportionate, and adverse effect on the rights of the DRO Backstop Commitment Parties shall additionally require the prior written consent of the Requisite DRO Backstop Parties; (vi) any waiver, modification, amendment, or supplement to the terms of this Agreement that has a material, disproportionate, and adverse effect on the rights of the ERO Backstop Commitment Parties shall additionally require the prior written consent of the Requisite

36

ERO Backstop Parties; (vii) any waiver, modification, amendment, or supplement to the terms of this Agreement that has a material, disproportionate, and adverse effect on the rights of the Private Placement Commitment Parties shall additionally require the prior written consent of the Requisite Private Placement Commitment Parties; (viii) any waiver, modification, amendment, or supplement to the terms of this Agreement related to the DIP Facility shall additionally require the prior written consent of the Requisite DIP Lenders; and (ix) any waiver, modification, amendment, or supplement to the terms in this Agreement that (a) has a material and adverse effect on the rights, obligations, or interests of the Consenting Sponsor or the treatment of the Interests in Holdings or (b) provides for the unequal treatment on account of the Consenting Claims held by the Consenting Sponsor or any of its affiliates shall additionally require the prior written consent of the Consenting Sponsor. Any waiver, modification, amendment, or supplement to any Definitive Document that is in effect in accordance with the terms thereof shall be governed as set forth in such Definitive Document. Any consent required to be provided pursuant to this <u>Section 10</u> may be delivered by e-mail from applicable counsel.

**11.   Effectiveness.**

This Agreement will become effective and binding on the Company, the Consenting Creditors, any Consenting Creditor that has entered into a Joinder Agreement prior to the Support Effective Date, and the Consenting Sponsor, in all cases, upon the time and date on which all of the following conditions have been satisfied in accordance with this Agreement:

(a) the occurrence of the Support Effective Date; and

(b) the Company Parties shall have paid all Restructuring Expenses that are due and payable as of the Support Effective Date; *provided* that the Company Parties shall have received an invoice for such Restructuring Expenses at least three (3) Business Day prior to the Support Effective Date (and delivery of any such invoice shall be deemed permitted notwithstanding any limitation on timing for delivery of invoices set forth in any fee or engagement letter between any Ad Hoc Group Advisor and any Company Party).

This Agreement will become effective and binding on any Consenting Creditor that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery of such validly completed Joinder Agreement and of a signed acknowledgement from the Company to the other Parties; *provided* that signature pages executed by Consenting Parties will be delivered to the Company and Davis Polk in an unredacted form (to be held by Weil and Davis Polk, on a professionals' eyes only basis); *provided*, *further*, that the Company may disclose publicly the aggregate principal amounts of the Prepetition Secured Loans and Prepetition Unsecured Notes set forth on the signature pages hereto on a facility by facility basis.

**12.   GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

Section 12.01  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the law of the State of New York without giving effect to the conflict of laws principles thereof.

Section 12.02  Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and

determined in the federal or state courts in the Borough of Manhattan in the City of New York ("**NY Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Court.  Each of the Parties further agrees that notice as provided in Section 21 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 12.02 shall be brought in the Bankruptcy Court.

Section 12.03 EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 13.    Remedies; Specific Performance.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party.  Each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including reasonable attorneys' fees and costs), including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder, as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

14.     **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 6.01 hereof, Sections 6.07, 13, 14, 15, 16, 17, 19, 20, 21, 21, 22, 23, and 24 hereof, and the provisos contained in Sections 3.01(a), 3.01(b), 4.01(a), and 4.01(b) hereof (and, to the extent applicable to the interpretation of such surviving sections, Section 1 hereof) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof. For the avoidance of doubt, any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

15.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  If any provision of this Agreement, or the application of any such provision to any Entity or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

17.     **Capacities of Consenting Creditors.**

Subject to the limitations set forth in footnote 2 of this Agreement, each Consenting Creditor (other than the Initial Consenting Creditors) has entered into this Agreement on account of all Claims and Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Claims and Interests.

18.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other Entity is or is intended to be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Company and any Consenting Party (or any advisor thereto) will continue in full force and effect in accordance with the terms thereof.

20.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered in portable document format (PDF) by electronic mail, which will be deemed to be an original for the purposes of this paragraph.

21.     **Notices.**

All notices hereunder will be deemed given if in writing and delivered by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)     If to the Company, to:

Air Methods Corporation
5500 South Quebec Street, Suite 300
Greenwood Village, CO 80111

Attention:   JaeLynn Williams, Chief Executive Officer
(jaelynn.williams@airmethods.com)
Christopher Brady, SVP, General Counsel and Secretary
(christopher.brady@airmethods.com)
Jason Kahn, Interim CFO
(jason.kahn@airmethods.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Attention:   Ray Schrock, Esq. (Ray.Schrock@weil.com)
Kelly DiBlasi, Esq. (Kelly.DiBlasi@weil.com)
Kevin Bostel, Esq. (Kevin.Bostel@weil.com)

40

Alexander P. Cohen, Esq. (Alexander.Cohen@weil.com)

(2)    If to the Consenting Creditors, to the addresses or electronic mail addresses set forth below the Consenting Creditor's signature, with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

Attention:    Damian S. Schaible, Esq. (Damian.Schaible@davispolk.com)
Adam Shpeen, Esq. (Adam.Shpeen@davispolk.com)
Stephen D. Piraino, Esq. (Stephen.Piraino@davispolk.com)
David Kratzer, Esq. (David.Kratzer@davispolk.com)

(3)    If to the Consenting Sponsor, to the addresses or electronic mail addresses set forth below the Consenting Sponsor's signature, with a copy (which will not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Attention: Paul Basta, Esq. (pbasta@paulweiss.com)
Jacob Adlerstein, Esq. (jadlerstein@paulweiss.com)
Kyle R. Satterfield, Esq. (ksatterfield@paulweiss.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

**22.    Reservation of Rights; No Admission.**

Section 22.01  Except as expressly provided in this Agreement or the Plan, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, any claims against any of the other Parties.

Section 22.02 Without limiting Sections 14 or 22.01 hereof, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), with respect to those Parties as to whom the Agreement is terminated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights,

41

remedies, claims, and defenses.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses that it has asserted or could assert.

Section 22.03  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any special committee of such governing body, as applicable), upon advice of counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take any such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to this Section 22.03 shall not be deemed to constitute a breach of this Agreement.

## 23.   Relationship among Parties.

Notwithstanding anything herein to the contrary: (a) the duties and obligations of the Parties under this Agreement shall be several, not joint and several; (b) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (c) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; and (d) none of the Consenting Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company Parties or any of the Company Parties' other creditors or stakeholders, including as a result of this Agreement or the transactions contemplated herein or in any exhibit hereto.

## 24.   No Solicitation; Representation by Counsel; Adequate Information.

Section 24.01  This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases. The acceptances of the Consenting Parties with respect to the Plan will not be solicited until such Consenting Parties have received the Disclosure Statement and, as applicable, related ballots and Solicitation Materials.

Section 24.02 Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been—or is part of the Ad Hoc Group that has been—represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

*[Remainder of Page Intentionally Left Blank]*

**<u>Exhibit A</u>**

**Plan**

INTENTIONALLY OMITTED

**<u>Exhibit B</u>**

**Exit Term Loan Facility Term Sheet**

PROJECT ALTITUDE

EXIT TERM LOAN FACILITY

SUMMARY OF TERMS AND CONDITIONS

*This summary of principal terms and conditions (this "**Exit Term Loan Facility Term Sheet**") outlines the material terms of the senior secured first lien exit term loan facility to be provided to a reorganized Air Methods Corporation, as borrower.  The final documentation for the financing described herein, if any, will constitute the sole agreement among the parties with respect to the matters addressed herein.*

*This Exit Term Loan Facility Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, which shall be set forth in the final Exit Term Loan Facility Documentation (as defined below), but rather is intended to be a summary outline of the material terms of such financing.  Capitalized terms used herein but not defined have the respective meanings ascribed to such terms in the Restructuring Support Agreement (the "**Restructuring Support Agreement**") to which this Exit Term Loan Facility Term Sheet is attached or in the Plan (as defined in the Restructuring Support Agreement).*

## PARTIES

| | |
|---|---|
| Borrower: | Air Methods Corporation, a Delaware limited liability company, as a reorganized debtor (the "**Borrower**"). |
| Guarantors: | The obligations of the Borrower under the Exit Term Loan Facility (as defined below) and, if mutually agreed, at the option of the Borrower, the obligations of the Borrower and its Restricted Subsidiaries (as defined below) under any currency, interest rate protection, commodity or other hedging agreement (but excluding any Excluded Swap Obligation (to be defined in a manner consistent with the Documentation Principles (as defined below)) (a "**Secured Hedging Agreement**") and any cash management arrangement (a "**Secured Cash Management Arrangement**"), in each case entered into with an Exit Term Lender (as defined below), the Exit Term Agent (as defined below), and any person that is an affiliate of an Exit Term Lender or the Exit Term Agent at the time the relevant transaction is entered into (collectively, the "**Obligations**") will be unconditionally guaranteed (the "**Guaranties**"), jointly and severally, by (a) ASP AMC Holdings, Inc., a Delaware corporation, or a newly formed holding company that will directly or indirectly hold 100% of the equity interests of the Borrower ("**Holdings**"), (b) each other direct or indirect parent of the Borrower, (c) each Restricted Subsidiary of the Borrower (the persons described in this clause (ii), the "**Subsidiary Guarantors**"), (c) each Discretionary Guarantor (to be defined in a manner consistent with the Documentation Principles) and (d) in the case of Secured Hedging Agreements and Secured Cash Management Arrangements of any Restricted Subsidiary, the Borrower (the persons described in the immediately foregoing clauses (a), (b), (c) and (d), collectively, the "**Guarantors**" and the Guarantors, together with the Borrower, |

collectively, the "**Credit Parties**"); <u>provided</u> that Excluded Subsidiaries (to be defined in a manner consistent with the Documentation Principles) will not be required to become Guarantors.

For purposes of the Exit Term Loan Facility Documentation, "**Restricted Subsidiary**" means any existing or future direct or indirect subsidiary of Holdings (other than any Unrestricted Subsidiary (as defined below)).

Unrestricted Subsidiaries:

The Exit Term Loan Facility Documentation will contain provisions pursuant to which the Borrower will be permitted to designate (or re-designate) any existing or subsequently acquired or organized Restricted Subsidiary as an "unrestricted subsidiary" (each, an "**Unrestricted Subsidiary**") and designate (or re-designate) any such Unrestricted Subsidiary as a Restricted Subsidiary, in each case, subject to terms and conditions to be mutually agreed.

Exit Term Lenders:

Initially, (i) each DRO Backstop Commitment Party, (ii) each holder of Allowed Prepetition Secured Loan Claims that exercises its DRO Subscription Right to purchase its Pro Rata share of DRO Term Loans and (iii) each holder of DIP-to-Exit Term Loans (as defined below) (collectively, together with their permitted assignees, the "**Exit Term Lenders**").

DRO Backstop Commitment Parties:

Each DRO Backstop Commitment Party has agreed to backstop (or cause any of its Fund Affiliates to backstop) the DRO Term Loans on the terms and conditions set forth in the Purchase Commitment and Backstop Agreement.

Exit Term Agent:

Wilmington Savings Fund Society, FSB, or another institution to be mutually agreed by the Required Lenders (to be mutually defined) and the Borrower, will act as administrative agent and collateral agent (in such capacities, the "**Exit Term Agent**").

## DESCRIPTION OF EXIT TERM LOAN FACILITY

Exit Term Loan Facility:

A 5-year senior secured first lien term loan facility in an aggregate principal amount of $250,000,000 (the "**Exit Term Loan Facility**" and the loans thereunder, the "**Exit Term Loans**"), consisting of:

(i)     DRO Term Loans in an aggregate principal amount equal to $175,000,000 *plus* the DRO Liquidity Shortfall (as defined in the Purchase Commitment and Backstop Agreement), and

(ii)    Exit Term Loans converted, on a dollar-for-dollar basis, from DIP Rolled-Up Loans upon the Plan Effective Date in an aggregate outstanding principal amount equal to $75,000,000 (the Exit Term Loans described in this <u>clause (ii)</u>, the "**DIP-to-Exit Term Loans**"); <u>provided</u>, that

the DIP Rolled-Up Loans will be reduced dollar-for-dollar by the DRO Liquidity Shortfall.

For the avoidance of doubt, the DRO Term Loans will be fungible with the DIP-to-Exit Term Loans and constitute a single class of term loans.

| | |
|---|---|
| Amortization: | Annual amortization (payable in equal quarterly installments beginning on the last day of the first full fiscal quarter ending after the Closing Date (as defined below)) shall be required in an aggregate annual amount equal to 1.00% *per annum* of the original principal amount of the Exit Term Loans, with the balance payable on the Maturity Date. |
| Incremental Facilities: | To be mutually agreed (if any). |
| Maturity: | The Exit Term Loan Facility will mature on the date that is five years following the Closing Date (the "**Maturity Date**"). |
| Use of Proceeds: | The proceeds of the DRO Term Loans will be used to make payments and distributions under the Plan and for general corporate purposes not otherwise prohibited by the Exit Term Loan Facility Documentation. |

The proceeds of the DIP-to-Exit Term Loans will be used (or deemed used) to refinance and discharge the DIP Rolled-Up Loans Claims.

Once repaid, Exit Term Loans may not be reborrowed.

## CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Interest Rates: | The Exit Term Loans comprising each borrowing shall bear interest at a rate equal to, as elected by the Borrower in its sole discretion, (i) Term SOFR (to be defined in a manner (including with respect to any credit spread adjustment) to be mutually agreed and which shall not be less than 4.00% *per annum*) *plus* 9.0% *per annum*, payable in cash at the end of each interest period or (ii) Base Rate (to be defined in a manner consistent with the Documentation Principles and which shall not be less than 3.00% *per annum*) *plus* 8.0% *per annum*, payable in cash on a quarterly basis. |
| Default Interest: | At any time when a payment event of default (with respect to any principal, interest or fees) or bankruptcy event of default exists, at the election of the Required Lenders, the relevant overdue amounts will bear interest, to the fullest extent permitted by law, (i) in the case of overdue principal or interest, at 2.00% *per annum* above the rate then borne (in the case of principal) by such borrowings or (in the case of interest) by the borrowings to which such overdue amount relates or (ii) in the case of fees, 2.00% *per annum* in excess |

3

of the rate otherwise applicable to Exit Term Loans maintained as Base Rate loans from time to time.

| | | |
|---|---|---|
| DRO Facility Premiums: | (i) | As consideration for the funding of DRO Term Loans, each Exit Term Lender shall receive its ratable share (calculated on the basis of (A) the principal amount of DRO Term Loans funded by such Exit Term Lender on the Closing Date divided by (B) the aggregate principal amount of DRO Term Loans funded on the Closing Date) of the DRO Equity Interests. |
| | (ii) | As consideration for committing to backstop the DRO, each DRO Backstop Commitment Party shall receive its Pro Rata share (based on the proportion that a DRO Backstop Commitment Party's DRO Backstop Commitment bears to the aggregate DRO Backstop Commitments) of the DRO Backstop Commitment Premium. |
| Exit Term Agent Fees: | | To be set forth in a separate fee letter agreement between the Exit Term Agent and the Borrower. |
| Optional Prepayments: | | The Borrower may, upon notice requirements to be mutually agreed consistent with the Documentation Principles, prepay the Exit Term Loans, in whole or in part, in minimum amounts to be agreed, without premium or penalty (other than customary breakage costs and the prepayment premium set forth under the heading "Call Protection" below). |
| Call Protection: | | To be mutually agreed (if any). |
| Mandatory Prepayments: | | The Borrower shall cause an amount no less than each amount calculated pursuant to the terms below to be offered to prepay the Exit Term Loans, in each case, with carve-outs and exceptions consistent with the Documentation Principles (as defined below): |
| | (i) | 100% of the net cash proceeds of any incurrence by Holdings, the Borrower and/or any of their Restricted Subsidiaries of indebtedness (other than debt otherwise permitted under the Exit Term Loan Facility Documentation (other than certain permitted refinancing debt)); |
| | (ii) | 100% of the net cash proceeds in excess of an amount to be mutually agreed in any single transaction or series of related transactions in respect of any Disposition (to be defined in a manner consistent with Documentation Principles) of assets of Holdings, the Borrower and their Restricted Subsidiaries or from any Casualty Event (to be defined in a manner consistent with the Documentation Principles) (other than certain Dispositions to be mutually agreed); |

4

(iii)     75% of Excess Cash Flow (to be defined in a manner consistent with the Documentation Principles) of the Holdings, the Borrower and their Restricted Subsidiaries for each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2024); <u>provided</u>, that:

(a)     any such Excess Cash Flow prepayment will be required only if (and only to the extent that) the amount of the prepayment, after giving effect to any reductions and other credits to be set forth in the Exit Term Loan Facility Documentation in a manner consistent with the Documentation Principles, exceeds an amount per fiscal year to be agreed;

(b)     if the effectiveness of the rule adopted by the Department of Veteran Affairs as 38 CFR part 70 (the "**VA Rate Reset Rule**") is delayed past February 16, 2024, the foregoing percentage will be increased to 100% until the earlier to occur of (1) the VA Rate Reset Rule (or any similar rule) becoming effective and (2) the Borrower and/or its Restricted Subsidiaries entering into an agreement with the Department of Veteran Affairs that establishes a payment methodology for the services provided by the Borrower and its Restricted Subsidiaries; and

(c)     no Excess Cash Flow prepayment shall be required if, after giving effect thereto, Liquidity (as defined below) is less than $175,000,000;

with respect to <u>clauses (ii)</u> and <u>(iii)</u> above, in each case, subject to the right of the Borrower and its Restricted Subsidiaries to reinvest (or commit to reinvest) in assets on terms and conditions consistent with the Documentation Principles.

Additionally, the Exit Term Loan Facility Documentation will include the right of individual Exit Term Lenders to decline mandatory prepayments with proceeds referred to in <u>clauses (i)</u> through <u>(iv)</u> above (but in the case of <u>clause (i)</u> above, solely to the extent not representing a refinancing of the Exit Term Loans), in which case, such proceeds shall be available to the Borrower and its restricted subsidiaries for any usages not prohibited by the Exit Term Loan Facility Documentation.

## **COLLATERAL**

Collateral:                     The Obligations will be secured by a valid and perfected security interest in, with the priority described below under the heading "Ranking", and lien on substantially all tangible and intangible, real

5

and personal property of the Credit Parties (collectively, the "**Collateral**"); it being expressly understood and agreed that the Collateral will not include exclusions to be mutually agreed.

Ranking:

The Obligations will be secured on a first-priority basis with respect to Collateral (with exceptions (if any) for priority liens on assets securing ABL and receivables facilities acceptable to the Required Lenders in their sole discretion).

## CONDITIONS

Conditions Precedent to Closing:

The Exit Term Loan Facility Documentation shall contain customary and usual conditions precedent for financings of this type to the effectiveness of the Exit Term Loan Facility Documentation and the funding of the DRO Term Loans (the date of satisfaction of such conditions, the "**Closing Date**"), which will include the conditions listed on **Annex I** hereto.

## DOCUMENTATION

Exit Term Loan Facility Documentation:

The definitive financing documentation for the Exit Term Loan Facility (the "**Exit Term Loan Facility Documentation**") shall (the items set forth in clauses (i) through (iii) below, the "**Documentation Principles**");

(i)     contain the terms and conditions set forth in this Exit Term Loan Facility Term Sheet and such other terms as the Borrower and the Required Lenders may mutually agree;

(ii)    contain the conditions to the effectiveness of the Exit Term Loan Facility Documentation and initial funding (or deemed funding) of the Exit Term Loan Facility on the Closing Date set forth on **Annex I** hereto;

(iii)   give due regard to the Prepetition Credit Agreement; provided that the Exit Term Loan Facility Documentation will contain customary benchmark replacement provisions and Delaware limited liability company division provisions, in each case, to be mutually agreed; and

(iv)    except as provided herein and except to the extent the same would contravene any provision hereof, give due regard to the agency and administrative requirements of the Exit Term Agent to the extent reasonably satisfactory to the Borrower and the Required Lenders.

Representations and Warranties:

The Exit Term Loan Facility Documentation shall contain representations and warranties (subject to exceptions and qualifications) customary and usual for financings of this type consistent with the Documentation Principles.

| | |
|---|---|
| Affirmative Covenants: | The Exit Term Loan Facility Documentation shall contain affirmative covenants (subject to exceptions and qualifications) customary and usual for financings of this type consistent with the Documentation Principles, which shall include in any event the use of commercially reasonable efforts to obtain within 30 days from emergence (i) a public corporate family rating issued by Moody's and a public corporate credit rating issued by S&P and (ii) a public credit rating from each of Moody's and S&P with respect to the Exit Term Loans; <u>provided</u>, that in no event shall the Borrower be required to maintain a specific rating with any such agency. |
| Financial Covenant: | None. |
| Negative Covenants: | The Exit Term Loan Facility Documentation shall contain negative covenants (including thresholds, qualifications and exceptions to be mutually agreed) customary and usual for financings of this type consistent with the Documentation Principles. |
| Events of Default: | The Exit Term Loan Facility Documentation shall contain events of default (including thresholds, qualifications, exceptions and grace periods) customary and usual for debtor-in-possession financings of this type and consistent with the Documentation Principles. |
| Indemnification and Expenses: | Usual and customary for financings of this type and consistent with the Documentation Principles. |
| Assignments and Participations: | Usual and customary for financings of this type and consistent with the Documentation Principles. |
| Amendments: | Usual and customary for financings of this type and consistent with the Documentation Principles. |
| Governing Law and Submission to Jurisdiction: | New York. |
| Other Provisions: | The Exit Term Loan Facility Documentation shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury and other similar provisions. |
| Counsel to Exit Term Lenders: | Davis Polk & Wardwell LLP. |
| Tax Treatment: | For U.S. federal, and applicable state and local, income tax purposes, the Credit Parties shall treat (i) the DRO Backstop Commitment Premium as a premium paid in respect of the issuance or termination of a put option in respect of the DRO, (ii) the issuance of DRO Term Loans and a corresponding portion of the New Interests to an Exit Term Lender as an investment unit for U.S. federal income tax purposes as defined under section 1273(c)(2) of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**") and (iii) the DIP-to-Exit Term Loans and the DRO Term Loans as "part of the same issue" as defined under |

Treasury regulations section 1.1275-1(f) and shall be issued under a single CUSIP with one another, and, in each case, the Credit Parties shall not take any inconsistent position on any tax return, unless required to do so pursuant to a change in law following the date hereof or a "determination" as defined under section 1313 of the Internal Revenue Code.

**Annex I**

**Conditions Precedent to Closing**

The effectiveness of the Exit Term Loan Facility Documentation and the initial funding (or deemed funding) of the Exit Term Loans shall be subject to the satisfaction (or waiver) of solely the following conditions:

1.       A final non-appealable order of the Bankruptcy Court confirming the plan of reorganization, subject to any consent rights of the Required Lenders under the Restructuring Support Agreement and, solely with respect to those provisions thereof that affect the rights and duties of the Exit Term Agent, in form and substance reasonably satisfactory to the Exit Term Agent, which shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the interest of the Exit Term Lenders, and authorizing the Borrower to execute, deliver and perform under all documents contemplated under the Exit Term Loan Facility Documentation shall have been entered and shall have become a final order of the Bankruptcy Court.

2.       Each Credit Party shall have executed and delivered the relevant Exit Term Loan Facility Documentation to which it is a party and the Exit Term Agent shall have received (i) customary legal opinions, evidence of authority, corporate documents, and officers' certificates as to the Credit Parties, (ii) a customary borrowing request, (iii) a customary closing certificate and (iv) a solvency certificate executed by the chief financial officer or other officer of equivalent duties of the Borrower.

3.       All documents and instruments necessary to establish that the Exit Term Agent will have a perfected first lien security interest (subject to permitted liens under the Exit Term Loan Facility Documentation) in the Collateral shall have been executed (to the extent applicable) and delivered to the Exit Term Agent and, if applicable, be in appropriate form for filing (it being understood and agreed that mortgages or amended mortgages may be provided within a number of days to be mutually agreed after the Closing Date).

4.       The Exit Term Agent shall have received, at least three (3) business days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), a certification regarding beneficial ownership in relation to the Borrower required by the Beneficial Ownership Regulation, in each case, that has been requested in writing by the Exit Term Lenders at least ten (10) business days prior to the Closing Date.

5.       All fees, premiums and expenses under the Exit Term Loan Facility to the extent due and payable on the Closing Date and invoiced at least three (3) business days prior to the Closing Date (including the reasonable and documented out-of-pocket fees and expenses of Davis Polk & Wardwell LLP, as counsel to the Exit Term Lenders, taken as a whole) shall have been paid.

6.       The maximum funded indebtedness on the Closing Date under the Exit Term Loan Facility and the Exit Securitization Program shall not be in excess of an amount to be mutually agreed.

7.       Substantially concurrently with the effectiveness of the Exit Term Loan Facility Documentation, the Exit Securitization Program shall become effective substantially in accordance with the terms of the Exit Securitization Program Term Sheet.

8.       The Plan Effective Date shall have occurred.

9.      Each of the representations and warranties contained in the Exit Term Loan Facility Documentation shall be true and correct in all material respects on and as of the Closing Date (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect (to be defined in a manner consistent with the Documentation Principles)).

10.      Liquidity (as defined below) as of the Closing Date as calculated on a date prior to emergence to be mutually determined (the "**Emergence Liquidity Test Date**") (after giving effect to the Restructuring) shall be at least $135,000,000.

"**Liquidity**" shall mean, as of any date, an amount equal to (i) the amount of (a) all unrestricted Cash (to be defined in a manner consistent with the Documentation Principles) and Cash Equivalents (to be defined in a manner consistent with the Documentation Principles) of Holdings and its Restricted Subsidiaries as determined in accordance with GAAP, (b) all Cash and Cash Equivalents of Holdings and its Restricted Subsidiaries restricted in favor of the Exit Term Loan Facility and (c) all Cash and Cash Equivalents of Holdings and its Restricted Subsidiaries restricted in favor of the Exit Securitization Program, *plus* (ii) the aggregate amount then available to be drawn under the Exit Securitization Program and any other committed debt of Holdings and its Restricted Subsidiaries, provided that, solely for purposes of determining whether this condition is satisfied, the "Borrowing Base" (or similar defined term) under the Exit Securitization Program shall be deemed to be the greater of (a) $150,000,000 and (b) the estimated amount as of the Emergence Liquidity Test Date.

11.      The Exit Term Agent shall have received a budget forecast through the Maturity Date in form and substance to be mutually agreed.

**<u>Exhibit C</u>**

**Joinder**

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This joinder agreement to the Restructuring Support Agreement, dated as of [_____], 2023 (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Company, the Consenting Creditors, and the Consenting Sponsor, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2023.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (a) delivery of a signature page for this joinder and (b) written acknowledgement by the Company, the Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors, as set forth in <u>Section 8</u> and <u>24</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

**DIP Commitment Election** (This election can only be made on or prior to the DIP Commitment Outside Date.):

□ By checking this box, the Joining Party hereby represents and warrants that as of [●], it held Prepetition Secured Loans in the amount set forth below, and hereby commits to provide a proportionate share of the DIP New Money Loans (as set forth below), on the terms and conditions in the DIP Credit Agreement and/or the DIP Documents, as applicable.

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


**By:**_____
**Name:**
**Title:**


████████████████████████████████████████████████

**Principal Amount of the Prepetition Secured Loans:**   $_____
**Principal Amount of the Prepetition Unsecured Notes:** $_____


**<u>Notice Address</u>:**


_____
_____
_____
**Attention:**       _____
**Email:**           _____


Acknowledged:

**AIR METHODS CORPORATION**
**(on behalf of the Company)**

By:_____
Name:
Title:

**<u>Exhibit D</u>**

**DIP Term Sheet**

PROJECT ALTITUDE

DIP FACILITY

SUMMARY OF TERMS AND CONDITIONS

*This summary of principal terms and conditions (this "**Term Sheet**") outlines the material terms of the senior secured superpriority debtor-in-possession term loan facility. The final documentation for the financing described herein, if any, will constitute the sole agreement among the parties with respect to the matters addressed herein. Such final documents will be subject to (i) the conditions set forth in this Term Sheet under the heading "Conditions Precedent to Effectiveness", (ii) the Borrower and the other Loan Parties (other than the Non-Debtor Guarantors (as defined below)) commencing bankruptcy cases (the "**Chapter 11 Cases**" and the date the Chapter 11 Cases are commenced, the "**Petition Date**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), (iii) the consent rights contained in the Restructuring Support Agreement (as defined below), and (iv) approval by the Bankruptcy Court of the DIP Documentation (as defined below).*

*This Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, which shall be set forth in the final DIP Documentation, but rather is intended to be a summary outline of the material terms of such financing. Capitalized terms used herein but not defined have the respective meanings ascribed to such terms in the Restructuring Support Agreement (the "**Restructuring Support Agreement**") to which this Term Sheet is attached.*

| | |
|---|---|
| **Borrower:** | Air Methods Corporation, a Delaware corporation (the "**Borrower**"). |
| **Guarantors:** | The obligations of the Borrower under the DIP Facility (as defined below) will be guaranteed, jointly and severally, by each of the Company Parties set forth on **Schedule I** hereto (collectively, the "**Guarantors**," and, together with the Borrower, the "**Loan Parties**"). |
| **Unrestricted Subsidiaries:** | All subsidiaries that are unrestricted subsidiaries pursuant to the Prepetition Credit Agreement (as defined below) shall be unrestricted subsidiaries under the DIP Facility. |
| **DIP Lenders:** | Each member of the Ad Hoc Group set forth on **Schedule I** to the Restructuring Support Agreement and ASP VII D2 Ltd (each, a "**DIP Backstop Party**" and, collectively, the "**DIP Backstop Parties**") and each Prepetition Secured Party that becomes party to the Restructuring Support Agreement on or before the DIP Commitment Outside Date and that makes the appropriate election on its signature page to the Restructuring Support Agreement (or, in the case of any Prepetition Secured Party that becomes party to the Restructuring Support Agreement after the Support Effective Date, its Joinder Agreement) (each, a "**Joining DIP Commitment Party**" and, collectively, the "**Joining DIP Commitment Parties**"; each Joining DIP Commitment Party and each DIP Backstop Party, in each case, that has a DIP Commitment (as defined below) and/or |

holds outstanding DIP Loans (as defined below), each, a "**DIP Lender**" and, collectively, the "**DIP Lenders**").

**DIP Backstop Parties:**    Each DIP Backstop Party has agreed to backstop (or cause any of its Fund Affiliates to backstop) the DIP Commitments (for the avoidance of doubt, on a pro rata basis between the Closing Date DIP Commitments (as defined below) and the Delayed Draw DIP Commitments (as defined below)) on the terms and conditions set forth herein and in the amounts set forth opposite such DIP Backstop Party's name on **Schedule I** to the Restructuring Support Agreement.

**DIP Agent:**    Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacity, the "**DIP Agent**").

**DIP Facility:**    A superpriority, senior secured, priming debtor-in-possession term loan facility in the aggregate principal amount of up to $155,000,000 (the "**DIP Facility**" and the loans thereunder, the "**DIP Loans**"), consisting of:

(i)    new money term loans to be made in a single draw on the Closing Date (as defined below) (which may, at the option of any DIP Lender, be funded through a financial institution selected by the Requisite DIP Backstop Parties and reasonably acceptable to the Borrower to act as fronting lender (the "**Fronting Lender**")) in an aggregate original principal amount equal to $40,000,000 (such term loans, the "**Closing Date DIP New Money Loans**" and the commitments in respect thereof, the "**Closing Date DIP Commitments**"),

(ii)    new money delayed draw term loans to be made in a single draw on the Delayed Draw Borrowing Date (as defined below) (which may, at the option of any applicable DIP Lender, be funded through the Fronting Lender) in an aggregate original principal amount equal to $40,000,000 (such term loans, the "**Delayed Draw DIP New Money Loans**" and the commitments in respect thereof, the "**Delayed Draw DIP Commitments**"; the Delayed Draw DIP New Money Loans, together with the Closing Date DIP New Money Loans, collectively, the "**DIP New Money Loans**"; and the Delayed Draw DIP Commitments, together with the Closing Date DIP Commitments, the "**DIP Commitments**"), and

(iii)    a roll-up (the "**Roll-Up**") of Prepetition Secured Loans held by DIP Lenders, on a pro rata basis in accordance with the share of DIP New Money Loans made by such DIP Lender, in an aggregate outstanding principal amount of $75,000,000 on the earlier to occur of (a) one business day prior to the Plan Effective Date and (b) the date on which

2

the Restructuring Support Agreement is terminated (such rolled-up DIP Loans, the "DIP Rolled-Up Loans"), which DIP Rolled-Up Loans will convert, on a dollar-for-dollar basis, to Exit Term Loans (as defined in the Plan) upon the Plan Effective Date, subject to the terms and conditions described herein and in the credit agreement (the "**DIP Credit Agreement**") and the other definitive documentation with respect to the DIP Facility (collectively, the "**DIP Documentation**"); provided that if the aggregate principal amount of the DRO is increased, the aggregate principal amount of the Roll-Up will be reduced dollar for dollar by the amount of such increase.

Each DIP Backstop Party's DIP Commitment shall be reduced, ratably, by the amount of such additional DIP Commitments of the Joining DIP Commitment Parties to reflect the share of the DIP Facility to be provided by such Joining DIP Commitment Parties in accordance with the Restructuring Support Agreement.

|  |  |
|---|---|
| **Budget:** | The DIP Credit Agreement shall provide for delivery of an Initial Budget (as defined below) as a condition to the Closing Date.  In addition, the DIP Credit Agreement shall require the Borrower to deliver to the DIP Agent (i) on every fourth Friday (commencing with the Friday of the fifth full calendar week after the Petition Date), a Budget for the rolling 13-week period commencing on the Saturday of the prior week (each, a "**Budget Supplement**") and (ii) on the Budget Variance Test Date (as defined below), a customary budget variance report (each such report, a "**Budget Variance Report**") covering the four-week period ending on the Friday of the week immediately preceding the applicable Budget Variance Test Date. |

"**Budget**" shall mean a 13-week consolidated weekly operating budget of the Debtors (as defined below) and their respective subsidiaries setting forth, among other things, projected receipts, disbursements, liquidity and net cash flow for the period described therein, prepared by the Borrower's management and in form and level of detail substantially consistent with the Initial Budget.

"**Initial Budget**" shall mean the initial Budget for the 13-week period commencing on or about the Petition Date, in form and substance acceptable to the Required Lenders.

"**Approved Budget**" shall mean, initially, the Initial Budget, as supplemented by each Budget Supplement to the extent the Required Lenders do not object to such Budget Supplement within five business days of receipt thereof.

|  |  |
|---|---|
| **Milestones:** | To be consistent with the Milestones set forth in the Restructuring Support Agreement. |

| | |
|---|---|
| **Maturity:** | The scheduled maturity date shall be the date that is four months after the Closing Date (the "**Scheduled Maturity Date**"). |
| | The DIP Facility (and all commitments thereunder) shall terminate upon the earliest to occur of (a) the Scheduled Maturity Date (b) the Plan Effective Date, (c) the consummation of a sale or other disposition of all or substantially all assets of the Loan Parties, taken as a whole, under section 363 of the Bankruptcy Code, and (d) the date of acceleration or termination of the DIP Facility in accordance with the terms hereof. |
| **Interest Rates:** | The DIP Loans shall bear interest at a rate equal to, as elected by the Borrower in its sole discretion, (i) Term SOFR (to be defined in the DIP Documentation) (which shall include a credit spread adjustment) *plus* 10.0% *per annum*, payable in cash at the end of each interest period (which shall be one-month only) or (ii) Base Rate (to be defined in the DIP Documentation) *plus* 9.0% *per annum*, payable in cash quarterly.  Interest on DIP Loans that bear interest by reference to Term SOFR shall be calculated using a 360-day year and actual days elapsed.  Interest on DIP Loans that bear interest by reference to Base Rate shall be calculated using a 365-day (or 366-day, in a leap year) year and actual days elapsed. |
| **Default Rate:** | The DIP Loans shall bear interest at the applicable interest rate *plus* 2.0% *per annum*, and with respect to any other amount (including overdue principal or interest), the interest rate applicable to Base Rate loans *plus* 2.0% *per annum*, in each case, at the election of the Required Lenders upon the occurrence and during the continuance of any Event of Default. |
| **Upfront Discount:** | The Borrower shall pay to each DIP Lender an upfront discount (the "**Upfront Discount**") in an amount equal to 2.0% of the aggregate amount of the DIP Commitments as of the Closing Date, which Upfront Discount will be fully earned, with respect to any DIP Lender, as of the later of (i) the date of execution of the RSA and (ii) the date on which such DIP Lender joins the fully executed RSA, subject to increase and/or reduction as a result of any subsequent permitted assignment by or to such DIP Lender, and due and payable in cash (i) in the case of the Closing Date DIP Commitments, on the Closing Date or (ii) in the case of the Delayed Draw DIP Commitments, on the Delayed Draw Borrowing Date. |
| **Backstop Premium:** | The Borrower shall pay to each of the DIP Backstop Parties a premium (the "**Backstop Premium**") in an amount equal to 8.0% of the aggregate principal amount of such DIP Backstop Party's DIP Commitments on the Support Effective Date, which Backstop Premium will be fully earned on the Support Effective Date and due and payable in cash on the Closing Date. |
| **Optional Prepayments:** | The Borrower may, upon providing notice not later than 1:00 p.m., three (3) business days' prior to each intended prepayment (or in |

the case of a prepayment of a Base Rate loan, no later than 11:00 a.m. on the date of such prepayment), prepay in full or in part, without premium or penalty (other than customary breakage costs), the DIP Loans.  Once repaid, DIP Loans may not be re-borrowed.

**Mandatory Prepayments:**    The following amounts received by Holdings and its restricted subsidiaries shall be applied to prepay the DIP Loans, in each case, as follows:

(i)     100% of the net cash proceeds from any Casualty Event (to be defined in the DIP Documentation consistent with the Prepetition Credit Agreement), in excess of $250,000 in any single transaction or series of related transactions;

(ii)    100% of the net cash proceeds from the issuance or incurrence of post-petition indebtedness or equity interests not permitted by the DIP Credit Agreement;

(iii)   100% of the net cash proceeds of any asset sales (other than (a) certain dispositions in the ordinary course of business and (b) other exceptions to be mutually agreed by the Required Lenders), in excess of $250,000 for each such asset sale or series of related asset sales (in each case, with only the amount in excess of such amount being required to repay the DIP Loans); and

(iv)    100% of net cash proceeds in respect of Extraordinary Receipts (to be defined in a manner mutually agreed) in excess of $1,000,000 in the aggregate for all such Extraordinary Receipts received during the term of the DIP Credit Agreement;

provided that:

(a) any prepayment described in clauses (i) through (iv) above will be applied (x) first, pro rata among the DIP New Money Loans then outstanding until such DIP New Money Loans are repaid in full, and (y) thereafter, pro rata among the DIP Rolled-Up Loans then outstanding until such DIP Rolled-Up Loans are repaid in full; and

(b) with respect to clauses (i), (iii) and (iv) above, in each case, the Borrower and its restricted subsidiaries shall have the right to reinvest (or commit to reinvest) in assets of the general type used or useful in the business of the Borrower and its subsidiaries pursuant to and as expressly contemplated by and identified in the Approved Budget, subject to any permitted variances and/or with the consent of the Required Lenders.

Additionally, the DIP Documentation will include the right of individual DIP Lenders to decline proceeds referred to in clauses (i) and (iii) above, in which case, such proceeds shall be available to

5

the Borrower and its restricted subsidiaries for any usages not prohibited by the DIP Documentation.

**Prepayment Premiums, Back-End Fees, Exit or Similar Fees:**   None other than those described under the headings "Backstop Premium" and "Upfront Discount".

**Priority:**   The obligations of the Borrower under the DIP Facility, including all DIP Loans, shall, subject to the Carve-Out (as defined below), at all times:

(i)   pursuant to section 364(d) of the Bankruptcy Code and the BH Intercreditor Agreement (as defined below), be secured by a perfected first priority security interest and lien on the Collateral (as defined below) of each Loan Party that constitutes "Collateral" under the Prepetition Credit Agreement as of the Petition Date (which liens shall rank senior to any valid and perfected liens granted pursuant to the Prepetition Credit Agreement);

(ii)   pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior security interest and lien on the Collateral of each Loan Party that is subject to (x) valid, perfected and non-avoidable prepetition permitted senior liens as of the Petition Date or (y) valid and non-avoidable prepetition permitted senior liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code;

(iii)   pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on the Collateral of each Loan Party (x) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (y) subject to entry of the Final DIP Order, claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (but including the proceeds thereunder to the extent otherwise constituting Collateral); and

(iv)   pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Cases subject to, and *pari passu* with, the Securitization Program Superpriority Claims.

**Security:**   All amounts owing by the Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a valid and perfected security interest in, with the priority described above under the heading "Priority," and lien on substantially all tangible and intangible, real and personal property of the Loan Parties (collectively, the "**Collateral**"); it being expressly understood and

6

agreed that the Collateral will not include Excluded Assets (to be defined in the DIP Documentation).

**Carve-out:**                   Each DIP Order shall include a carve-out from the priority granted to the DIP Facility described above (the "**Carve-Out**"), which shall be in an amount equal to the sum of:

(i)     all fees required to be paid to the Clerk of the Bankruptcy Court and to the trustee in the Chapter 11 Cases under section 1930(a) of title 28 of the United States Code *plus* interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below);

(ii)    all reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below);

(iii)   to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or retained by the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Estate Professionals**") (in each case, other than any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors), at any time before or on the first business day following delivery by the DIP Agent (acting at the direction of Required Lenders) of a Carve-Out Trigger Notice (as defined below) and without regard to whether such fees and expenses are provided for in the Approved Budget or were invoiced after the Carve-Out Trigger Notice Date, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii) being the "**Pre-Carve-Out Cap**");

(iv)    Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery of the Carve-Out Trigger Notice (the amount set forth in this clause (iv) being the "**Debtor Post-Carve-Out Cap**"); and

(v)     Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery of the Carve-Out Trigger Notice (the amount set forth in this clause (v) being

7

the "**Committee Post-Carve-Out Cap**" and, together with the Debtor Post-Carve Out Cap, the "**Post Carve-Out Caps**" and, the Post-Carve Out Caps together with the Pre-Carve-Out Cap and the amounts set forth in clauses (i) and (ii), the "**Carve-Out Cap**");

provided that the Carve-Out shall be subject to the applicable restrictions on the use of proceeds of the DIP Loans.

"**Carve-Out Trigger Notice**" shall mean a written notice delivered by email by the DIP Agent (acting at the direction of Required Lenders) (or, after the applicable DIP Obligations have been indefeasibly paid in full and the DIP Commitments terminated, the prepetition administrative agent) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Documentation (or, after the DIP Obligations have been indefeasibly paid in full and the DIP Commitments terminated, any occurrence that would constitute an event of default under the DIP Documentation and that is continuing), stating that the Post-Carve-Out Caps have been invoked.

"**Carve-Out Trigger Notice Date**" shall mean the day on which a Carve-Out Trigger Notice is received by the Loan Parties.

|  |  |
|---|---|
| **Conditions Precedent to Effectiveness:** | The DIP Documentation will contain customary and usual conditions precedent for debtor-in-possession financings of this type to the effectiveness of the DIP Documentation and the funding of the Closing Date DIP New Money Loans (the date of satisfaction of such conditions, the "**Closing Date**"), which will be limited to the following: |

(i)      The Petition Date shall have occurred and each Loan Party (other than the Non-Debtor Guarantors) shall be a debtor and a debtor in possession (collectively, the "Debtors").

(ii)      Within three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance consistent with this Term Sheet and otherwise (a) subject to any consent rights of the Required Lenders under the Restructuring Support Agreement and (b) solely with respect to those provisions thereof that affect the rights and duties of the DIP Agent, in form and substance reasonably satisfactory to the DIP Agent.

(iii)      The DIP Agent shall have received counterparts of the applicable DIP Documentation required to be delivered on

8

the Closing Date, duly executed by the Loan Parties and the DIP Lenders, as applicable.

(iv)    The DIP Agent shall have received a customary notice of borrowing with respect to the Closing Date DIP New Money Loans.

(v)    The DIP Agent shall have received a customary closing certificate, dated as of the Closing Date, and signed by a responsible officer of the Borrower.

(vi)    Each UCC financing statement and each other document required by the DIP Documentation to be filed, registered or recorded in order to create a perfected first priority lien on the Collateral shall be in proper form for filing, registration or record.

(vii)    Since the Petition Date, no Material Adverse Effect shall have occurred.

(viii)    The customary "first day orders" shall have been entered by the Bankruptcy Court and shall be in full force and effect.

(ix)    No trustee under chapter 7 or chapter 11 shall have been appointed in the Chapter 11 Cases.

(x)    Each of the representations and warranties contained in the DIP Documentation shall be true and correct in all material respects on and as of the Closing Date (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect (as defined below)).

(xi)    The DIP Agent shall have received copies of organizational documents, certificates of good standing and resolutions with respect to each Loan Party and certifications with respect thereto.

(xii)    The DIP Agent shall have received payment of all fees, premiums and expenses under the DIP Facility to the extent due and payable on the Closing Date and invoiced at least three (3) business days prior to such date (including the reasonable and documented out-of-pocket fees and expenses of Evercore Group L.L.C., as financial advisor to the Ad Hoc Group, and in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees and expenses of (a) McDermott Will & Emery LLP, as

9

counsel to the DIP Agent, and (b) Davis Polk & Wardwell LLP and Vinson & Elkins LLP, each as counsel to the Ad Hoc Group).

(xiii)　The DIP Agent shall have received at least three (3) business days prior to the Closing Date all documentation and other information requested in writing by the DIP Agent at least seven (7) business days prior to the Closing Date required under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(xiv)　The DIP Agent shall have received the Initial Budget.

(xv)　The DIP Agent shall have received a completed perfection certificate with respect to the Non-Debtor Guarantors, dated as of the Closing Date, together with all attachments contemplated thereby.

(xvi)　The Restructuring Support Agreement shall be in full force and effect.

(xvii)　All Milestones required to be satisfied on or prior to the Closing Date shall have been satisfied (unless waived or extended by the requisite parties in accordance with the Restructuring Support Agreement).

(xviii)　The proceeds of the Closing Date DIP New Money Loans shall be disbursed in accordance with the Initial Budget.

(xix)　No default or event of default shall have occurred and be continuing.

(xx)　The Loan Parties, the DIP Agent and Royal Bank of Canada, as administrative agent under the Prepetition Credit Agreement, shall have entered into an intercreditor agreement (the "**BH Intercreditor Agreement**"), which shall, among other things, give priority to the DIP Agent, on behalf of the DIP Lenders, with respect to the liens on the Collateral of the Loan Parties listed under the heading "BH Loan Parties" on **Schedule I** hereto (the "**Non-Debtor Guarantors**").

**Conditions Precedent to Extension of Delayed Draw DIP New Money Loans:**

The DIP Documentation will contain customary and usual conditions precedent for debtor-in-possession financings of this type to the obligation of the DIP Lenders to fund Delayed Draw DIP New Money Loans (the date of satisfaction of such conditions and the funding of the Delayed Draw DIP New Money Loans, the "**Delayed Draw Borrowing Date**"), which will be limited to the following:

10

(i)  The Closing Date shall have occurred.

(ii)  The Bankruptcy Court shall have entered the Final DIP Order, in form and substance consistent with this Term Sheet and otherwise (a) subject to any consent rights of the Required Lenders under the Restructuring Support Agreement and (b) solely with respect to those provisions thereof that affect the rights and duties of the DIP Agent, in form and substance reasonably satisfactory to the DIP Agent.

(iii)  All material "second day orders" intended to be entered on or prior to the date of the entry of the Final Order shall have been entered by the Bankruptcy Court on or prior to the entry of the Final Order.

(iv)  The DIP Agent shall have received a customary notice of borrowing with respect to the Delayed Draw DIP New Money Loans.

(v)  Each of the representations and warranties contained in the DIP Documentation shall be true and correct in all material respects on and as of the Delayed Draw Borrowing Date (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect).

(vi)  The DIP Agent shall have received (a) the Approved Budget for the 13-week period commencing on or about the Delayed Draw Borrowing Date (provided that the condition set forth in this clause (a) shall be deemed satisfied if a Budget Supplement with respect to the same 13-week period has been timely delivered to the DIP Agent and the Required Lenders have not objected thereto and (b) all Budget Variance Reports then required to have been delivered.

(vii)  The Chapter 11 Cases shall not have been dismissed or converted under chapter 7 of the Bankruptcy Code.

(viii)  No trustee under chapter 7 or chapter 11 shall have been appointed in the Chapter 11 Cases.

(ix)  The Restructuring Support Agreement shall be in full force and effect.

(x)  All Milestones required to be satisfied on or prior to the Delayed Draw Borrowing Date shall have been satisfied

11

(unless waived or extended by the requisite parties in accordance with the Restructuring Support Agreement).

(xi)    The proceeds of the Delayed Draw DIP New Money Loans made on the Delayed Draw Borrowing Date shall be disbursed in accordance with the Approved Budget.

(xii)    No default or event of default shall have occurred and be continuing.

(xiii)    Each of the representations and warranties contained in the DIP Documentation shall be true and correct in all material respects on and as of the Delayed Draw Borrowing Date (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect).

**Representations and Warranties:**

The DIP Credit Agreement shall contain representations and warranties customary and usual for debtor-in-possession financings of this type (to be applicable to the Loan Parties and their restricted subsidiaries) (which shall be subject, where applicable, to qualifications (including knowledge qualifiers), applicable legal reservations and qualifications, limitations for materiality to be provided in the DIP Documentation (including as to a Material Adverse Effect standard)): organization and existence; power and authority; authorization; execution, delivery and enforceability of the DIP Documentation; no conflicts with law, organizational documents or material contractual obligations; accuracy of disclosure as of the Closing Date; financial statements and pro forma financial information; the Initial Budget and each Approved Budget; no Material Adverse Effect; compliance with applicable laws and regulations, material consents and approvals; ownership of property; intellectual property; capitalization of subsidiaries as of the Closing Date; insurance; environmental laws; ERISA and labor matters; no material litigation; margin regulations; anti-terrorism laws, anti-bribery laws and anti-corruption laws (including money laundering laws, rules and regulations and laws applicable to sanctioned persons (including FCPA, OFAC and the USA PATRIOT Act)); inapplicability of the Investment Company Act of 1940; payment of taxes; validity, priority and perfection of liens and security interests in the Collateral; certain bankruptcy matters (including as to DIP Orders); and use of proceeds.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the condition (financial or otherwise), results of operations, business or assets of the Loan Parties, taken as a whole, (ii) the ability of each Loan Party to perform its material obligations under the DIP Documentation to which it is a party or (iii) the legality,

validity or enforceability of the DIP Documentation or the rights and remedies (taken as a whole) of the DIP Agent under the DIP Documentation; provided that, for the avoidance of doubt, it is understood and agreed that the following shall be disregarded in determining whether a "Material Adverse Effect" has occurred: the effect of (a) the filing of the Chapter 11 Cases, the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of the cases under chapter 11 of the Bankruptcy Code, (b) any actions required to be taken under the DIP Documentation or the DIP Orders and (c) any matters (including, for the avoidance of doubt, any litigation) disclosed in schedules to the DIP Documentation and/or publicly disclosed in any first day pleadings or declarations in the Chapter 11 Cases.

|  |  |
|---|---|
| **Affirmative Covenants:** | The DIP Credit Agreement shall contain affirmative covenants customary and usual for debtor-in-possession financings of this type, which shall be limited to the following: delivery of financial statements and reports; delivery of certificates, notices and other material information (including notices of default, litigation, ERISA events and Material Adverse Effect); compliance with applicable laws and regulations (including environmental laws); payment of taxes; use of proceeds; preservation of existence; visitation and inspection rights; keeping of books and records; maintenance of properties and insurance coverage; covenants to guarantee obligations and give security; ratings (at the request of the Required Lenders); delivery of an Approved Budget (and supplements thereto); post-closing covenants; satisfaction of Milestones; repatriation of cash; bankruptcy matters; provision of draft motions and pleadings (subject to limitations and exceptions reasonably acceptable to the DIP Lenders); and further assurances, subject, where applicable, in the case of each of the foregoing covenants, to exceptions and qualifications to be provided in the DIP Documentation. |
| **Financial Covenants** | The DIP Credit Agreement shall contain the following financial covenant applicable to the Borrower and its restricted subsidiaries: |

Minimum Liquidity Covenant:  Commencing with the Friday of the first full week after the Petition Date and tested on each Friday thereafter, the Borrower shall not permit liquidity to be less than $25,000,000 as of such date.

Budget Variance Covenant: On Budget Variance Test Date (as defined below), the Borrower shall not permit:

(a)    actual receipts for such Budget Variance Test Period (as defined below) (excluding extraordinary receipts and proceeds of non-ordinary course asset sales unless approved by the Required Lenders) to be less than (i) for the first two Budget Variance

Test Periods following the Petition Date, 80% of the forecasted receipts for such Budget Variance Test Period in the applicable Approved Budget and (ii) for each other Budget Variance Test Periods thereafter, 85% of the forecasted receipts for such Budget Variance Test Period in the applicable Approved Budget for each Budget Variance Test Period thereafter; and

(b)    actual total disbursements for such Budget Variance Test Period to be greater than (i) for the first two Budget Variance Test Periods, 120% of the forecasted total disbursements (other than Professional Fee Disbursements (as defined below)) for such Budget Variance Test Period in the applicable Approved Budget and (ii) for each other Budget Variance Test Period thereafter, 115% of the forecasted total disbursements (other than Professional Fee Disbursements) for such Budget Variance Test Period in the applicable Approved Budget.

To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the calculations set forth above.

"**Budget Variance Test Date**" shall mean the Friday of every week (commencing with the Friday of the third full calendar week occurring after the Petition Date) or, to the extent such Friday is not a Business Day, the next Business Day thereafter.

"**Budget Variance Test Period**" shall mean (a) with respect to the first Budget Variance Test Date, the two-week period ending on the Friday of the week immediately preceding the Budget Variance Test Date, (b) with respect to the second Budget Variance Test Date, the three-week period ending on the Friday of the week immediately preceding the Budget Variance Test Date and (c) with respect to the third Budget Variance Test Date and each Budget Variance Test Date thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Budget Variance Test Date.

"**Professional Fee Disbursements**" shall mean the disbursements of the type identified as "Professional Fees" provided under the Initial Budget and subsequent Approved Budget.

| | |
|---|---|
| **Negative Covenants:** | The DIP Credit Agreement shall contain negative covenants customary and usual for debtor-in-possession financings of this type and subject to the consent rights of the DIP Lenders under the Restructuring Support Agreement. |
| **Events of Default:** | The DIP Credit Agreement shall contain events of default customary and usual for debtor-in-possession financings of this type and subject to the consent rights of the DIP Lenders under the Restructuring Support Agreement. |
| **DIP Documentation:** | The DIP Documentation will (i) reflect the terms and conditions set forth in this Term Sheet, (ii) reflect the operational and strategic requirements of the Borrower and its subsidiaries, (iii) otherwise give due consideration the Prepetition Credit Agreement, and (iv) take into account the prepetition indebtedness and business plan of the Borrower and its subsidiaries, subject to the consent rights of the DIP Lenders under the Restructuring Support Agreement. |
| **Indemnification and Expenses:** | Usual and customary for debtor-in-possession financings of this type. |
| **Assignments and Participations:** | Usual and customary for debtor-in-possession financings of this type; <u>provided</u> that the aggregate principal amount of DIP Loans that can be held at any time by an affiliate lender shall not exceed the aggregate amount of such affiliate lender's backstop DIP Commitments and the number of affiliate lenders that may hold DIP Loans shall not exceed the number of affiliate lenders holding Prepetition Secured Loans as of the Petition Date. |
| **Amendments:** | The consent of (i) at least three unaffiliated DIP Lenders having unused DIP Commitments and/or holding outstanding DIP Loans representing more than 50% of the aggregate of all unused DIP Commitments and/or DIP Loans at the relevant time or (ii) if there are not at least three unaffiliated Lenders holding outstanding Term Loans and unused Commitments representing more than 50% of the sum of the outstanding Term Loans and such unused Commitments at such time, then Lenders holding outstanding Term Loans and unused Commitments representing more than 50% of the sum of the outstanding Term Loans and such unused Commitments at such time, in each case, excluding any unused Commitments and outstanding Term Loans of Defaulting Lenders (the "**Required Lenders**") will be required to make amendments to the DIP Credit Agreement, except for provisions requiring approval by all affected DIP Lenders or all DIP Lenders as set forth in the DIP Documentation.  In the event that a DIP Lender fails to consent to an amendment, modification or waiver, the Borrower will have the customary ability to replace such lender (a so-called "yank" right). |

| | |
|---|---|
| **Governing Law and Submission to Jurisdiction:** | New York and, to the extent applicable, the Bankruptcy Code. Each party hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States of America for the Southern District of New York and appellate courts from any thereof. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall, to the extent permitted by law, be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. |
| **Counsel to DIP Lenders:** | Davis, Polk & Wardwell LLP. |
| **Tax Treatment:** | For U.S. federal, and applicable state and local, income tax purposes, the Loan Parties shall treat (i) the Backstop Premium as a premium paid in respect of the issuance or termination of a put option in respect of the DIP New Money Loans and (ii) the Upfront Discount as "original issue discount" for U.S. federal income tax purposes within the meaning of section 1273(a)(1) of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), on the DIP New Money Loans issued in connection therewith, and the Loan Parties shall not take any inconsistent position on any tax return, unless required to do so pursuant to a change in law following the date hereof or a "determination" as defined under section 1313 of the Internal Revenue Code. |

**Schedule I**

**Guarantors**

## Schedule I

### Guarantors

1. ASP AMC Holdings, Inc., a Delaware corporation

2. ASP AMC Intermediate Holdings, Inc., a Delaware corporation

3. Air Methods Telemedicine, LLC, a Delaware limited liability company

4. United Rotorcraft Solutions, LLC, a Texas limited liability company

5. Mercy Air Service, Inc., a California corporation

6. LifeNet, Inc., a Missouri corporation

7. Rocky Mountain Holdings, L.L.C., a Delaware limited liability company

8. Air Methods Tours, Inc., a Delaware corporation

9. Tri-State Care Flight, LLC, an Arizona limited liability company

10. Advantage LLC, a Delaware limited liability company

11. Enchantment Aviation, Inc., a New Mexico corporation

12. Native Air Services, Inc., a Nevada corporation

13. Native American Air Ambulance, Inc., a Nevada corporation

14. AirMD, LLC, a Delaware limited liability company

15. Midwest Corporate Air Care, LLC, a Kansas limited liability company

**BH Loan Parties**:

16. Blue Hawaiian Holdings, LLC, a Delaware limited liability company

17. Helicopter Consultants of Maui, LLC, a Hawaii limited liability company

18. Nevada Helicopter Leasing LLC, a Nevada limited liability company

19. Air Repair Limited Liability Company, a Hawaii limited liability company

20. Alii Aviation, LLC, a Hawaii limited liability company

21. Hawaii Helicopters, LLC, a Hawaii limited liability company

**Exhibit E**

**PCBA Documentation Principles**

# PCBA DOCUMENTATION PRINCIPLES

## SUMMARY OF AGREED TERMS

*This summary of documentation principles (this "**Summary of Agreed Terms**") outlines certain agreed terms of the Purchase Commitment and Backstop Agreement. The executed Purchase Commitment and Backstop Agreement, if any, will constitute the sole agreement among the parties with respect to the matters addressed herein. Such final documentation will be subject to the consent rights contained in the Restructuring Support Agreement to which this Summary of Agreed Terms is attached (the "**RSA**").*

*This Summary of Agreed Terms does not attempt to describe all of the terms, conditions, and requirements that would pertain to the Purchase Commitment and Backstop Agreement, but rather is intended to be a summary outline of certain material terms of such agreement. Capitalized terms used herein but not defined have the respective meanings ascribed to such terms in the Purchase Commitment and Backstop Agreement (the "**BCA**").*

| | | |
|---|---|---|
| **Commitment Rights:** | **Transfer** | The BCA shall include unrestricted transfer rights for the Commitment Parties to transfer their Backstop Commitments and/or Private Placement Commitments, in whole or in part, to their Related Funds, or to other Commitment Parties and/or their Related Funds (each transferee Related Fund must sign a joinder and/or an amendment to the BCA and the RSA, as applicable). |
| | | The BCA shall also allow transfer rights for the Commitment Parties to transfer their Backstop Commitments and/or Private Placement Commitments, in whole or in part, to other third parties (an "**Outside Transfer**"). The Company may have a consent right over an Outside Transfer, but for the avoidance of doubt, it shall not have a consent right over Outside Transfers effected by Commitment Parties that are prohibited or precluded by applicable regulatory requirements from fulfilling their Backstop Commitments and/or Private Placement Commitments under the BCA and/or receiving their New Interests in the form of New Common Stock, in whole or in part. Each Commitment Party's Outside Transfers are limited to no more than four (4) transferees and, prior to effecting an Outside Transfer, the transfer needs to be presented to the other Backstop Parties who are not prohibited or precluded. For the avoidance of doubt, in the case of any Outside Transfer, the transferor and transferee must execute a joinder or amendment to the BCA and RSA, as applicable, in accordance with the terms thereof. |

**Consent Rights:**

The providers of new money that are the Commitment Parties under the BCA shall have fulsome additional consent rights incremental to the consent rights under the RSA. Moreover, in order to prevent outcomes adverse to the interests of the Commitment Parties that are not a Sponsor Commitment Party or an Affiliate of a Sponsor Commitment Party, (i) any Sponsor Commitment Party and its Affiliates shall not be permitted to receive, by way of transfer or otherwise, directly or indirectly, any additional DRO Backstop Commitments other than their initial allotment (allotted ratably on the basis of their Allowed Prepetition Secured Loan Claims), (ii) the DRO Backstop Commitments held by any Sponsor Commitment Party and/or any of its Affiliates shall be disregarded for purposes of consents and voting under the BCA, and (iii) any Sponsor Commitment Party and/or its Affiliates shall be disregarded for purposes of meeting the minimum number of unaffiliated persons that are required for meeting certain consent thresholds.

**Cash Break Fee:**

The following events shall trigger the payment of a "cash break fee" (e.g., the DRO Backstop Commitment Termination Premium, the ERO Backstop Commitment Termination Premium, and the Private Placement Commitment Termination Premium) under the BCA: (x) the Debtor's invocation of the fiduciary out and (y):

(i) the Debtors terminating the BCA:

    a.  upon the occurrence of a "Company Termination Event" under the RSA (other than pursuant to Section 6.04(b) of the RSA (if the principal cause is unrelated to a breach of any Debtor), Section 6.04(c) of the RSA (if the principal cause is unrelated to a breach of any Debtor), Section 6.04(d) of the RSA, Section 6.04(j) of the RSA (solely in the case of a filing by an Initial Consenting Creditor referenced therein), or due to certain circumstances related to breaches of Consenting Creditors under the RSA; or

    b.  due to the Backstop Order or the Confirmation Order having been reversed, dismissed or vacated (if such Order, in each case, has not been reversed, stayed, or vacated within seven (7) Business Days of the entry of such Order),

provided that such termination does not occur as a result of any action by a Commitment Party or a failure of a Commitment Party (in each case, other than a Sponsor Commitment Party) to take actions required by the RSA or the BCA;

(ii) the creditors terminating the BCA:

    a. upon the occurrence of a "Creditor Termination Event" under the RSA (other than pursuant to Section 6.02(h) of the RSA);

    b. if the Closing Date has not occurred by the Outside Date (subject to certain permitted extensions by consent);

    c. upon certain breaches of any Debtor of contractual arrangements under the BCA, to the extent not cured (if curable); or

    d. due to the occurrence of a Material Adverse Effect having occurred within a defined period of time (and carving out the Chapter 11 Cases and related events) (but excluding any Material Adverse Effect that occurred prior to the signing of the BCA (to the extent in the public domain or disclosed in diligence process prior to signing the BCA))

and in the case of any of the last three bullets, provided that such termination does not occur as a result of any action by a Commitment Party or a failure of a Commitment Party (in each case, other than a Sponsor Commitment Party) to take actions required by the RSA or this Agreement.

The cash break fee will equal (i) with respect to the DRO, 9.0% of Plan Equity Value and (ii) with respect to the ERO and Private Placement, 8.0% of the aggregate committed amount of $135 million, calculated at a 35% discount to Plan Equity Value.

**Sponsor Commitment Parties**    The Consenting Sponsor and its affiliates shall have the opportunity to participate as a DRO Backstop

Commitment Party on a pro rata basis (on account of Prepetition Secured Loan holdings) with the other Consenting Creditor DRO Backstop Commitment Parties. Any proposed amendment, restatement, modification or change that would disproportionately and adversely affect a Sponsor Commitment Party vis-à-vis other similarly situated Commitment Parties shall require the prior written consent (with email being sufficient) of each affected Sponsor Commitment Party.

**<u>Schedule I</u>**

**DIP Commitments and DIP Backstop Commitments**

INTENTIONALLY OMITTED